**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and Debtors-in-Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| Duro Dyne National Corp., *et al.*[1] | Case No. 18-27963 (MBK) |
| Debtors. | (Jointly Administered) |

<div align="center">

**CERTIFICATION OF JEFFREY D. PROL**

</div>

I, Jeffrey D. Prol, am an partner at Lowenstein Sandler LLP, counsel to the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases. I make this certification in support of confirmation of the Debtors' Second Amended Prenegotiated Plan of Reorganization, and state as follows:

1.      The Bayshore Mortgage, which is Exhibit 1 to the Note Issuance Agreement, shall be substantially in the form annexed hereto as Exhibit A.

2.      The Fairfield Mortgage, which is Exhibit 2 to the Note Issuance Agreement, shall be substantially in the form annexed hereto as Exhibit B.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Duro Dyne National Corp. (4664); Duro Dyne Machinery Corp. (9699); Duro Dyne Corporation (3616); Duro Dyne West Corp. (5943); and Duro Dyne Midwest Corp. (4662).

3.      A revised version of the Duro Dyne Asbestos Personal Injury Trust Agreement which is Exhibit A to the Plan is annexed hereto as Exhibit C.

4.      A revised version of the Duro Dyne asbestos Personal Injury trust Distribution Procedures which is Exhibit F to the Plan is annexed hereto as Exhibit D.

5.      A copy of the form of Claimant Release is annexed hereto as Exhibit E.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 5, 2019                            */s/ Jeffrey D. Prol*
                                                  Jeffrey D. Prol, Esq.

EXHIBIT A

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/18/2018 1/15/2019 Revision
COMMON INTEREST PRIVILEGE

# MORTGAGE AGREEMENT[1]

by

## DURO DYNE SPENCE LLC

**as mortgagor**

**(Mortgagor)**

**in favor of**

## DURO DYNE ASBESTOS PERSONAL INJURY TRUST

**as mortgagee**

**(Mortgagee)**

**County: [Suffolk]**

**Block: [BLOCK]**

**Lot: [LOT]**

**Premises: [81 Spence Street, Bay Shore, New York]**

**Dated: [DATE]**

---

**Record and Return to:**

Lowenstein Sandler LLP

One Lowenstein Drive

Roseland, New Jersey 07068

Attn: Jeffrey D. Prol, Esq.

[1] NTD: Revise to satisfy State-specific recording requirements.

08/30/2018 50077031.9

PRIVILEGED & CONFIDENTIAL
YCST ~~8/30/2018 Edits to LS EDITS    8/16/2018~~1/15/2019 Revision
COMMON INTEREST PRIVILEGE

# MORTGAGE AGREEMENT

This Mortgage Agreement (this "**Mortgage**"), made as of the [DATE] day of [MONTH], ~~2018~~2019 by DURO DYNE SPENCE LLC, a New York limited liability company, having an address at [ADDRESS] ("**Mortgagor**") to DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust, established pursuant to the Plan of Reorganization (defined below), having an address at [ADDRESS] (together with its successors and assigns, "**Mortgagee**").

## RECITALS

A.    Mortgagor is the fee owner of that certain real property located at 81 Spence Street, Bay Shore, New York, described on Schedule A attached hereto and made a part hereof;

B.    This Mortgage is given to Mortgagee to secure a certain promise to pay in the original principal amount of Thirteen Million Five Hundred Thousand 00/100 DOLLARS ($13,500,000.00) (the "**Principal Obligation**"), which Principal Obligation is evidenced by that certain Asbestos Trust Promissory Note, dated as of [DATE], issued by Duro Dyne National Corp., an affiliate of Mortgagor, to Mortgagee, as the noteholder (as amended, amended and restated, supplemented, renewed or otherwise modified from time to time, the "**Trust Note**") and pursuant to that certain Plan of Reorganization (as defined below); and

C.    Mortgagor desires to secure the payment of the outstanding principal amount set forth in, and evidenced by, the Trust Note, together with all interest accrued and unpaid thereon and all other sums due to Mortgagee in respect of the Principal Obligation under the Trust Note, that certain Note Issuance and Security Agreement dated as of even date herewith by and between Duro Dyne National Corp., an affiliate of Mortgagor, Mortgagor, ISWR Ohio LLC, an affiliate of Mortgagor, and the Duro Dyne Asbestos Personal Injury Trust (the "**Note Issuance Agreement**"), and this Mortgage, and to secure the performance and observance of all the provisions hereof, of the Trust Note, and of all other documents, agreements, and certificates that are either or both executed and delivered in connection with the Note Issuance Agreement (all such obligations being hereinafter collectively referred to as the "**Secured Indebtedness**").

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, Mortgagor hereby represents, warrants, covenants, and agrees for the benefit of Mortgagee as follows:

## ARTICLE I
## DEFINITIONS

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS  8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

For purposes of this Mortgage, the following terms shall have the following meaning. Capitalized terms used in this Mortgage without definition shall have the meaning ascribed to such terms in the Note Issuance Agreement.

"**Applicable Law**" means, at any time with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Entity or its property or in respect of its operations or to any referenced circumstances or events.

"**Casualty**" has the meaning set forth in Section 4.04(e).

"**Environmental Law**" has the meaning set forth in Section 4.10(a).

"**Environmental Liens**" has the meaning set forth in Section 4.10(d).

"**Event of Default**" has the meaning set forth in the Note Issuance Agreement.

"**Fixtures and Equipment**" has the meaning set forth in Section 2.01(b).

"**Hazardous Substance**" has the meaning set forth in Section 4.10(a).

"**Improvements**" has the meaning set forth in Section 2.01(b).

"**Knowledge of Mortgagor**" means the knowledge of (i) any current member, manager, or officer of Mortgagor, and (ii) any current officer or director of Issuer, in each instance after reasonable inquiry.

"**Land**" has the meaning set forth in Section 2.01(a).

"**Leases**" has the meaning set forth in Section 2.01(d).

"**Mortgage**" has the meaning set forth in the introductory paragraph.

"**Mortgagee**" has the meaning set forth in the introductory paragraph.

"**Mortgagor**" has the meaning set forth in the introductory paragraph.

"**Mortgage Release**" has the meaning set forth in Section 6.01.

"**Net Proceeds**" means gross proceeds of the sale, transfer, or conveyance transaction less customary and usual closing costs.

"**Note Issuance Agreement**" has the meaning set forth in the Recitals.

"**Permitted Encumbrances**" means (i) the easements, covenants, restrictions, right-of-ways and other matters currently of record with respect to the Property, and Taxes that

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS — 8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

are not yet due and payable or that may thereafter be paid without penalty or that are being contested in good faith by appropriate proceedings, (ii) any municipal lien (other than with respect to Taxes), utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Land and Improvements if bonded off or released of record, (iii) any mechanics' or materialmen's liens that attach automatically under Applicable Law upon the commencement of any work upon, or delivery of any materials to, the Property and for which Mortgagor is not delinquent in the payment for any such work or materials; (iv) zoning, building and other similar restrictions; and (v) encumbrances that do not, individually or in the aggregate, materially impair the continued use, value, or operation of the Property and that do not, in the aggregate, exceed $5,000 in amount.

"**Plan of Reorganization**" means the *Second Amended* *Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code*, dated as of **[_____]**, 2018*2019*, which was confirmed by order entered by the United States Bankruptcy Court for the District Court of New Jersey on _____, 2018*2019*.

"**Proceeds**" has the meaning set forth in Section 2.01(h).

"**Property**" has the meaning set forth in Section 2.01.

"**Release**" has the meaning set forth in Section 4.10(a)(iii).

"**Remediation**" has the meaning set forth in Section 4.10(a)(iv).

"**Rents**" has the meaning set forth in Section 2.01(e).

"**Restoration**" shall mean the repair and restoration of any Property after a Casualty as nearly as possible to the condition such Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Mortgagee.

"**Secured Indebtedness**" has the meaning set forth in the Recitals.

"**Tenant-OwnedMade Improvments**" means improvements or fixtures located on the Property that are set forth on, or otherwisedotherwise described on, attached Exhibit A.[3] [NTD: Status?]

"**Trust Note**" has the meaning set forth in the Recitals.

## ARTICLE II
## GRANTS OF SECURITY

Section 2.01   **Property Mortgaged.** In order to secure the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, whether at the stated maturity, by acceleration, or otherwise, Mortgagor does hereby MORTGAGE, PLEDGE, BARGAIN, ASSIGN, TRANSFER, WARRANT, CONVEY, AND

[3] NTD: Subject to Charter Oak review with respect to effect on value of collateral package for Note.

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

GRANT, to Mortgagee the following property, rights, interests, and estates now owned, or hereafter acquired by Mortgagor (collectively, the "**Property**"):

(a)    all that certain tract or parcel of land lying and being in [Suffolk County, New York], and being more particularly described in Schedule A attached hereto and incorporated herein by this reference (the "**Land**");

(b)    all buildings, structures, and other improvements of every kind and nature whatsoever now or hereafter situated on the Land, exclusive of any Tenant-Owned Improvements (collectively, the "**Improvements**"), and any appliances, storm doors and windows, lighting, plumbing, pipes, pumps, tanks, conduits, sprinkler and other fire prevention or suppression, refrigeration, incineration, escalator, elevator, loading, security, water, steam, gas, electrical, telephone, cable, internet, switchboards, storm and sanitary sewer, drainage, HVAC, boilers, waste removal, or other utility equipment or systems, exclusive of any Tenant-Owned Improvements (collectively, the "**Fixtures and Equipment**") now or hereafter affixed to or located at the Land or the Improvements and all replacements, substitutions, and additions to the foregoing;

(c)    all easements, rights-of-way or use, strips and gores of land, streets, ways, alleys, passages, sewer rights, utility reservations and capacity rights, waters, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, minerals, royalties, privileges, liberties, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating, or pertaining to the Land or the Improvements, or any part thereof and the reversions, remainders, rents, issues, and profits thereof; and all land lying in the bed of any street, road, or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim, and demand whatsoever, both at law and in equity, of Mortgagor of, in, and to the Land and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(d)    all leasehold estates, leases, subleases, sub-subleases, licenses, concessions, occupancy agreements, or other agreements (written or oral, now or at any time in effect and every modification, amendment, or other agreement relating thereto, including every guarantee of the performance and observance of the covenants, conditions, and agreements to be performed and observed by the other party thereto) which grant a possessory interest in, or the right to use or occupy, all or any part of the Land or Improvements, together with all related security and other deposits (in each case, as amended, amended and restated, supplemented, renewed, extended, substituted, or otherwise modified from time to time, collectively, "**Leases**"); for the avoidance of doubt, the term "Leases" shall include the Bay Shore Lease, as amended, amended and restated, modified, supplemented, or extended from time to time;

(e)    all rents (whether denoted as advance rent, minimum rent, percentage rent, additional rent, or otherwise), receipts, issues, income, revenues, profits, deposits (whether denoted as security deposits or otherwise), lease termination fees or payments,

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

rejection damages, buy-out fees, and any other fees made or to be made in lieu of rent, any award made hereafter to Mortgagor in any court proceeding involving any tenant, lessee, licensee, or concessionaire under any of the Leases, and all other payments, rights and benefits of whatever nature from time to time due under any of the Leases, including, without limitation, (i) rights to payment earned or arising under the Leases for space in the Improvements for the operation of ongoing businesses, and (ii) all other income, consideration, issues, accounts, profits, or benefits of any nature arising from the ownership, possession, use, or operation of the Property (collectively, the "**Rents**");

(f)    all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications, and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management, or operation of the Land and any part thereof and any Improvements and all right, title, and interest of Mortgagor therein and thereunder, including, without limitation, the right, upon the happening of any default or Event of Default hereunder, to receive and collect any sums payable to Mortgagor thereunder;

(g)    all trade names, trademarks, logos, copyrights, goodwill, and books and records relating to or used in connection with the operation of the Property by Mortgagor or any part thereof; all general intangibles related to the operation of the Property by Mortgagor now existing or hereafter arising;

(h)    all insurance or other settlement proceeds relating to or arising out of the foregoing, or any portion of the foregoing, and all causes of action, claims, compensation, awards, damages, proceeds, payments, relief, or recoveries, including interest thereon, as a result of any casualty or condemnation of all or any part of the Property or for any damage or injury to the Property (collectively, the "**Proceeds**"); and

(i)    any and all other rights of Mortgagor in and to the items set forth in subsections (a) through (i) above.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever; PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall be well and truly paid the Secured Indebtedness at the time and in the manner provided in the Trust Note, Note Issuance Agreement, and this Mortgage, if Mortgagor shall perform the other obligations as set forth in this Mortgage and the other Credit Documents, and if Mortgagor shall abide by and comply with each and every covenant and condition set forth herein and therein, these presents and the estate hereby granted shall cease, terminate, and be void.

**Section 2.02    Absolute Assignment of Rents.** Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title, and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Mortgage, Mortgagee grants to Mortgagor a revocable

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS — 8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

license to (i) collect, receive, use, and enjoy the Rents, and (ii) enforce the terms of, and perform the obligations of the landlord under, the Leases.

## ARTICLE III
## SECURED INDEBTEDNESS

**Section 3.01   Secured Indebtedness.** This Mortgage and the grants, assignments, and transfers made in Article II are given for the purpose of securing the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, whether at the stated maturity, by acceleration, or otherwise.

**Section 3.02   Incorporation by Reference.** All the covenants, conditions, and agreements of Mortgagor contained in the Note Issuance Agreement, are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.  To the extent that any such covenants, conditions, and agreements of Mortgagor contained in the Note Issuance Agreement conflict with those in this Mortgage, then the covenants, conditions, and agreements of Mortgagor contained in this Mortgage shall control.

## ARTICLE IV
## MORTGAGOR'S REPRESENTATIONS, WARRANTIES, AND COVENANTS

**Section 4.01   No Transfers.** Mortgagor shall not sell, transfer, or otherwise convey the Land and Improvements except as set forth in Section 4.02 below.  Nor shall Mortgagor create, incur, assume, or suffer to exist any Lien, other than Permitted Encumbrances, on any portion of the Property or permit any such action to be taken.

**Section 4.02   Permitted Transfer.** Notwithstanding anything to the contrary contained herein, Mortgagor shall be permitted to sell, transfer, and convey the Land and Improvements, *provided* that (a) the Net Proceeds of such transaction are applied to the payment of the Secured Indebtedness, (b) Mortgagor or an affiliate thereof provides substitute collateral to Mortgagee in reasonably equivalent value to the Property, and a mortgage agreement, in the form of this Mortgage (with property and State-specific modifications), is provided to Mortgagee with respect to any such substitute real property collateral, or (c) a combination of clauses (a) and (b) (*i.e.*, if only a portion of the Net Proceeds are applied against the Obligations, then the value of the substitute collateral that would otherwise be required by clause (b) shall be reduced by the amount of such application against the Secured Indebtedness). In the event of a sale, transfer, or conveyance of the Land and Improvements, it shall be at Mortgagor's option to proceed using either of clauses (a), (b), or (c).

**Section 4.03   Warranty of Title.**

(a)      Mortgagor represents and warrants that it possesses fee simple title to the Land and owns the Improvements (including any Tenant-Made Improvements), Fixutres and Equipment, and the balance of the Property, free and clear of all Liens other than

-7-

PRIVILEGED & CONFIDENTIAL
YCST  8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

Permitted Encumbrances. Mortgagor shall forever warrant, defend and preserve such title and priority of the Mortgage against claims of all Entities whatsoever.

(b)      Mortgagor further represents and warrants that all of the Improvements (including any Tenant-Made Improvements) and Fixtures and Equipment situated on the Land lie wholly within the boundaries and building restriction lines of the Land, and no improvements on adjoining properties encroach upon the Land, and no easements or other encumbrances upon the Land encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those that are insured against by any applicable title insurance policy.

### Section 4.04   Insurance.

(a)      Mortgagor represents and warrants that it has obtained or caused to be obtained and delivered to Mortgagee all insurance policies that provide insurance coverage of any kind on the Property, including any blanket insurance which may cover the Property and other property not subject to this Mortgage, and all such insurance policies (i) reflect insurance coverage on the Property that is consistent with the coverages maintained by Mortgagor on the Property for the ten-year period preceding the date of this Mortgage, (ii) contain the standard New York mortgagee non-contribution clause endorsement or an equivalent endorsement satisfactory to Mortgagee naming Mortgagee as the person to which all payments made by the insurer thereunder shall be paid or name Mortgagee as an additional insured, and (iii) are otherwise in form and substance satisfactory in all respects to Mortgagee.

(b)      Mortgagor further represents and warrants that no claims have been made or are currently pending, outstanding, or otherwise remain unsatisfied under any insurance policy obtained and delivered under subsection (a), and neither Mortgagor nor any other Entity has done, by act or omission, anything that would impair the coverage of any such insurance policy.

(c)      Mortgagor shall pay or cause to be paid the premiums for all insurance policies described in subsection (a) as the same become due and payable, and Mortgagor shall at all times comply with and shall cause the Property and the use, occupancy, operation, maintenance, alteration, repair, and restoration thereof to comply with the terms, conditions, stipulations, and requirements of such insurance policies.

(d)      If at any time Mortgagee is not in receipt of written evidence that all insurance required hereunder is in force and effect, Mortgagee shall have the right without notice to Mortgagor to take such action as Mortgagee deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Mortgagee, in its sole discretion, deems appropriate, and all expenses incurred by Mortgagee in connection with such action or in obtaining such insurance and keeping it in effect shall be secured by this Mortgage and paid by Mortgagor to Mortgagee **upon demand**.

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS—8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

(e)     If the Property shall be damaged or destroyed, in whole or in part, by fire or other property hazard or casualty (any such event, a "**Casualty**"), Mortgagor shall give prompt notice thereof to Mortgagee. Proceeds of insurance paid to Mortgagee by any insurer in connection with any Casualty shall be applied as follows:

(i)     If the Proceeds shall be less than $100,000.00 and the costs of completing the Restoration shall be less than $100,000.00, the Proceeds will be disbursed by Mortgagee to Mortgagor upon receipt, provided that all of the conditions set forth in Section 4.04(e)(ii)(A) below, excluding Section 4.04(e)(ii)(A)(7), are satisfied and Mortgagor delivers to Mortgagee a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(ii)     If the Proceeds are equal to or greater than $100,000.00 or the costs of completing the Restoration is equal to or greater than $100,000.00, Mortagee shall make the Proceeds available for the Restoration in accordance with the provisions of this Section 4.04(ii).

(A)     The Proceeds shall be made available to Mortgagor as necessary to restore or replace the damaged or lost property in accordance with customary construction financing procedures and protections as reasonably determined by Mortgagee, provided that each of the following conditions are met:

(1)     no Event of Default shall have occurred and be continuing;

(2)     the Mortgagor has sufficient available economic resources to complete the Restoration;

(3)     Mortgagor shall commence the Restoration as soon as reasonably practicable, but in no event later than ninety (90) days after such Casualty, and shall diligently pursue the same to completion reasonably satisfactory to Mortgagee;

(4)     Mortgagee shall be reasonably satisfied that any operating deficits, including all scheduled payments of principal and interest under the Trust Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty will be covered out of (1) the Proceeds or (2) by other funds of Mortgagor or Duro Dyne National Corp.;

(5)     Mortgagee shall be reasonably satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date and (2)  such time as may be

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

required under all Applicable Law in order to repair and restore the Property to the condition it was in immediately prior to such Casualty;

(6)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Law;

(7)    the Restoration shall be done and completed by Mortgagor (or Mortgagor's agent) in an expeditious and diligent fashion and in compliance with all Applicable Law; and

(8)    such Casualty does not result in the loss of access to the Property or the Improvements. [NTD:   As discussed, Casualty has not resulted in destruction of all means of ingress and egress to property, e.g., earthquake]

(B)    Proceeds shall be held by Mortgagee in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 4.04(e), shall constitute additional security for the Secured Indebteness. The final disbursement of the Proceeds shall be disbursed by Mortgagee to, or as directed by, Mortgagor only upon completion of the Restoration, upon receipt of evidence satisfactory to Mortgagor, including without limitation an officer's certificate of the Mortgagor, that (1) all costs incurred in connection with the Restoration, including without limitation all materials installed and work and labor performed have been paid for in full, (2) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property (other than the liens imposed by this Mortgage and Permitted Encumbrances) that have not either been fully bonded to the satisfaction of Mortgagee and discharged of record, and (3) all required certificates of occupancy and approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities.

(C)    All Proceeds not required to be made available for the Restoration pursuant to the terms hereof may be retained and applied by Mortgagee toward the payment of the Secured Indebtedness, whether or not then due and payable in such order, priority, and proportions as Mortgagee, in its sole discretion.

The provisions contained herein with respect to insurance shall apply notwithstanding any contrary provisions of subdivision 4 of Section 254 of the Real Property Law of New York.

PRIVILEGED & CONFIDENTIAL
        YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

(f)    Mortgagor shall cooperate with Mortgagee in obtaining for Mortgagee the benefits of any insurance proceeds lawfully or equitably payable in connection with the Property or any part thereof, and Mortgagee shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by any Entity of the expense of an appraisal on behalf of Mortgagee in case of any casualty affecting the Property or any part thereof) out of such insurance proceeds.

**Section 4.05    Payment of Taxes.**

(a)    Mortgagor represents and warrants that it is not in default of payment of any Taxes due and payable on the Property.

(b)    Mortgagor shall pay or cause to be paid all Taxes on the Property prior to same becoming delinquent, and Mortgagor shall provide Mortgagee with written evidence satisfactory to Mortgagee that all Taxes have been timely paid within ten (10) calendar days of such payment.

(c)    If the Mortgagor (i) determines that it will be unable to pay any Taxes on the Property, or (ii) receives notice that it is in default on the payment of any Taxes on the Property, it must notify Mortgagee within three (3) Business Day of such determination or notice.

(d)    If at any time Mortgagee receives a notice from Mortgagor under subsection (c) or is not in receipt of written evidence that all Taxes have been timely paid by Mortgagor, Mortgagee shall have the right without notice to Mortgagor to take such action as Mortgagee in its sole discretion deems necessary to protect its interest in the Property, including, without limitation, paying Taxes on the Property and any penalties or other costs necessary to cure any default in the payment of Taxes on the Property, and all expenses incurred by Mortgagee in connection with such action shall be secured by this Mortgage and paid by Mortgagor to Mortgagee **upon demand.**

**Section 4.06    Condemnation.** In the event of a taking of any of the Property by any public or quasi-public authority through eminent domain or otherwise, Mortgagee may participate in any proceedings related to such taking, and Mortgagor shall from time to time deliver to Mortgagee all instruments requested by Mortgagee to permit such participation. Mortgagor shall, at its expense, diligently prosecute any such proceedings, and shall consult with Mortgagee, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Mortgagor shall not be relieved of any obligations under this Mortgage, and all parties to the Trust Note and the Note Issuance Agreement shall continue to perform their respective Obligations thereunder.  The Secured Indebtedness shall not be reduced until any condemnation award shall have been actually received and applied by Mortgagee, after the deduction of expenses of collection, to the reduction or discharge of the Obligations. Mortgagee shall not be limited to the interest paid on the condemnation award by the condemning authority but shall be entitled to receive out of the condemnation award interest at

-11-

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS  8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

the rate or rates provided in the Note Issuance Agreement or in the Trust Note. If the applicable Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of the condemnation award, Mortgagee shall have the right, whether or not a deficiency judgment on the Trust Note shall have been sought, recovered or denied, to receive the condemnation award, or a portion thereof, sufficient to pay the Secured Indebtedness.  Further, Mortgagor shall cooperate with Mortgagee in obtaining for Mortgagee the benefits of any condemnation or similar award lawfully or equitably payable in connection with the Property or any part thereof, and Mortgagee shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by any Entity of the expense of an appraisal on behalf of Mortgagor in case of any condemnation affecting the Property or any part thereof) out of such award.

## Section 4.07   Assignment of Leases and Proceeds Therefrom.

(a)      As of the date of this Mortgage, Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of its right, title, and interest in and to all Leases, whether now in existence or which may hereafter come into existence during the term of this Mortgage, (but without an assumption by Mortgagee of liabilities of Mortgagor under any such Leases by virtue of this assignment), and Mortgagor hereby absolutely and unconditionally assigns to Mortgagee the proceeds now or hereafter arising from the Leases to be applied by Mortgagee in payment of the Secured Indebtedness. Mortgagee may retain and apply such proceeds toward payment of the Secured Indebtedness in such order, priority, and proportions as Mortgagee, in its sole discretion, shall deem proper. Nevertheless, subject to the terms of this Mortgage and provided no Event of Default has occurred, Mortgagee grants to Mortgagor a revocable license to (i) collect, receive, use, and enjoy the Rents, and (ii) enforce the terms of, and perform the obligations of the landlord under, the Leases.  The license granted to Mortgagor in this subsection (a) shall terminate immediately upon the occurrence of an Event of Default and Mortgagor agrees (i) to hold any Rents collected or received on or after the date of such Event of Default in trust for Mortgagee; and (ii) to remit any Rents collected or received by Mortgagor on or after date of such Event of Default within one (1) Business Day.

(b)      Mortgagor shall not, without the prior written consent of Mortgagee, make, or suffer to be made, any Leases which are not in conformity with prevailing market rents and terms for similar space in the area where the leased Property is located ("**Prevailing Terms**"). Except as provided in subsection (c) below, Mortgagor will not modify or cancel or accept surrender of any Leases or assign the whole or any part of the rents thereon. Mortgagee shall have all of the rights against tenants of the Property as set forth in Section 291-f of the Real Property Law of New York.

(c)      Anything contained in subsection (b) to the contrary notwithstanding, and provided that no Event of Default exists, Mortgagor shall have the right to terminate or modify any existing Lease provided that the replacement Lease shall provide for the payment of rents that are on Prevailing Terms, shall be with a tenant having a credit rating at least as good as that of the existing tenant (or such tenant provides other credit enhancement tools) and shall contain such other terms and conditions as are comparable

PRIVILEGED & CONFIDENTIAL
YCST  8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

for property of like character in the area in which the leased Property is situated. Mortgagor shall on request furnish to Mortgagee a report of its leasing activities with respect to the Property.

(d)      Mortgagor shall (i) fulfill or perform, in all material respects, each and every provision of the Leases on the part of Mortgagor to be fulfilled or performed, (ii) promptly send copies of all notices of default which Mortgagor shall send or receive under the Leases to Mortgagee, and (iii) enforce, short of termination of the Leases, the performance or observance of the provisions thereof by the tenants thereunder. Nothing contained in this paragraph shall be construed as imposing on Mortgagee any of the obligations of the lessor under the Leases.

(e)      Mortgagor represents and warrants that there are no prior assignments of any Leases or any proceeds thereof.

**Section 4.08   Use and Maintenance of the Property.**

(a)      Mortgagor represents and warrants that the Land has rights of access to public ways and is served by water, storm sewer, sanitary sewer or septic services, and storm drain facilities adequate to service the Improvements and Fixtures and Equipment for their intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting such property (which are connected so as to serve such property without passing over other property) or in recorded easements serving such property. All roads necessary for the use of the Land and Improvements for their current purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

(b)      Mortgagor further represents and warrants that the Property is in good condition, order, and repair in all material respects; there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Mortgagor has not received notice from any insurance company or bonding company of any defects or inadequacies in such Property, or any part thereof, that would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(c)      Mortgagor further represents and warrants that there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(d)      Mortgagor further represents and warrants that none of the Improvements is located in an area identified by the Federal Emergency Management Agency as having special flood hazards.

PRIVILEGED & CONFIDENTIAL
YCST ~~8/30/2018 Edits to LS EDITS~~  ~~8/16/2018~~1/15/2019 Revision
COMMON INTEREST PRIVILEGE

(e)    Mortgagor shall cause the Property to be maintained in good working order and repair, normal wear and tear excepted, and the Improvements and the Fixtures and Equipment shall not be removed, demolished, or materially altered (except for normal replacement of the Fixtures and Equipment) without the prior written consent of Mortgagee. Mortgagor shall promptly comply, in all material respects, with all Applicable Laws affecting the Property, or any portion thereof or the use thereof. Mortgagor shall or shall cause the tenant to promptly repair, replace, or rebuild any part of the Property that may be damaged or destroyed by Casualty (including any fire or other property hazard or casualty for which insurance was not obtained or obtainable) or that may be affected by any taking by any public or quasi-public authority through eminent domain or otherwise, and shall complete and pay for, within a reasonable time, any structure at any time in the process of construction or repair on the Premises.  So long as this Mortgage is in effect, if such Casualty shall be covered by insurance, Mortgagor shall remain obligated to repair, replace or rebuild such portion of the Property notwithstanding that the Proceeds from insurance policies may be insufficient to effect such repair, replacement, or rebuilding or that Mortgagee shall exercise its rights under Section 4.04 hereof to retain and apply all or any portion of such proceeds to the Secured Indebtedness.

(f)    Except for Permitted Encumbrances, Mortgagor shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever that may be or become a Lien or charge against the Property or any part thereof and shall promptly pay for all utility services provided to the Property.

**Section 4.09    Property in Compliance with Applicable Law.**

(a)    Mortgagor represents and warrants that (i) the Property and the use of the Property comply in all material respects with all Applicable Laws and legal requirements, including building and zoning ordinances and codes, (ii) Mortgagor is not in default or violation of any order, writ, injunction, decree, or demand of any Governmental Authority, (iii) there has not been committed by Mortgagor or any other Entity in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof, and (iv) all Improvements and Fixtures and Equipment are in material compliance with Applicable Law.

(b)    Mortgagor further represents and warrants that all certifications, permits, licenses, and approvals, including certificates of completion and occupancy permits, required for the legal use, occupancy, and operation of the Property have been obtained and are in full force and effect, and the use being made of the Property is in conformity with the certificate of occupancy issued for such property.

(c)    Mortgagor further represents and warrants that no portion of the Property was purchased with proceeds of any illegal activity.

(d)    Mortgagor shall not, without obtaining the prior consent of Mortgagee, initiate, join in, or consent to any private restrictive covenant, zoning ordinance, or other

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS  8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

public or private restrictions, limiting or adversely affecting the uses that may be made of the Property or any part thereof.

(e)    Mortgagor shall not commit, and shall never permit any other Entity in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof.

## Section 4.10  Environmental Provisions.

(a)    For the purposes of this Section 4.10 the following terms shall have the following meanings:

(i)    the term **"Environmental Law"** shall mean any present and future Applicable Law (A) relating to protection of human health or the environment; (B) relating to Hazardous Substances (as defined below); (C) relating to liability for or costs of Remediation (as defined below) or prevention of Releases (as defined below) of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment; (D) conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (E) requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Entity, whether or not in connection with transfer of title to or interest in the Property; (F) imposing conditions or requirements in connection with permits or other authorization for lawful activity related to the environmental condition of Property; (G) relating to nuisance, trespass, or other causes of action related to the environmental condition of the Property; or (H) relating to wrongful death, personal injury, or property or other damage in connection with any environmental condition of the Property, including, without limitation, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

(ii)    the term **"Hazardous Substances"** shall mean any and all substances (whether solid, liquid, or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials,

PRIVILEGED & CONFIDENTIAL
        YCST 8/30/2018 Edits to LS EDITS  8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables, explosives, mold, mycotoxins, microbial matter and airborne pathogens (naturally occurring or otherwise), but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purpose of cleaning or other maintenance or operations, and otherwise in compliance with all Environmental Laws.

(iii)    The term "Release" shall mean, with regard to Hazardous Substances, any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing, or other movement of Hazardous Substances.

(iv)    The term "Remediation" shall mean any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain, or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

(b)    Mortgagor represents and warrants that to the Knowledge of Mortgagor:

(i)    There are no Hazardous Substances or underground storage tanks in, on, or under any of the Property, except those that are (A) in compliance with Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required under Environmental Law), (B) de-minimis amounts necessary to operate such property that will not result in an environmental condition in, on, or under such property and that are otherwise permitted under and used in compliance with Environmental Law, or (C) fully disclosed to Mortgagee in Schedule B hereto;

(ii)    there are no past, present, or threatened Releases of Hazardous Substances in, on, under, or from any of the Property that has not been fully remediated in accordance with Environmental Law;

(iii)    there is no threat of any Release of Hazardous Substances migrating to any of the Property;

(iv)    there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with any of the Property that has not been fully remediated in accordance with Environmental Law;

-16-

PRIVILEGED & CONFIDENTIAL
YCST  8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

(v)    Mortgagor does not know of, and has not received, any written or oral notice or other communication from any Entity (including a Governmental Authority) relating to Hazardous Substances or Remediation thereof, possible liability of any Entity pursuant to any Environmental Law, other environmental conditions in connection with any of the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and

(vi)    Mortgagor has truthfully and fully disclosed to Mortgagee in Schedule B hereto any and all information relating to environmental conditions in, on, under, or from the Property that is known to Mortgagor, and has provided to Mortgagee all information that is contained in Mortgagor's files and records, including any reports relating to Hazardous Substances in, on, under, or from the Property and to the environmental condition of the Property. [NTD: Intent is receipt of any existing Phase I or similar reports and any other items currently known to Mortgagor w/r/t the property]

(c)    Mortgagor shall comply, and shall cause all tenants or other occupants of the Property to comply, in all material respects with all Environmental Law and permits issued pursuant thereto.

(d)    Mortgagor covenants and agrees that:

(i)    there shall be no Releases of Hazardous Substances in, on, under, or from the Property or any part thereof requiring notification or disclosure under any Environmental Law with respect to which Mortgagor has not (A) commenced compliance with Mortgagor's obligations under clauses (iv) and (v), as applicable, within fifteen (15) calendar days after Mortgagee's written request or (B) satisfied Mortgagor's obligations under clauses (iv) and (v), as applicable, within 365 days (or such longer period to which Mortgagee may consent in Mortgagee's reasonable discretion) after Mortgagee's written request;

(ii)    there shall be no Hazardous Substances in, on, or under the Property or any part thereof, except those that are (A) in compliance with all Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required by Environmental Law), (B) de-minimis amounts necessary to operate the Property or any part thereof for the purposes for which it was used as of the date this Mortgage is executed that will not result in an environmental condition in, on, or under the Property or any part thereof and that are otherwise permitted under and used in compliance with Environmental Law, or (C) to the extent permits are required under Environmental Laws, fully disclosed to Mortgagee in writing;

(iii)    Mortgagee shall keep the Property free and clear of all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Mortgagor or any other Entity ("**Environmental Liens**");

PRIVILEGED & CONFIDENTIAL
YCST  8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

(iv)    if Mortgagee has reason to believe that an environmental hazard exists on the Property or any part thereof, Mortgagor shall, at its sole cost and expense and pursuant to any reasonable written request of Mortgagee, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property or any part thereof (including sampling, testing and analysis of soil, water, air, building materials, and other materials and substances, whether solid, liquid, or gas), and share with Mortgagee the reports and other results thereof, and Mortgagee shall be entitled to rely on such reports and other results thereof;

(v)    if Mortgagee has reason to believe that an environmental hazard exists on the Property or any part thereof, Mortgagor shall, at its sole cost and expense, comply with all reasonable written requests of Mortgagee to (A) reasonably effectuate Remediation of any condition (including a Release of a Hazardous Substance) in, on, under, or from such Property or any part thereof; (B) comply with any Environmental Law; (C) comply with any directive from any Governmental Authority; and (D) take any other reasonable action necessary or appropriate for protection of human health or the environment;

(vi)    Mortgagor shall not do or allow any Entity or other user of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any person or Entity (whether on or off the Property), impairs or may impair the value of the Property or any part thereof, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement, or easement applicable to the Property or any part thereof; and

(vii)    Mortgagor shall immediately notify Mortgagee in writing of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from, or migrating towards the Property or any part thereof in violation of Environmental Laws; (B) any non-compliance with any Environmental Laws related in any way to the Property or any part thereof; (C) any Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property or any part thereof; and (E) any written or oral notice or other communication of which Mortgagor becomes aware from any source whatsoever (including a Governmental Authority) relating in any way to the Release or potential Release of Hazardous Substances or Remediation thereof, likely to result in liability of any Entity pursuant to any Environmental Law, other environmental conditions in connection with the Property or any part thereof, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.

(e)    If Mortgagor fails to timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any such action described in subsections (d)(iv) or (d)(v), Mortgagee shall have the right, in its sole and absolute discretion, to make advances or payments toward the performance or satisfaction of the same, but shall in no event be

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

under any obligation to do so. All sums so advanced or paid by Mortgagee (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, will immediately, upon demand, become due and payable from Mortgagor and shall bear interest at the Interest Rate from the date any such sums are so advanced or paid by Mortgagee until the date any such sums are repaid by Mortgagor to Mortgagee.

(f)    If this Mortgage is foreclosed, or if the Property is sold pursuant to provisions of this Mortgage, of if Mortgagor tenders a deed or assignment in lieu of foreclosure or sale, Mortgagor shall deliver the Property to the purchaser at foreclosure or sale or to Mortgagee, its nominee, or a wholly owned subsidiary, as the case may be, in the same environmental condition as existed on the date of this Mortgage.

(g)    Mortgagor will defend, indemnify, and hold harmless Mortgagee from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) arising out of, or in any way related to, (i) any breach by Mortgagor of any of the provisions of this Section 4.10, (ii) the Release or threatened Release of any Hazardous Substance which is at, in, on, under, about, from or affecting the Property, including, without limitation, any damage or injury resulting from any such Hazardous Substance to or affecting the Property or the soil, water, air, vegetation, buildings, personal property, persons or animals located on the Property or on any other property or otherwise, (iii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any such Hazardous Substance, (iv) any lawsuit, proceeding or investigations brought or threatened, settlement reached, or order or directive of or by any Governmental Authority relating to such Hazardous Substance, or (v) any violation of any Environmental Law or any policy or requirement of Mortgagee under this Section 4.10.

(h)    The obligations and liabilities of Mortgagor under this Section 4.10 shall survive and continue in full force and effect and shall not be terminated, discharged, or released, in whole or in part, irrespective of whether the Secured Indebtedness has been paid in full and irrespective of any foreclosure of this Mortgage, sale of the Property pursuant to the provisions of this Mortgage or acceptance by Mortgagee of a deed or assignment in lieu of foreclosure or sale and irrespective of any other fact or circumstance of any nature whatsoever.

**Section 4.11  Truth of Statements Made Herein.** The Mortgagor represents and warrants that this Mortgage neither contains any untrue statements of material fact nor omits any material fact necessary in order to make the statement made, in light of the circumstances under which it is made, accurate.

PRIVILEGED & CONFIDENTIAL
YCST ~~8/30/2018 Edits to LS EDITS   8/16/2018~~1/15/2019 Revision
COMMON INTEREST PRIVILEGE

**Section 4.12   Survival of Representations and Warranties.** All representations and warranties contained in this Mortgage shall survive the execution and delivery of this Mortgage.

# ARTICLE V
# REMEDIES

**Section 5.01   Remedies Following Event of Default.** If an Event of Default exists, in addition to any other rights, remedies, and powers that Mortgagee may have under the Trust Note or the Note Issuance Agreement, or as provided by law, Mortgagee may immediately take such action, without notice or demand, as it deems advisable to protect and enforce the Lien and security interest hereof and its rights hereunder, including, without limitation, the following actions, concurrently or otherwise, at such time and in such manner as Mortgagee may determine in its sole discretion, without impairing or otherwise affecting the other rights, remedies, and powers of Mortgagee:

(a)     **Entry and Possession.** The license granted to Mortgagor under Section 2.02 hereof shall automatically be revoked, and Mortgagee may enter into or upon the Property, either personally or by its agents, nominees, or attorneys, and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages, or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records, and accounts relating thereto, and Mortgagor agrees to surrender possession of the Property and of such books, records, and accounts to Mortgagee upon demand, and thereupon Mortgagee may (i) use, operate, manage, control, insure, maintain, repair, restore, improve, alter, and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce, or modify Leases, obtain and evict tenants, and demand, sue for, collect, and receive all Rents of the Property and every part thereof; (iii) apply the receipts and income (including Rents) from the Property to the payment of the Secured Indebtedness, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations; and (iv) require Mortgagor to transfer and assign to Mortgagee, in form satisfactory to Mortgagee, Mortgagor's interest as lessor in any Lease now or hereafter affecting the whole or any part of the Property.

(b)     **Payment of Sums.** Pay any sums in any form or manner deemed expedient by Mortgagee to protect the Lien and security interest of this Mortgage or to cure any Event of Default other than payment of principal of or interest on the Secured Indebtedness; make any payment hereby authorized to be made according to any bill, statement, or estimate furnished or procured from the appropriate public officer or the party claiming payment without inquiry into the accuracy or validity thereof, and the receipt of any such public officer or party in the hands of Mortgagee shall be conclusive evidence of the validity and amount of items so paid, in which event the amounts so paid, shall be added to and become a part of the Secured Indebtedness and be immediately due

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS - 8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

and payable to Mortgagee; and Mortgagee shall be subrogated to any encumbrance, Lien, claim, or demand, and to all the rights and securities for the payment thereof, paid or discharged with the principal sum secured hereby or by Mortgagee under the provisions hereof, and any such subrogation rights shall be additional and cumulative security to this instrument.

(c)     **Acceleration.** Declare the entire Secured Indebtedness immediately due, payable, and collectible, regardless of maturity, and, in that event, the entire Secured Indebtedness shall become immediately due, payable, and collectible; and thereupon Mortgagee may institute proceedings to foreclose this Mortgage by judicial action, or to enforce its provisions or any of the indebtedness or obligations secured by this Mortgage.

(d)     **Foreclosure Sale.** Institute a foreclosure action in accordance with Applicable Law in effect on the date foreclosure is commenced, or take any other action as may be allowed, at law or in equity, for the enforcement of the Secured Indebtedness and realization on the Property (or such part or parts thereof as Mortgagee may from time to time elect to foreclose upon). If Mortgagee is the purchaser at the foreclosure sale of the Property, in lieu of paying cash Mortgagee may make settlement for all or a portion of the purchase price by crediting the sale proceeds against the Secured Indebtedness.

(e)     **Other Rights.** Exercise any and all rights, remedies, and powers accruing to a secured party under this Mortgage, any other Applicable Law, or available in equity.

**Section 5.02   No Obligation to Marshal Assets.** In exercising its rights and remedies hereunder, Mortgagee shall have no obligation whatsoever to marshal assets, or to realize upon all of the Property. Mortgagee shall have the right to realize upon all or any part of the Property from time to time as Mortgagee deems appropriate. Mortgagor hereby waives any right to have any of the Property marshaled in connection with any sale or other exercise of Mortgagee's rights, remedies, and powers hereunder.

**Section 5.03   Remedies Cumulative.** The rights, powers, and remedies of Mortgagee granted and arising under this Mortgage are separate, distinct, and cumulative of all other rights, powers, and remedies that Mortgagee may have at law or in equity, none of which are to the exclusion of the others and all of which are cumulative to the rights, powers, and remedies provided at law for the collection of indebtedness, enforcement of rights under mortgages, and preservation of security. No act of Mortgagee shall be construed as an election to proceed under any one provision herein or under the Trust Note or Note Issuance Agreement to the exclusion of any other provision, or an election of remedies to the bar of any other remedy allowed at law or in equity, anything herein or otherwise to the contrary notwithstanding.

**Section 5.04   No Waiver.** No failure or delay of Mortgagee of any kind in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  No waiver by Mortgagee of any Event of Default or breach of this Mortgage shall operate as a waiver of any other Event of Default or breach of this Mortgage or of the same

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS—8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

Event of Default or breach of this Mortgage on a future occasion, and no action by Mortgagee hereunder shall in any way affect or impair Mortgagee's rights and remedies or the obligations of Mortgagor under this Mortgage.

## ARTICLE VI
## RELEASE OF MORTGAGE

**Section 6.01   Release on Satisfaction of Secured Indebtedness.** If at any time during the period of this Mortgage the Secured Indebtedness has been paid and performed in full, no indebtedness remains outstanding under the Trust Note, then Mortgagee will, upon written request of Mortgagor and at Mortgagor's sole cost and expense, execute and deliver to Mortgagor a release, reconveyance, satisfaction, or cancellation (a "**Mortgage Release**") of this Mortgage and such other documentation as may be reasonably necessary to effectuate the release and termination of Mortgagee's Liens and security interests on the Property.

**Section 6.02   Release on Sale or Transfer of Property.** If the Property or any portion thereof is sold or otherwise transferred in accordance with the provisions of Section 4.02 above, then Mortgagee will, upon written request of Mortgagor and at Mortgagor's sole cost and expense, execute and deliver to Mortgagor a Mortgage Release of this Mortgage with respect to such portion of the Property as is so sold or transferred and such other documentation as may be reasonably necessary to effectuate the release and termination of Mortgagee's liens and security interests on such portion of the Property.

## ARTICLE VII
## NOTICES

**Section 7.01   Notices.** Unless specifically stated otherwise in this Mortgage, all notices, requests, and other communications to Mortgagor or Mortgagee shall be in writing and shall be given to such party at its address set forth below or at such other address as such party may hereafter specify in writing for the purpose of receiving notices hereunder. Each such notice, request, or other communication shall be effective and deemed received by Mortgagor or Mortgagee, as applicable, (a) if given by a nationally recognized overnight courier service sent for next Business Day delivery, on the first (1st) Business Day after such communication is deposited with such courier service; or (b) if given by certified mail, return receipt requested, on the third (3rd) Business Day after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid.

To Mortgagor:                81 Spence Street

Bay Shore, New York 11706

Attn: Patrick Rossetto

To Mortgagee:                [ADDRESS]

-22-

PRIVILEGED & CONFIDENTIAL
YCST ~~8/30/2018 Edits to LS EDITS~~ ~~8/16/2018~~ 1/15/2019 Revision
COMMON INTEREST PRIVILEGE

**Section 7.02**  All notices and demands delivered by 'an attorney for Mortgagor or Mortgagee on such party's behalf shall be deemed to have been delivered by such party. Notices shall be valid only if served in the manner provided in this Article VII.

## ARTICLE VIII
## INSURANCE; CASUALTY AND CONDEMNATION

**Section 8.01   Insurance.** Mortgagor shall provide or cause to be provided the following: (a) fire and extended coverage insurance including vandalism and malicious mischief, broadened to the so-called "All Risk of Physical Loss" coverage basis of not less than one hundred (100%) percent of the full replacement value of the insured property (both real and personal, including fixtures and equipment) at the time of issuance of such policy or policies and at each renewal date thereof, exclusive of land, excavations, foundations, and other items normally excluded from such policies; (b) public liability insurance in an amount not less than One Million and 00/100 Dollars ($1,000,000.00) and umbrella liability insurance of not less than Five Million Dollars ($5,000,000.00) and workers' compensation insurance (if applicable); and (c) in the event any part of the Property is now or is hereafter determined by the Secretary of Housing and Urban Development ("**HUD**") or the Director of the Federal Emergency Management Agency ("**FEMA**") to be in a "Special Flood Hazard Area," Mortgagor covenants to provide flood insurance providing coverage at least equivalent to that provided under the National Flood Insurance Program ("**NFIP**"), in the Special Flood Hazard Area, the aggregate amount of flood insurance must equal, at a minimum, (i) the amount of flood insurance available under NFIP, (ii) the insurable value of all buildings, or (iii) such other amount as may reasonably be required by Mortgagee; or, if only part of the Property is in a Special Flood Hazard Area, the insurable buildings exposed to flood hazards must be covered by flood insurance in an aggregate amount equal at a minimum (x) the amount of flood insurance available under NFIP, (y) the insurable value of the exposed building, or (z) such other amount as may reasonably be required by Mortgagee.  All insurance policies shall be in the form and substance, for amounts and in companies reasonably acceptable to Mortgagee, with annual premiums prepaid by Mortgagor, shall contain non-contributory standard mortgagee and Mortgagee's loss payable clauses (as Mortgagee may require) effective as of the closing date, providing for any loss payable thereunder to be paid to Mortgagee, shall provide that the policy may not be canceled without thirty (30) calendar days' prior written notice to Mortgagee and shall be deposited with Mortgagee at any time while any part of the Secured Indebtedness remains outstanding.

**Section 8.02   Notice to Mortgagee.**  Mortgagor shall give Mortgagee prompt written notice (which shall in no event be greater than seven (7) calendar days after such occurrence) of the occurrence of any Casualty affecting, or the institution of any proceedings for eminent domain or condemnation of, the Property or any portion thereof.  Mortgagee may participate in any suits or proceedings relating to any such occurrence of Casualty or institution of proceedings for eminent domain or condemnation, or any proceeds, causes of action, claims, compensation, awards, or recoveries related thereto, and Mortgagee is hereby authorized, in its own name or in Mortgagor's name, to adjust any loss covered by insurance or any condemnation claim or cause

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

of action, and to settle or compromise any claim or cause of action in connection therewith, and Mortgagor shall from time to time upon request deliver to Mortgagee any instruments required to permit such participation; *provided, however*, that, so long as no Event of Default shall be continuing, Mortgagee shall not have the right to participate in the adjustment of any loss.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01    Amendments, Extensions, and Modifications.** No amendment, supplement, waiver, or other modification of this Mortgage shall be effective unless it is in writing and executed by Mortgagor and Mortgagee.

**Section 9.02    Entire Agreement.** The Credit Documents and the Plan of Reorganization contain or incorporate by reference the entire agreement of the parties with respect to matter contemplated herein and supersede all prior negotiations. The Credit Documents and the Plan of Reorganization grant further rights to Mortgagee and contain further agreements and affirmative and negative covenants by Mortgagor that apply to this Mortgage and to the Property and such further rights and agreements are incorporated herein by this reference.

**Section 9.03    Successors and Assigns.** This Mortgage may be assigned or transferred, in whole or in part, by Mortgagee subject, in all events, to the terms and conditions of Section 16 of the Note Issuance Agreement. Mortgagor may not assign or transfer this Mortgage or any of its rights hereunder without the prior written consent of Mortgagee or as otherwise permitted by this Mortgage. This Mortgage shall inure to the benefit of and be binding upon the parties hereto and their permitted assigns. The terms "Mortgagor" and "Mortgagee" shall include the legal representatives, heirs, executors, administrators, successors, and assigns of the parties hereto, and all those holding under either of them. The term "Mortgagee" shall include any payee of the Secured Indebtedness and any transferee or assignee thereof, whether by operation of law or otherwise.

**Section 9.04    No Merger.** In the event that Mortgagee's interest under this Mortgage and title to the Property or any estate therein shall become vested in the same person or entity, this Mortgage shall not merge in such title but shall continue as a valid lien on the Property for the amount secured hereby, unless expressly provided otherwise in writing executed by the person in whom such interests, title, and estate are vested.

**Section 9.05    Headings.** The headings of the various articles, sections, and subsections in this Mortgage are for reference only and shall not define, expand, or limit any of the terms or provisions hereof.

**Section 9.06    Severability.** Whenever possible, each provision of this mortgage shall be interpreted in such manner as to be effective and valid under Applicable Law, but to the extent any provision of this Agreement is held to be invalid, void, voidable, prohibited, illegal, or unenforceable in any respect under any Applicable Law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction,

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Mortgage in any jurisdiction. Mortgagor shall use commercially reasonable efforts to replace such invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision of this Mortgage with an effective, valid, and enforceable provision that will achieve, to the fullest extent possible, the economic, business, and other purposes of the invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision; *provided, however*, that no provision of this Mortgage shall be replaced without the consent of Mortgagee.

Section 9.07   Governing Law. This Mortgage and any claim, controversy, dispute, or cause of action (whether in contract, equity, tort, or otherwise) based upon, arising out of, or relating to this Mortgage and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

Section 9.08   Waiver of Jury Trial.

(a)   MORTGAGOR           HEREBY        IRREVOCABLY        AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR   INDIRECTLY   RELATING   TO   THIS   MORTGAGE,   THE   SECURED INDEBTEDNESS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, EQUITY, TORT, OR ANY OTHER THEORY.   MORTGAGOR AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY BENCH TRIAL WITHOUT A JURY AND THAT ANY PARTY THERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH PARTY TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.

(b)   MORTGAGOR RESPRESENTS AND WARRANTS TO HAVING DISCUSSED, OR HAVING HAD AN OPPORTUNITY TO DISCUSS, THIS AGREEMENT AND SPECIFICALLY THE PROVISIONS OF THIS SECTION 9.08 WITH COUNSEL OF ITS OWN CHOOSING.

Section 9.09   Service of Process and Jurisdiction.

(a)   Unless otherwise required by non-waivable provisions of Applicable Law, Morgagor consents to service of process by overnight mail or overnight delivery by a nationally recognized overnight courier, at the addtess to which notic is to be given under Section 7.01 hereof, it being agreed that service in such manner shall constitute valid service upon Mortgagor in connection with any action or proceeding arising out of, connected with, related to, or incidental to this Mortgage; provided, however, that nothing in this Section 9.08 shall affect the right of any Entity to serve legal process in any other manner permitted by Applicable Law of the jurisdiction in which such action or proceeding is brought.

-25-

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS — 8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

(b)     Except as provided in subsection (c) below, Mortgagor irrevocably agrees that all disputes arising out of, connected with, related to, or incidental to this Mortgage, whether arising in contract, tort, or otherwise, must be resolved exclusively by state or federal courts located in Trenton, New Jersey, and Mortgagor irrevocably waives any objection to the location of the court considering the dispute or any claim that Mortgagor is not personally subject to the jurisdiction of such court; however, any appeals from those courts may be heard by a court outside of Trenton, New Jersey.

(c)     Mortgagee shall have the right to proceed in a court in any location to enable Mortgagee (1) to obtain personal jurisdiction over any Entity or any property of any Entity, including any of the Property, (2) to institute a foreclosure action in accordance with Section 5.01(d), (3) to enforce any part of the Lien and security interest granted under this Mortgage, including, without limitation, the collection or recovery of Rents, or (4) to enforce a judgment or other court order in favor of Mortgagee. Mortgagor waives any objection to the location of the court in which Mortgagee has commenced a proceeding described in this subsection.

**Section 9.10   Sole Discretion of Mortgagee.** Except as may otherwise be expressly provided to the contrary, wherever, pursuant to this Mortgage or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the Secured Indebtedness, Mortgagee exercises any right given to it to consent or not consent, or to approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to consent or not consent, or to approve or disapprove, or to decide that arrangements or terms are satisfactory or not satisfactory, shall be in the sole and absolute discretion of Mortgagee and shall be final and conclusive.

**Section 9.11   Reasonableness.** If at any time Mortgagor believes that Mortgagee has not acted reasonably in granting or withholding any approval or consent under the Note, this Mortgage, or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the loan secured hereby, as to which approval or consent either (i) Mortgagee has expressly agreed to act reasonably, or (ii) absent such agreement, Applicable Law would nonetheless require Mortgagee to act reasonably, then Mortgagor's sole remedy shall be to seek injunctive relief or specific performance, and no action for monetary damages or punitive damages shall in any event or under any circumstance be maintained by Mortgagor against Mortgagee.

**Section 9.12   Waiver of Statutory Rights.** Mortgagor shall not and will not apply for or avail itself of any appraisement, valuation, stay, extension or exemption laws, or any so-called "Moratorium Laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, but hereby waives the benefit of such laws to the full extent that Mortgagor may do so under Applicable Law. Mortgagor for itself and all who may claim through or under it waives any and all right to have the property and estates comprising the Property marshaled upon any foreclosure of the lien of this Mortgage and agrees that any court having jurisdiction to foreclose such lien may order the Property sold as an entirety. Mortgagor hereby waives for itself and all who may claim through or under it, and to the

PRIVILEGED & CONFIDENTIAL
YCST ~~8/30/2018 Edits to LS EDITS~~ ~~8/16/2018~~1/15/2019 Revision
COMMON INTEREST PRIVILEGE

full extent Mortgagor may do so under applicable law, any and all rights of redemption from sale under any order of decree of foreclosure of this Mortgage or granted under any statute now existing or hereafter enacted.

**Section 9.13   Filing of the Mortgage.** Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage, and any security instrument creating a Lien or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any Applicable Law in order to publish notice of and fully to protect, preserve, and perfect the Lien hereof upon, and the interest of Mortgagee in, the Property.  To the extent not exempted therefrom under section 1146(a) of the Bankruptcy Code or the order confirming the Plan of Reorganization, Mortgagor will pay all filing, registration, and recording fees, and all expenses incident to the preparation, execution, and acknowledgement of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Property, and any instrument of further assurance, and all other costs arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, and security instrument with respect to the Property or any instrument of further assurance; *provided, however,* that any Taxes imposed on the making and recording of this Mortgage shall be subject to the treatment set forth in Section 10.02(f) hereof.

**Section 9.14   Further Assurances.** Mortgagor shall from time to time and at the sole cost and expense of Mortgagor promptly execute and deliver all further instruments, documents, and notices and take all further action that may be necessary or desirable, or that Mortgagee may reasonably request, in order to create, grant, perfect, or protect any interest or rights granted or purported to be granted to Mortgagee by this Mortgage or to enable Mortgagee to exercise its rights and remedies hereunder.  Without limiting the generality of the foregoing, Mortgagor shall, upon Mortgagee's request, appear in and defend any action or proceeding that may affect Mortgagor's title to the Property or otherwise affect the interests and rights of Mortgagee under this Mortgage. Further, Mortgagor shall furnish to Mortgagee, from time to time upon Mortgagee's request, statements and schedules further identifying, updating, and describing the Property and such other information, reports, and evidence concerning the Property as Mortgagee may reasonably request.

# ARTICLE X
## STATE-SPECIFIC PROVISIONS

**Section 10.01 State-Specific Provisions Control.** In the event of any conflict between the terms and provisions set forth in this Article X and the other terms and provisions of this Mortgage, the terms and provisions of this Article X shall control and be binding.

**Section 10.02 State-Specific Provisions.**  With respect to the Property, which is located in the State of New York, notwithstanding anything contained herein to the contrary:

(a)      **Remedies Not Exclusive.**   The rights and remedies of Mortgagee specified in this Mortgage shall be in addition to Mortgagee's rights and remedies under

PRIVILEGED & CONFIDENTIAL
YCST  8/30/2018 Edits to LS EDITS   8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

New York law, specifically including Section 254 of the Real Property Law.  In the event of any conflict between the provision of this Mortgage and the provisions of Section 254 of the Real Property Law, the provisions of this Mortgage shall control.

(b)     **Trust Fund.** Pursuant to Section 13 of the Lien Law of New York, Mortgagor shall receive the advances secured hereby, if any, and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of any improvement and shall apply such advances, if any, first to the payment of the cost of any improvement before using any part thereof for any other purpose. Mortgagor shall comply strictly with Section 13 of the Lien Law of New York.

(c)     **Commercial Property.** Mortgagor represents and warrants that this Mortgage does not encumber real property principally improved or to be improved by one (1) or more structures containing in the aggregate not more than six (6) residential dwelling units, each having their own separate cooking facilities.

(d)     **[New York Real Property Law Section 291-f.** In connection with any non-residential Leases having an unexpired term of five (5) years or longer from the date of this Mortgage, Mortgagee shall have, against the tenant under each Lease, all the rights set forth in Section 291-f of the Real Property Law of the State of New York, as amended from time to time.  Mortgagor shall promptly deliver the written notices described in said Section 291-f to all present tenants under the Leases.][32]

(e)     **Security Deposits.** In furtherance of and not in limitation of any other provisions of this Mortgage, any assignment of security deposits is subject to Section 7-103, Section 7-105, and Section 7-106 of the New York General Obligations Law.

(f)     **Mortgage Taxes.** (i) As provided in the order confirming the Plan of Reorganization, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to a confirmed plan under section 1129 of the Bankruptcy Code shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real-estate transfer tax, mortgage-recording tax, or other similar tax or governmental assessment. To the fullest extent contemplated by section 644.1(b)(3) of the Codes, Rules and Regulations of the State of New York and Bankruptcy Code section 1146(a), the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation of this instrument or other related documents without the payment of any such tax or governmental assessment.

(ii)     Mortgagor shall execute an affidavit, consistent with clause (i) above, to be recorded concurrently with this Mortgage, which shall describe the basis for the exemption from mortgage recording and similar taxes.

[SIGNATURE PAGE FOLLOWS]

---

[32] NTD: We would like this deleted for several reasons. First, the lease term has less that 5-years remaining. Second, this provision is not necessary where the tenant is an affiliate, as is the case here.  [UNDER REVIEW]

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS—8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

IN WITNESS WHEREOF, Mortgagor has caused this Mortgage to be executed on the date set forth in the acknowledgment below and to be effective as of the date first set forth above.

WITNESS:

DURO DYNE SPENCE LLC, a New York limited liability company

_____

Name:

By_____

Name:

Title:

STATE OF _____                )

                                )      SS.

COUNTY OF _____               )

On the _____ day of _____ in the year 20182019 before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/ executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

My commission expires:

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS — 8/16/20181/15/2019 Revision
COMMON INTEREST PRIVILEGE

## SCHEDULE A

## LEGAL DESCRIPTION

-30-

PRIVILEGED & CONFIDENTIAL
YCST 8/30/2018 Edits to LS EDITS — 8/18/2018 1/15/2019 Revision
COMMON INTEREST PRIVILEGE

EXHIBIT A

Tenant- Owned Made Improvments

01 23366303.1

01 23502941.3 23502941.4

08/30/2018 50077031.0

Document comparison by Workshare Compare on Tuesday, January 15, 2019
4:33:15 PM

**Input:**

| | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE02/YCST01/23502941/3 |
| Description | #23502941v3<YCST01> - Fitzpatrick as FCR for Duro Dyne - NY Mortgage |
| Document 2 ID | interwovenSite://WORKSITE02/YCST01/23502941/4 |
| Description | #23502941v4<YCST01> - Fitzpatrick as FCR for Duro Dyne - NY Mortgage |
| Rendering set | Standard |

**Legend:**

| | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

**Statistics:**

| | Count |
|---|---|
| Insertions | 19 |
| Deletions | 24 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 43 |

**EXHIBIT B**

## OPEN-END MORTGAGE, SECURITY AGREEMENT AND FIXTURE FILING

by

**ISWR OHIO LLC**

**and**

**DURO DYNE NATIONAL CORP.**
**(successor by merger to Duro Dyne Midwest Corp.)**

as ~~mortgagor~~mortgagors

(~~Mortgagor~~)Mortgagors)

in favor of

**DURO DYNE ASBESTOS PERSONAL INJURY TRUST**

as mortgagee

(Mortgagee)

County: [BUTLER]

Block: [BLOCK]

Lot: [LOT]

Premises: [3825 SYMMES ROAD, FAIRFIELD, OHIO]

Dated: [DATE]

---

Record and Return to:

Lowenstein Sandler LLP

One Lowenstein Drive

Roseland, New Jersey 07068

Attn: Jeffrey D. Prol, Esq.

—2—

## OPEN-END MORTGAGE, SECURITY AGREEMENT
## AND FIXTURE FILING

This Open-End Mortgage, Security Agreement and Fixture Filing (this "**Mortgage**"), made as of the [DATE] day of [MONTH], ~~2018,~~ 2019, by **ISWR OHIO LLC**, an Ohio limited liability company, having an address at [ADDRESS] ("~~Mortgagor"~~ "**Property Mortgagor**"), and **DURO DYNE NATIONAL CORP., a New York corporation, having an address at 81 Spence Street, Bay Shore, New York 11706 ("Tenant Mortgagor" and together with Mortgagor, collectively, "Mortgagors"),** to DURO DYNE ASBESTOS PERSONAL INJURY TRUST, a Delaware statutory trust, established pursuant to the Plan of Reorganization (defined below), having an address at [ADDRESS] (together with its successors and assigns, "**Mortgagee**").

## RECITALS

A.    Property Mortgagor is the fee owner of that certain real property located at 3825 Symmes Road, Fairfield, Ohio, described on Schedule A attached hereto and made a part hereof;

B.    Property Mortgagor is an affiliate of Tenant Mortgagor;

B.    Tenant Mortgagor is a tenant of the Property (as hereinafter defined) and owns certain leasehold improvements and fixtures located on the Property, including those that are set forth on, or otherwise described on, attached Exhibit A (collectively, the "Tenant-Owned Improvement");

C.    This Mortgage is given to Mortgagee to secure a certain promise to pay in the original principal amount of Thirteen Million Five Hundred Thousand 00/100 DOLLARS ($13,500,000.00) (the "**Principal Obligation**"), which Principal Obligation is evidenced by that certain Asbestos Trust Promissory Note, dated as of [DATE], issued by ~~Duro Dyne National Corp., an affiliate of~~ Tenant Mortgagor~~,~~ to Mortgagee, as the noteholder (as amended, amended and restated, supplemented, renewed or otherwise modified from time to time, the "**Trust Note**") and pursuant to that certain Plan of Reorganization (as defined below); and

C.    ~~Mortgagor desires~~ Mortgagors desire to secure the payment of the outstanding principal amount set forth in, and evidenced by, the Trust Note, together with all interest accrued and unpaid thereon and all other sums due to Mortgagee in respect of the Principal Obligation under the Trust Note, that certain Note Issuance and Security Agreement dated as of even date herewith by and ~~between Duro Dyne National Corp., an affiliate of~~ among Tenant Mortgagor, Property Mortgagor, Duro Dyne Spence LLC, an affiliate of ~~Mortgagor, and the Duro Dyne Asbestos Personal Injury Trust~~ Mortgagors, and Mortgagee (the "**Note Issuance Agreement**"), and this Mortgage, and to secure the performance and observance of all the provisions hereof, of the Trust Note, and of all other documents, agreements, and certificates that are either or both executed and delivered in connection with the Note Issuance Agreement (all such obligations being hereinafter collectively referred to as the "**Secured Indebtedness**").

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, ~~Mortgagor~~Mortgagors hereby ~~represents, warrants, covenants, and agrees~~represent, warrant, covenant, and agree for the benefit of Mortgagee as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Mortgage, the following terms shall have the following meaning. Capitalized terms used in this Mortgage without definition shall have the meaning ascribed to such terms in the Note Issuance Agreement.

"**Applicable Law**" means, at any time with reference to any Entity or property, all then existing laws, statutes, codes, treaties, judgments, decrees, injunctions, writs, and orders of any Governmental Authority, and rules, regulations, ordinances, directives, orders, licenses, and permits of any Governmental Authority applicable to such Entity or its property or in respect of its operations or to any referenced circumstances or events.

"**Casualty**" has the meaning set forth in Section 4.04(e).

"**Environmental Law**" has the meaning set forth in Section 4.10(a).

"**Environmental Liens**" has the meaning set forth in Section 4.10(d).

"**Event of Default**" has the meaning set forth in the Note Issuance Agreement.

"**Fixtures and Equipment**" has the meaning set forth in Section 2.01(b).

"**Hazardous Substance**" has the meaning set forth in Section 4.10(a).

"**Improvements**" has the meaning set forth in Section 2.01(b).

"**Knowledge of Mortgagor**" means the knowledge of (i) any current member, manager, or officer of Mortgagor, and (ii) any current officer or director of ~~Issuer~~Tenant Mortgagor, in each instance after reasonable inquiry.

"**Land**" has the meaning set forth in Section 2.01(a).

"**Leases**" has the meaning set forth in Section 2.01(d).

"**Mortgage**" has the meaning set forth in the introductory paragraph.

"**Mortgagee**" has the meaning set forth in the introductory paragraph.

"**Mortgagor**" has the meaning set forth in the introductory paragraph.

"**Mortgage Release**" has the meaning set forth in Section 6.01.

"**Net Proceeds**" means gross proceeds of the sale, transfer, or conveyance transaction less customary and usual closing costs.

"**Note Issuance Agreement**" has the meaning set forth in the Recitals.

"**Permitted Encumbrances**" means (i) the easements, covenants, restrictions, right-of-ways and other matters currently of record with respect to the Property, and Taxes that are not yet due and payable or that may thereafter be paid without penalty or that are being contested in good faith by appropriate proceedings, (ii) any municipal lien (other than with respect to Taxes), utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Land and Improvements if bonded off or released of record, (iii) any mechanics' or materialmen's liens that attach automatically under Applicable Law upon the commencement of any work upon, or delivery of any materials to, the Property and for which ~~Mortgagor is~~Mortgagors are not delinquent in the payment for any such work or materials; (iv) zoning, building and other similar restrictions; and (v) encumbrances that do not, individually or in the aggregate, materially impair the continued use, value, or operation of the Property and that do not, in the aggregate, exceed $5,000 in amount.

"**Plan of Reorganization**" means the *Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., Under Chapter 11 of the Bankruptcy Code*, dated as of [_____], ~~2018.~~2019, which was confirmed by order entered by the United States Bankruptcy Court for the District Court of New Jersey on ____________, ~~2018.~~2019.

"**Proceeds**" has the meaning set forth in Section 2.01(h)

"**Property**" has the meaning set forth in Section 2.01.

"**Release**" has the meaning set forth in Section 4.10(a)(iii).

"**Remediation**" has the meaning set forth in Section 4.10(a)(iv).

"**Rents**" has the meaning set forth in Section 2.01(e).

"**Restoration**" shall mean the repair and restoration of any Property after a Casualty as nearly as possible to the condition such Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Mortgagee.

"**Secured Indebtedness**" has the meaning set forth in the Recitals.

"**Statutory Condition**" is defined in Section 5302.14 of the Ohio Revised Code and provides generally that if the ~~Mortgagor pays~~Mortgagors pay the principal and interest secured by

this Mortgage, ~~performs~~perform the other obligations secured hereby and the conditions of any prior mortgage, ~~pays~~pay all the taxes and assessments, ~~maintains~~maintain insurance against fire and other hazards, and ~~does~~do not commit or suffer waste, then this Mortgage shall be void.

"**Tenant-Owned ~~Improvements" means improvements or fixtures located on the Property that are set forth on, or otherwised described on, attached Exhibit A.¹ [NTD: Status?]~~**Improvements" has the meaning set forth in the Recitals.

"**Trust Note**" has the meaning set forth in the Recitals.

## ARTICLE II
## GRANTS OF SECURITY

**Section 2.01   Property Mortgaged.** In order to secure the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, whether at the stated maturity, by acceleration, or otherwise, Property Mortgagor ~~does~~and Tenant Mortgagor do hereby MORTGAGE, PLEDGE, BARGAIN, ASSIGN, TRANSFER, WARRANT, CONVEY, AND GRANT, upon Statutory Condition, to Mortgagee the ~~following~~Mortgagors' respective property, rights, interests, and estates now owned, or hereafter acquired by ~~Mortgagor~~Mortgagors in the following (collectively, the "**Property**"):

(a)      all that certain tract or parcel of land lying and being in [Butler County, Ohio], and being more particularly described in <u>Schedule A</u> attached hereto and incorporated herein by this reference (the "**Land**");

(b)      all buildings, structures, and other improvements of every kind and nature whatsoever now or hereafter situated on the Land~~, exclusive of any Tenant-Owned Improvements~~ (collectively, the "**Improvements**"), and any appliances, storm doors and windows, lighting, plumbing, pipes, pumps, tanks, conduits, sprinkler and other fire prevention or suppression, refrigeration, incineration, escalator, elevator, loading, security, water, steam, gas, electrical, telephone, cable, internet, switchboards, storm and sanitary sewer, drainage, HVAC, boilers, waste removal, or other utility equipment or systems~~, exclusive of any Tenant-Owned Improvements~~ (collectively, the "**Fixtures and Equipment**") now or hereafter affixed to or located at the Land or the Improvements and all replacements, substitutions, and additions to the foregoing;²

(c)      all easements, rights-of-way or use, strips and gores of land, streets, ways, alleys, passages, sewer rights, utility reservations and capacity rights, waters, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, minerals, royalties, privileges, liberties, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating, or pertaining to the Land or the Improvements, or any part thereof and the reversions,

~~¹ NTD: Subject to Charter Oak review with respect to effect on value of collateral package for Note.~~
~~² NTD: Confirm ownership of improvements as between Mortgagor and Duro Dyne~~

-~~4~~ 4 -

remainders, rents, issues, and profits thereof; and all land lying in the bed of any street, road, or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, rights of dower, rights of curtesy, property, possession, claim, and demand whatsoever, both at law and in equity, of Property Mortgagor of, in, and to the Land and the Improvements, and every part and parcel thereof, with the appurtenances thereto;

(d)        all leasehold estates, leases, subleases, sub-subleases, licenses, concessions, occupancy agreements, or other agreements (written or oral, now or at any time in effect and every modification, amendment, or other agreement relating thereto, including every guarantee of the performance and observance of the covenants, conditions, and agreements to be performed and observed by the other party thereto) which grant a possessory interest in, or the right to use or occupy, all or any part of the Land or Improvements, together with all related security and other deposits (in each case, as amended, amended and restated, supplemented, renewed, extended, substituted, or otherwise modified from time to time, collectively, "**Leases**"); for the avoidance of doubt, the term "Leases" shall include the Bay Shore Lease, as amended, amended and restated, modified, supplemented, or extended from time to time;

(e)        all rents (whether denoted as advance rent, minimum rent, percentage rent, additional rent, or otherwise), receipts, issues, income, revenues, profits, deposits (whether denoted as security deposits or otherwise), lease termination fees or payments, rejection damages, buy-out fees, and any other fees made or to be made in lieu of rent, any award made hereafter to ~~Mortgagor~~Mortgagors in any court proceeding involving any tenant, lessee, licensee, or concessionaire under any of the Leases, and all other payments, rights and benefits of whatever nature from time to time due under any of the Leases, including, without limitation, (i) rights to payment earned or arising under the Leases for space in the Improvements for the operation of ongoing businesses, and (ii) all other income, consideration, issues, accounts, profits, or benefits of any nature arising from the ownership, possession, use, or operation of the Property (collectively, the "**Rents**");

(f)        all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications, and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management, or operation of the Land and any part thereof and any Improvements and all right, title, and interest of ~~Mortgagor~~Mortgagors therein and thereunder, including, without limitation, the right, upon the happening of any default or Event of Default hereunder, to receive and collect any sums payable to ~~Mortgagor~~Mortgagors thereunder;

(g)        all trade names, trademarks, logos, copyrights, goodwill, and books and records relating to or used in connection with the operation of the Property by Property Mortgagor or any part thereof; all general intangibles related to the operation of the Property by Property Mortgagor now existing or hereafter arising;

(h)    all insurance or other settlement proceeds relating to or arising out of the foregoing, or any portion of the foregoing, and all causes of action, claims, compensation, awards, damages, proceeds, payments, relief, or recoveries, including interest thereon, as a result of any casualty or condemnation of all or any part of the Property or for any damage or injury to the Property (collectively, the "**Proceeds**"); and

(i)    any and all other rights of ~~Mortgagor~~Mortgagors in and to the items set forth in subsections (a) through (i) above.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Mortgagee and its successors and assigns, forever; PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagee shall be well and truly paid the Secured Indebtedness at the time and in the manner provided in the Trust Note, Note Issuance Agreement, and this Mortgage, if ~~Mortgagor~~Mortgagors shall perform the other obligations as set forth in this Mortgage and the other Credit Documents, and if ~~Mortgagor~~Mortgagors shall abide by and comply with each and every covenant and condition set forth herein and therein, these presents and the estate hereby granted shall cease, terminate, and be void.

**Section 2.02    Absolute Assignment of Rents.** ~~Mortgagor~~Mortgagors hereby absolutely and unconditionally ~~assigns~~assign to Mortgagee all of ~~Mortgagor's~~Mortgagors' respective right, title, and interest in and to all current and future Leases and Rents; it being intended by ~~Mortgagor~~Mortgagors that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Mortgage, Mortgagee grants to ~~Mortgagor~~Mortgagors a revocable license to (i) collect, receive, use, and enjoy the Rents, and (ii) enforce the terms of, and perform the obligations of the landlord under, the Leases.

## ARTICLE III
## SECURED INDEBTEDNESS

**Section 3.01    Secured Indebtedness.** This Mortgage and the grants, assignments, and transfers made in Article II are given for the purpose of securing the due and punctual payment and performance of all of the Secured Indebtedness as and when the same becomes due and payable, whether at the stated maturity, by acceleration, or otherwise.

**Section 3.02    Incorporation by Reference.** All the covenants, conditions, and agreements of ~~Mortgagor~~Mortgagors contained in the Note Issuance Agreement, are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein. To the extent that any such covenants, conditions, and agreements of ~~Mortgagor~~Mortgagors contained in the Note Issuance Agreement conflict with those in this Mortgage, then the covenants, conditions, and agreements of ~~Mortgagor~~Mortgagors contained in this Mortgage shall control.

## ARTICLE IV
## ~~MORTGAGOR'S~~MORTGAGORS' REPRESENTATIONS, WARRANTIES, AND COVENANTS

**Section 4.01  No Transfers.** ~~Mortgagor~~Mortgagors shall not sell, transfer, or otherwise convey the Land and Improvements except as set forth in Section 4.02 below.  Nor shall ~~Mortgagor~~Mortgagors create, incur, assume, or suffer to exist any Lien, other than Permitted Encumbrances, on any portion of the Property or permit any such action to be taken.

**Section 4.02  Permitted Transfer.** Notwithstanding anything to the contrary contained herein, ~~Mortgagor~~Mortgagors shall be permitted to sell, transfer, and convey the Land and Improvements, *provided* that (a) the Net Proceeds of such transaction are applied to the payment of the Secured Indebtedness, (b) ~~Mortgagor~~Mortgagors or an affiliate thereof provides substitute collateral to Mortgagee in reasonably equivalent value to the Property, and a mortgage agreement, in the form of this Mortgage (with property and State-specific modifications), is provided to Mortgagee with respect to any such substitute real property collateral, or (c) a combination of clauses (a) and (b) (*i.e.*, if only a portion of the Net Proceeds are applied against the Obligations, then the value of the substitute collateral that would otherwise be required by clause (b) shall be reduced by the amount of such application against the Secured Indebtedness). In the event of a sale, transfer, or conveyance of the Land and Improvements, it shall be at ~~Mortgagor's~~Mortgagors' option to proceed using either of clauses (a), (b), or (c).

**Section 4.03  Warranty of Title.**

(a)  Property Mortgagor represents and warrants that ~~it~~Property Mortgagor possesses fee simple title to the Land and owns the Improvements, ~~Fixtures~~Fixtures and Equipment, and the balance of the Property, excluding the Tenant-Owned Improvements, free and clear of all Liens other than Permitted Encumbrances. ~~Mortgagor~~Tenant Mortgagor represents and warrants that Tenant Mortgagor possesses title to the Tenant-Owned Improvements free and clear of all Liens other than Permitted Encumbrances. Mortgagors shall forever warrant, defend and preserve such title and priority of the Mortgage against claims of all Entities whatsoever.

(b)  ~~Mortgagor~~Mortgagors further represents and warrants that all of the Improvements and Fixtures and Equipment situated on the Land lie wholly within the boundaries and building restriction lines of the Land, and no improvements on adjoining properties encroach upon the Land, and no easements or other encumbrances upon the Land encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those that are insured against by any applicable title insurance policy.

**Section 4.04  Insurance.**

(a)  ~~Mortgagor represents~~Mortgagors represent and ~~warrants~~warrant that ~~it~~each has obtained or caused to be obtained and delivered to Mortgagee all insurance policies

that provide insurance coverage of any kind on the Property, including any blanket insurance which may cover the Property and other property not subject to this Mortgage, and all such insurance policies (i) reflect insurance coverage on the Property that is consistent with the coverages maintained by ~~Mortgagor~~Mortgagors on the Property for the ten-year period preceding the date of this Mortgage, (ii) contain the standard Ohio mortgagee non-contribution clause endorsement, if any, or an equivalent endorsement satisfactory to Mortgagee naming Mortgagee as the person to which all payments made by the insurer thereunder shall be paid or name Mortgagee as an additional insured, and (iii) are otherwise in form and substance satisfactory in all respects to Mortgagee.

(b)    ~~Mortgagor~~Mortgagors further ~~represents~~represent and ~~warrants~~warrant that no claims have been made or are currently pending, outstanding, or otherwise remain unsatisfied under any insurance policy obtained and delivered under subsection (a), and neither ~~Mortgagor~~Mortgagors nor any other Entity has done, by act or omission, anything that would impair the coverage of any such insurance policy.

(c)    ~~Mortgagor~~Mortgagors, as applicable, shall pay or cause to be paid the premiums for all insurance policies described in subsection (a) as the same become due and payable, and ~~Mortgagor~~Mortgagors shall at all times comply with and shall cause the Property and the use, occupancy, operation, maintenance, alteration, repair, and restoration thereof to comply with the terms, conditions, stipulations, and requirements of such insurance policies.

(d)    If at any time Mortgagee is not in receipt of written evidence that all insurance required hereunder is in force and effect, Mortgagee shall have the right without notice to ~~Mortgagor~~Mortgagors to take such action as Mortgagee deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Mortgagee, in its sole discretion, deems appropriate, and all expenses incurred by Mortgagee in connection with such action or in obtaining such insurance and keeping it in effect shall be secured by this Mortgage and paid by ~~Mortgagor~~Mortgagors to Mortgagee **upon demand**.

(e)    If the Property shall be damaged or destroyed, in whole or in part, by fire or other property hazard or casualty (any such event, a "**Casualty**"), Property Mortgagor shall give prompt notice thereof to Mortgagee. Proceeds of insurance paid to Mortgagee by any insurer in connection with any Casualty shall be applied as follows:

(i)    If the Proceeds shall be less than $100,000.00 and the costs of completing the Restoration shall be less than $100,000.00, the Proceeds will be disbursed by Mortgagee to Property Mortgagor upon receipt, provided that all of the conditions set forth in Section 4.04(e)(ii)(A) below, excluding Section 4.04(e)(ii)(A)(7), are satisfied and Property Mortgagor delivers to Mortgagee a written undertaking to expeditiously commence and to satisfactorily complete

with due diligence the Restoration in accordance with the terms of this Agreement.

(ii)    If the Proceeds are equal to or greater than $100,000.00 or the costs of completing the Restoration is equal to or greater than $100,000.00, ~~Mortagee~~Mortgagee shall make the Proceeds available for the Restoration in accordance with the provisions of this Section 4.04(ii).

(A)    The Proceeds shall be made available to Property Mortgagor as necessary to restore or replace the damaged or lost property in accordance with customary construction financing procedures and protections as reasonably determined by Mortgagee, provided that each of the following conditions are met:

(1)    no Event of Default shall have occurred and be continuing;

(2)    the Property Mortgagor has sufficient available economic resources to complete the Restoration;

(3)    Property Mortgagor shall commence the Restoration as soon as reasonably practicable, but in no event later than ninety (90) days after such Casualty, and shall diligently pursue the same to completion reasonably satisfactory to Mortgagee;

(4)    Mortgagee shall be reasonably satisfied that any operating deficits, including all scheduled payments of principal and interest under the Trust Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty will be covered out of (1) the Proceeds or (2) by other funds of Property Mortgagor or Duro Dyne National Corp.;

(5)    Mortgagee shall be reasonably satisfied that the Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Maturity Date and (2) such time as may be required under all Applicable Law in order to repair and restore the Property to the condition it was in immediately prior to such Casualty;

(6)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all Applicable Law;

(7)    the Restoration shall be done and completed by Property Mortgagor (or Property Mortgagor's agent) in an expeditious and diligent fashion and in compliance with all Applicable Law; and

(8)    such Casualty does not result in the loss of access to the Property or the Improvements.

(B)    Proceeds shall be held by Mortgagee in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 4.04(e), shall constitute additional security for the Secured ~~Indebteness~~Indebtedness. The final disbursement of the Proceeds shall be disbursed by Mortgagee to, or as directed by, Property Mortgagor only upon completion of the Restoration, upon receipt of evidence satisfactory to Mortgagor, including without limitation an officer's certificate of the Mortgagor, that (1) all costs incurred in connection with the Restoration, including without limitation all materials installed and work and labor performed have been paid for in full, (2) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property (other than the liens imposed by this Mortgage and Permitted Encumbrances) that have not either been fully bonded to the satisfaction of Mortgagee and discharged of record, and (3) all required certificates of occupancy and approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities.

(C)    All Proceeds not required to be made available for the Restoration pursuant to the terms hereof may be retained and applied by Mortgagee toward the payment of the Secured Indebtedness, whether or not then due and payable in such order, priority, and proportions as Mortgagee, in its sole discretion.

The provisions contained herein with respect to insurance shall apply notwithstanding any contrary provisions of Ohio law.

(f)    ~~Mortgagor~~Mortgagors shall cooperate with Mortgagee in obtaining for Mortgagee the benefits of any insurance proceeds lawfully or equitably payable in connection with the Property or any part thereof, and Mortgagee shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by any Entity of the expense of an appraisal on behalf of Mortgagee in case of any casualty affecting the Property or any part thereof) out of such insurance proceeds.

## Section 4.05    Payment of Taxes.

(a)    ~~Mortgagor represents~~Mortgagors represent and ~~warrants~~warrant that ~~it is~~Mortgagors are not in default of payment of any Taxes due and payable on the Property.

(b)    ~~Mortgagor~~Mortgagors shall pay or cause to be paid all Taxes on the Property prior to same becoming delinquent, and ~~Mortgagor~~Mortgagors shall provide Mortgagee with written evidence satisfactory to Mortgagee that all Taxes have been timely paid within ten (10) calendar days of such payment.

(c)    If the ~~Mortgagor~~Mortgagors (i) ~~determines~~determine that ~~it~~Mortgagors will be unable to pay any Taxes on the Property, or (ii) ~~receives~~receive notice that ~~it is~~Mortgagors are in default on the payment of any Taxes on the Property, ~~it~~Mortgagors must notify Mortgagee within three (3) Business Day of such determination or notice.

(d)    If at any time Mortgagee receives a notice from ~~Mortgagor~~Mortgagors under subsection (c) or is not in receipt of written evidence that all Taxes have been timely paid by ~~Mortgagor~~Mortgagors, Mortgagee shall have the right without notice to ~~Mortgagor~~Mortgagors to take such action as Mortgagee in its sole discretion deems necessary to protect its interest in the Property, including, without limitation, paying Taxes on the Property and any penalties or other costs necessary to cure any default in the payment of Taxes on the Property, and all expenses incurred by Mortgagee in connection with such action shall be secured by this Mortgage and paid by ~~Mortgagor~~Mortgagors to Mortgagee **upon demand.**

**Section 4.06   Condemnation.** In the event of a taking of any of the Property by any public or quasi-public authority through eminent domain or otherwise, Mortgagee may participate in any proceedings related to such taking, and ~~Mortgagor~~Mortgagors shall from time to time deliver to Mortgagee all instruments requested by Mortgagee to permit such participation. ~~Mortgagor~~Mortgagors shall, at ~~its~~Mortgagors' expense, diligently prosecute any such proceedings, and shall consult with Mortgagee, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), ~~Mortgagor~~Mortgagors shall not be relieved of any obligations under this Mortgage, and all parties to the Trust Note and the Note Issuance Agreement shall continue to perform their respective Obligations thereunder.   The Secured Indebtedness shall not be reduced until any condemnation award shall have been actually received and applied by Mortgagee, after the deduction of expenses of collection, to the reduction or discharge of the Obligations. Mortgagee shall not be limited to the interest paid on the condemnation award by the condemning authority but shall be entitled to receive out of the condemnation award interest at the rate or rates provided in the Note Issuance Agreement or in the Trust Note. If the applicable Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of the condemnation award, Mortgagee shall have the right, whether or not a deficiency judgment on the Trust Note shall have been sought, recovered or denied, to receive the condemnation award, or a portion thereof, sufficient to pay the Secured Indebtedness. Further, ~~Mortgagor~~Mortgagors shall cooperate with Mortgagee in obtaining for Mortgagee the benefits of any condemnation or similar award lawfully or equitably payable in connection with the Property or any part thereof, and Mortgagee shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by any

Entity of the expense of an appraisal on behalf of Mortgagee in case of any condemnation affecting the Property or any part thereof) out of such award.

## Section 4.07   Assignment of Leases and Proceeds Therefrom.

(a)    As of the date of this Mortgage, ~~Mortgagor~~Mortgagors hereby absolutely and unconditionally assigns to Mortgagee all of ~~its~~Mortgagors' respective right, title, and interest in and to all Leases, whether now in existence or which may hereafter come into existence during the term of this Mortgage, (but without an assumption by Mortgagee of liabilities of ~~Mortgagor~~Mortgagors under any such Leases by virtue of this assignment), and ~~Mortgagor~~Mortgagors hereby absolutely and unconditionally ~~assigns~~assign to Mortgagee the proceeds now or hereafter arising from the Leases to be applied by Mortgagee in payment of the Secured Indebtedness. Mortgagee may retain and apply such proceeds toward payment of the Secured Indebtedness in such order, priority, and proportions as Mortgagee, in its sole discretion, shall deem proper. Nevertheless, subject to the terms of this Mortgage and provided no Event of Default has occurred, Mortgagee grants to ~~Mortgagor~~Mortgagors a revocable license to (i) collect, receive, use, and enjoy the Rents, and (ii) enforce the terms of, and perform the obligations of the landlord under, the Leases.  The license granted to ~~Mortgagor~~Mortgagors in this subsection (a) shall terminate immediately upon the occurrence of an Event of Default and ~~Mortgagor agrees~~Mortgagors agree (i) to hold any Rents collected or received on or after the date of such Event of Default in trust for Mortgagee; and (ii) to remit any Rents collected or received by ~~Mortgagor~~Mortgagors on or after date of such Event of Default within one (1) Business Day.

(b)    ~~Mortgagor~~Mortgagors shall not, without the prior written consent of Mortgagee, make, or suffer to be made, any Leases which are not in conformity with prevailing market rents and terms for similar space in the area where the leased Property is located ("**Prevailing Terms**"). Except as provided in subsection (c) below, ~~Mortgagor~~Mortgagors will not modify or cancel or accept surrender of any Leases or assign the whole or any part of the rents thereon.

(c)    Anything contained in subsection (b) to the contrary notwithstanding, and provided that no Event of Default exists, ~~Mortgagor~~Mortgagors shall have the right to terminate or modify any existing Lease provided that the replacement Lease shall provide for the payment of rents that are on Prevailing Terms, shall be with a tenant having a credit rating at least as good as that of the existing tenant (or such tenant provides other credit enhancement tools) and shall contain such other terms and conditions as are comparable for property of like character in the area in which the leased Property is situated. ~~Mortgagor~~Mortgagors shall on request furnish to Mortgagee a report of ~~its~~their leasing activities with respect to the Property.

(d)    ~~Mortgagor~~Mortgagors shall (i) fulfill or perform, in all material respects, each and every provision of the Leases on the part of ~~Mortgagor~~Mortgagors to be fulfilled

or performed, (ii) promptly send copies of all notices of default which Mortgagor Mortgagors shall send or receive under the Leases to Mortgagee, and (iii) enforce, short of termination of the Leases, the performance or observance of the provisions thereof by the tenants thereunder. Nothing contained in this paragraph shall be construed as imposing on Mortgagee any of the obligations of the lessor under the Leases.

(e)    Mortgagor represents Mortgagors represent and warrants warrant that there are no prior assignments of any Leases or any proceeds thereof.

**Section 4.08    Use and Maintenance of the Property.**

(a)    Property Mortgagor represents and warrants that the Land has rights of access to public ways and is served by water, storm sewer, sanitary sewer or septic services, and storm drain facilities adequate to service the Improvements and Fixtures and Equipment for their intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting such property (which are connected so as to serve such property without passing over other property) or in recorded easements serving such property. All roads necessary for the use of the Land and Improvements for their current purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

(b)    (i)    Property Mortgagor represents and warrants that the Property other than the Tenant-Owned Improvements is in good condition, order, and repair in all material respects; there exists no structural or other material defects or damages in the Property other than the Tenant-Owned Improvements, whether latent or otherwise, and Mortgagor has not received notice from any insurance company or bonding company of any defects or inadequacies in such Property, or any part thereof, that would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(ii)    (b)    Tenant Mortgagor further represents and warrants that the Property is Tenant-Owned Improvements are in good condition, order, and repair in all material respects; there exists no structural or other material defects or damages in the Property Tenant-Owned Improvements, whether latent or otherwise, and Tenant Mortgagor has not received notice from any insurance company or bonding company of any defects or inadequacies in such Property Tenant-Owned Improvements, or any part thereof, that would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(c)    (i)    Property Mortgagor represents and warrants that there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property other than the Tenant-Owned Improvements, nor are there any

contemplated improvements to the Property other than the Tenant-Owned Improvements that may result in such special or other assessments.

(ii)        (c) Tenant Mortgagor further represents and warrants that there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property Tenant-Owned Improvements, nor are there any contemplated improvements to the Property Tenant-Owned Improvements that may result in such special or other assessments.

(d)        Mortgagor Mortgagors further represents represent and warrants warrant that none of the Improvements is located in an area identified by the Federal Emergency Management Agency as having special flood hazards.

(e)        Mortgagor Mortgagors shall cause the respective Property owned by the Mortgagors to be maintained in good working order and repair, normal wear and tear excepted, and the Improvements and the Fixtures and Equipment shall not be removed, demolished, or materially altered (except for normal replacement of the Fixtures and Equipment) without the prior written consent of Mortgagee. Mortgagor Mortgagors shall promptly comply, in all material respects, with all Applicable Laws affecting the respective Property owned by the Mortgagors, or any portion thereof or the use thereof. Mortgagor Mortgagors shall or shall cause the tenant to promptly repair, replace, or rebuild any part of the Property that may be damaged or destroyed by Casualty (including any fire or other property hazard or casualty for which insurance was not obtained or obtainable) or that may be affected by any taking by any public or quasi-public authority through eminent domain or otherwise, and shall complete and pay for, within a reasonable time, any structure at any time in the process of construction or repair on the Premises.  So long as this Mortgage is in effect, if such Casualty shall be covered by insurance, Mortgagor Mortgagors shall remain obligated to repair, replace or rebuild such portion of the respective Property owned by the Mortgagors notwithstanding that the Proceeds from insurance policies may be insufficient to effect such repair, replacement, or rebuilding or that Mortgagee shall exercise its rights under Section 4.04 hereof to retain and apply all or any portion of such proceeds to the Secured Indebtedness.

(f)        Except for Permitted Encumbrances, Mortgagor Mortgagors shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever that may be or become a Lien or charge against the Property owned by such Mortgagors or any part thereof and shall promptly pay for all utility services provided to the Property.

**Section 4.09    Property in Compliance with Applicable Law.**

(a)        Mortgagor represents Mortgagors represent and warrants warrant that (i) the respective Property owned by the Mortgagors and the use of the such Property comply in all material respects with all Applicable Laws and legal requirements, including building and zoning ordinances and codes, (ii) Mortgagor is Mortgagors are not in default or violation of any order, writ, injunction, decree, or demand of any Governmental

Authority, (iii) there has not been committed by ~~Mortgager~~Mortgagors or any other Entity in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof, and (iv) all Improvements and Fixtures and Equipment owned by the respective Mortgagors are in material compliance with Applicable Law.

(b)    ~~Mortgagor~~Mortgagors further represents and warrants that all certifications, permits, licenses, and approvals, including certificates of completion and occupancy permits, required for the legal use, occupancy, and operation of the respective Property owned by the Mortgagors have been obtained and are in full force and effect, and the use being made of ~~the~~such Property is in conformity with the certificate of occupancy issued for such property.

(c)    ~~Mortgagor~~Mortgagors further ~~represents~~represent and ~~warrants~~warrant that no portion of the Property was purchased with proceeds of any illegal activity.

(d)    ~~Mortgagor~~Mortgagors shall not, without obtaining the prior consent of Mortgagee, initiate, join in, or consent to any private restrictive covenant, zoning ordinance, or other public or private restrictions, limiting or adversely affecting the uses that may be made of the Property or any part thereof.

(e)    ~~Mortgagor~~Mortgagors shall not commit, and shall never permit any other Entity in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof.

## Section 4.10  Environmental Provisions.

(a)    For the purposes of this Section 4.10 the following terms shall have the following meanings:

(i)    the term "**Environmental Law**" shall mean any present and future Applicable Law (A) relating to protection of human health or the environment; (B) relating to Hazardous Substances (as defined below); (C) relating to liability for or costs of Remediation (as defined below) or prevention of Releases (as defined below) of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment; (D) conditioning transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (E) requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any Governmental Authority or other Entity, whether or not in connection with transfer of title to or interest in the Property; (F) imposing conditions or requirements in connection with permits or other authorization for lawful activity related to the environmental condition of Property; (G) relating to nuisance, trespass, or other causes of action related to the

environmental condition of the Property; or (H) relating to wrongful death, personal injury, or property or other damage in connection with any environmental condition of the Property, including, without limitation, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.

(ii)    the term **"Hazardous Substances"** shall mean any and all substances (whether solid, liquid, or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables, explosives, mold, mycotoxins, microbial matter and airborne pathogens (naturally occurring or otherwise), but excluding substances of kinds and in amounts ordinarily and customarily used or stored in similar properties for the purpose of cleaning or other maintenance or operations, and otherwise in compliance with all Environmental Laws.

(iii)    The term **"Release"** shall mean, with regard to Hazardous Substances, any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing, or other movement of Hazardous Substances.

(iv)    The term **"Remediation"** shall mean any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain, or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

(b)    ~~Mortgagor represents~~Mortgagors represent and ~~warrants~~warrant that to the Knowledge of ~~Mortgagor~~Mortgagors:

(i)    There are no Hazardous Substances or underground storage tanks in, on, or under any of the respective Property owned by the Mortgagors, except those that are (A) in compliance with Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required under Environmental Law), (B) de-minimis amounts necessary to operate such property that will not result in an environmental condition in, on, or under such property and that are otherwise permitted under and used in compliance with Environmental Law, or (C) fully disclosed to Mortgagee in Schedule B hereto;

(ii)    there are no past, present, or threatened Releases of Hazardous Substances in, on, under, or from any of the respective Property owned by the Mortgagors that has not been fully remediated in accordance with Environmental Law;

(iii)    there is no threat of any Release of Hazardous Substances migrating to any of the respective Property owned by the Mortgagors;

(iv)    there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with any of the respective Property owned by the Mortgagors that has not been fully remediated in accordance with Environmental Law;

(v)    ~~Mortgagor does~~Mortgagors do not know of, and has not received, any written or oral notice or other communication from any Entity (including a Governmental Authority) relating to Hazardous Substances or Remediation thereof, possible liability of any Entity pursuant to any Environmental Law, other environmental conditions in connection with any of the respective Property owned by the Mortgagors, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and

(vi)    ~~Mortgagor has~~Mortgagors have truthfully and fully disclosed to Mortgagee in Schedule B hereto any and all information relating to environmental conditions in, on, under, or from the Property that is known to ~~Mortgagor~~Mortgagors, and ~~has~~have provided to Mortgagee all information that is contained in ~~Mortgagor's~~Mortgagors' files and records, including any reports relating to Hazardous Substances in, on, under, or from the respective Property owned by the Mortgagors and to the environmental condition of the respective Property owned by the Mortgagors.

(c)    ~~Mortgagor~~Mortgagors shall comply, and shall cause all tenants or other occupants of the Property to comply, in all material respects with all Environmental Law and permits issued pursuant thereto.

(d)      ~~Mortgagor covenants~~Mortgagors covenant and ~~agrees~~agree that:

(i)      there shall be no Releases of Hazardous Substances in, on, under, or from the Property or any part thereof requiring notification or disclosure under any Environmental Law with respect to which ~~Mortgagor has~~Mortgagors have not (A) commenced compliance with ~~Mortgagor's~~Mortgagors' respective obligations under clauses (iv) and (v), as applicable, within fifteen (15) calendar days after Mortgagee's written request or (B) satisfied Mortgagor's obligations under clauses (iv) and (v), as applicable, within 365 days (or such longer period to which Mortgagee may consent in Mortgagee's reasonable discretion) after Mortgagee's written request;

(ii)      there shall be no Hazardous Substances in, on, or under the Property or any part thereof, except those that are (A) in compliance with all Environmental Laws and with permits issued pursuant thereto (to the extent such permits are required by Environmental Law), (B) de-minimis amounts necessary to operate the Property or any part thereof for the purposes for which it was used as of the date this Mortgage is executed that will not result in an environmental condition in, on, or under the Property or any part thereof and that are otherwise permitted under and used in compliance with Environmental Law, or (C) to the extent permits are required under Environmental Laws, fully disclosed to Mortgagee in writing;

(iii)      ~~Mortgagee~~Mortgagors shall keep the Property free and clear of all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of ~~Mortgagor~~Mortgagors or any other Entity ("**Environmental Liens**");

(iv)      if Mortgagee has reason to believe that an environmental hazard exists on the Property or any part thereof, ~~Mortgagor~~Mortgagors shall, at ~~its~~Mortgagors' sole cost and expense and pursuant to any reasonable written request of Mortgagee, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property or any part thereof (including sampling, testing and analysis of soil, water, air, building materials, and other materials and substances, whether solid, liquid, or gas), and share with Mortgagee the reports and other results thereof, and Mortgagee shall be entitled to rely on such reports and other results thereof;

(v)      if Mortgagee has reason to believe that an environmental hazard exists on the Property or any part thereof, ~~Mortgagor~~Mortgagors shall, at ~~its~~Mortgagors' sole cost and expense, comply with all reasonable written requests of Mortgagee to (A) reasonably effectuate Remediation of any condition (including a Release of a Hazardous Substance) in, on, under, or from such Property or any part thereof; (B) comply with any Environmental Law; (C)

comply with any directive from any Governmental Authority; and (D) take any other reasonable action necessary or appropriate for protection of human health or the environment;

(vi)    ~~Mortgagor~~Mortgagors shall not do or allow any Entity or other user of the Property to do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any person or Entity (whether on or off the Property), impairs or may impair the value of the Property or any part thereof, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement, or easement applicable to the Property or any part thereof; and

(vii)    ~~Mortgagor~~Mortgagors shall immediately notify Mortgagee in writing of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from, or migrating towards the Property or any part thereof in violation of Environmental Laws; (B) any non-compliance with any Environmental Laws related in any way to the Property or any part thereof; (C) any Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property or any part thereof; and (E) any written or oral notice or other communication of which ~~Mortgagor~~Mortgagors becomes aware from any source whatsoever (including a Governmental Authority) relating in any way to the Release or potential Release of Hazardous Substances or Remediation thereof, likely to result in liability of any Entity pursuant to any Environmental Law, other environmental conditions in connection with the Property or any part thereof, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section.

(e)    If ~~Mortgagor fails~~Mortgagors fail to timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any such action described in subsections (d)(iv) or (d)(v), Mortgagee shall have the right, in its sole and absolute discretion, to make advances or payments toward the performance or satisfaction of the same, but shall in no event be under any obligation to do so. All sums so advanced or paid by Mortgagee (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, will immediately, upon demand, become due and payable from ~~Mortgagor~~Mortgagors and shall bear interest at the Interest Rate from the date any such sums are so advanced or paid by Mortgagee until the date any such sums are repaid by ~~Mortgagor~~Mortgagors to Mortgagee.

(f)    If this Mortgage is foreclosed, or if the Property is sold pursuant to provisions of this Mortgage, of if ~~Mortgagor tenders~~Mortgagors tender a deed or assignment in lieu of foreclosure or sale, ~~Mortgagor~~Mortgagors shall deliver the Property to the purchaser at foreclosure or sale or to Mortgagee, its nominee, or a wholly owned

subsidiary, as the case may be, in the same environmental condition as existed on the date of this Mortgage.

(g)     ~~Mortgagor~~Mortgagors will defend, indemnify, and hold harmless Mortgagee from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) arising out of, or in any way related to, (i) any breach by ~~Mortgagor~~Mortgagors of any of the provisions of this Section 4.10, (ii) the Release or threatened Release of any Hazardous Substance which is at, in, on, under, about, from or affecting the Property, including, without limitation, any damage or injury resulting from any such Hazardous Substance to or affecting the Property or the soil, water, air, vegetation, buildings, personal property, persons or animals located on the Property or on any other property or otherwise, (iii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any such Hazardous Substance, (iv) any lawsuit, proceeding or investigations brought or threatened, settlement reached, or order or directive of or by any Governmental Authority relating to such Hazardous Substance, or (v) any violation of any Environmental Law or any policy or requirement of Mortgagee under this Section 4.10.

(h)     The obligations and liabilities of ~~Mortgagor~~Mortgagors under this Section 4.10 shall survive and continue in full force and effect and shall not be terminated, discharged, or released, in whole or in part, irrespective of whether the Secured Indebtedness has been paid in full and irrespective of any foreclosure of this Mortgage, sale of the Property pursuant to the provisions of this Mortgage or acceptance by Mortgagee of a deed or assignment in lieu of foreclosure or sale and irrespective of any other fact or circumstance of any nature whatsoever.

**Section 4.11    Truth of Statements Made Herein.** The ~~Mortgagor represents~~Mortgagors represent and ~~warrants~~warrant that this Mortgage neither contains any untrue statements of material fact nor omits any material fact necessary in order to make the statement made, in light of the circumstances under which it is made, accurate.

**Section 4.12    Survival of Representations and Warranties.** All representations and warranties contained in this Mortgage shall survive the execution and delivery of this Mortgage.

<div align="center">

**ARTICLE V**
**REMEDIES**

</div>

**Section 5.01    Remedies Following Event of Default.** If an Event of Default exists, in addition to any other rights, remedies, and powers that Mortgagee may have under the Trust Note or the Note Issuance Agreement, or as provided by law, Mortgagee may immediately take such action, without notice or demand, as it deems advisable to protect and enforce the Lien and

security interest hereof and its rights hereunder, including, without limitation, the following actions, concurrently or otherwise, at such time and in such manner as Mortgagee may determine in its sole discretion, without impairing or otherwise affecting the other rights, remedies, and powers of Mortgagee:

(a)    **Entry and Possession.** The license granted to ~~Mortgagor~~Mortgagors under Section 2.02 hereof shall automatically be revoked, and Mortgagee may enter into or upon the Property, either personally or by its agents, nominees, or attorneys, and dispossess ~~Mortgagor~~Mortgagors and ~~its~~their respective agents and servants therefrom, without liability for trespass, damages, or otherwise and exclude ~~Mortgagor~~Mortgagors and ~~its~~Mortgagors' respective agents or servants wholly therefrom, and take possession of all books, records, and accounts relating thereto, and ~~Mortgagor agrees~~Mortgagors agree to surrender possession of the Property and of such books, records, and accounts to Mortgagee upon demand, and thereupon Mortgagee may (i) use, operate, manage, control, insure, maintain, repair, restore, improve, alter, and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) exercise all rights and powers of ~~Mortgagor~~Mortgagors with respect to the Property, whether in the name of ~~Mortgagor~~Mortgagors or otherwise, including, without limitation, the right to make, cancel, enforce, or modify Leases, obtain and evict tenants, and demand, sue for, collect, and receive all Rents of the Property and every part thereof; (iii) apply the receipts and income (including Rents) from the Property to the payment of the Secured Indebtedness, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations; and (iv) require ~~Mortgagor~~Mortgagors to transfer and assign to Mortgagee, in form satisfactory to Mortgagee, ~~Mortgagor's~~Mortgagors' interest as lessor in any Lease now or hereafter affecting the whole or any part of the Property.

(b)    **Payment of Sums.** Pay any sums in any form or manner deemed expedient by Mortgagee to protect the Lien and security interest of this Mortgage or to cure any Event of Default other than payment of principal of or interest on the Secured Indebtedness; make any payment hereby authorized to be made according to any bill, statement, or estimate furnished or procured from the appropriate public officer or the party claiming payment without inquiry into the accuracy or validity thereof, and the receipt of any such public officer or party in the hands of Mortgagee shall be conclusive evidence of the validity and amount of items so paid, in which event the amounts so paid, shall be added to and become a part of the Secured Indebtedness and be immediately due and payable to Mortgagee; and Mortgagee shall be subrogated to any encumbrance, Lien, claim, or demand, and to all the rights and securities for the payment thereof, paid or discharged with the principal sum secured hereby or by Mortgagee under the provisions hereof, and any such subrogation rights shall be additional and cumulative security to this instrument.

(c)    **Acceleration.** Declare the entire Secured Indebtedness immediately due, payable, and collectible, regardless of maturity, and, in that event, the entire Secured Indebtedness shall become immediately due, payable, and collectible; and thereupon Mortgagee may institute proceedings to foreclose this Mortgage by judicial action, or to enforce its provisions or any of the indebtedness or obligations secured by this Mortgage.

(d)    **Foreclosure Sale.** Institute a foreclosure action in accordance with Applicable Law in effect on the date foreclosure is commenced, or take any other action as may be allowed, at law or in equity, for the enforcement of the Secured Indebtedness and realization on the Property (or such part or parts thereof as Mortgagee may from time to time elect to foreclose upon). If Mortgagee is the purchaser at the foreclosure sale of the Property, in lieu of paying cash Mortgagee may make settlement for all or a portion of the purchase price by crediting the sale proceeds against the Secured Indebtedness.

(e)    **Other Rights.** Exercise any and all rights, remedies, and powers accruing to a secured party under this Mortgage, any other Applicable Law, or available in equity.

**Section 5.02    No Obligation to Marshal Assets.** In exercising its rights and remedies hereunder, Mortgagee shall have no obligation whatsoever to marshal assets, or to realize upon all of the Property. Mortgagee shall have the right to realize upon all or any part of the Property from time to time as Mortgagee deems appropriate. ~~Mortgagor~~Mortgagors hereby ~~waives~~waive any right to have any of the Property marshaled in connection with any sale or other exercise of Mortgagee's rights, remedies, and powers hereunder.

**Section 5.03    Remedies Cumulative.** The rights, powers, and remedies of Mortgagee granted and arising under this Mortgage are separate, distinct, and cumulative of all other rights, powers, and remedies that Mortgagee may have at law or in equity, none of which are to the exclusion of the others and all of which are cumulative to the rights, powers, and remedies provided at law for the collection of indebtedness, enforcement of rights under mortgages, and preservation of security. No act of Mortgagee shall be construed as an election to proceed under any one provision herein or under the Trust Note or Note Issuance Agreement to the exclusion of any other provision, or an election of remedies to the bar of any other remedy allowed at law or in equity, anything herein or otherwise to the contrary notwithstanding.

**Section 5.04    No Waiver.** No failure or delay of Mortgagee of any kind in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  No waiver by Mortgagee of any Event of Default or breach of this Mortgage shall operate as a waiver of any other Event of Default or breach of this Mortgage or of the same Event of Default or breach of this Mortgage on a future occasion, and no action by Mortgagee hereunder shall in any way affect or impair Mortgagee's rights and remedies or the obligations of ~~Mortgagor~~Mortgagors under this Mortgage.

## ARTICLE VI
## RELEASE OF MORTGAGE

**Section 6.01   Release on Satisfaction of Secured Indebtedness.** If at any time during the period of this Mortgage the Secured Indebtedness has been paid and performed in full, no indebtedness remains outstanding under the Trust Note, then Mortgagee will, upon written request of ~~Mortgagor~~Mortgagors and at ~~Mortgagor's~~Mortgagors' sole cost and expense, execute and deliver to ~~Mortgagor~~Mortgagors a release, reconveyance, satisfaction, or cancellation (a **"Mortgage Release"**) of this Mortgage and such other documentation as may be reasonably necessary to effectuate the release and termination of Mortgagee's Liens and security interests on the Property.

**Section 6.02   Release on Sale or Transfer of Property.** If the Property or any portion thereof is sold or otherwise transferred in accordance with the provisions of Section 4.02 above, then Mortgagee will, upon written request of ~~Mortgagor~~Mortgagors and at ~~Mortgagor's~~Mortgagors' sole cost and expense, execute and deliver to ~~Mortgagor~~Mortgagors a Mortgage Release of this Mortgage with respect to such portion of the Property as is so sold or transferred and such other documentation as may be reasonably necessary to effectuate the release and termination of Mortgagee's liens and security interests on such portion of the Property.

## ARTICLE VII
## NOTICES

**Section 7.01   Notices.** Unless specifically stated otherwise in this Mortgage, all notices, requests, and other communications to ~~Mortgagor~~Mortgagors or Mortgagee shall be in writing and shall be given to such party at its address set forth below or at such other address as such party may hereafter specify in writing for the purpose of receiving notices hereunder. Each such notice, request, or other communication shall be effective and deemed received by ~~Mortgagor~~Mortgagors or Mortgagee, as applicable, (a) if given by a nationally recognized overnight courier service sent for next Business Day delivery, on the first (1st) Business Day after such communication is deposited with such courier service; or (b) if given by certified mail, return receipt requested, on the third (3rd) Business Day after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid.

To ~~Mortgagor~~Mortgagors:          81 Spence Street

                              Bay Shore, New York 11706

                              Attn: Patrick Rossetto

To Mortgagee:                 [ADDRESS]

Section 7.02  All notices and demands delivered by ~~a~~an attorney for ~~Mortgagor~~Mortgagors or Mortgagee on such party's behalf shall be deemed to have been delivered by such party. Notices shall be valid only if served in the manner provided in this Article VII.

## ARTICLE VIII
## INSURANCE; CASUALTY AND CONDEMNATION

Section 8.01  **Insurance.**  ~~Mortgagor~~Mortgagors shall provide or cause to be provided the following: (a) fire and extended coverage insurance including vandalism and malicious mischief, broadened to the so-called "All Risk of Physical Loss" coverage basis of not less than one hundred (100%) percent of the full replacement value of the insured property (both real and personal, including fixtures and equipment) at the time of issuance of such policy or policies and at each renewal date thereof, exclusive of land, excavations, foundations, and other items normally excluded from such policies; (b) public liability insurance in an amount not less than One Million and 00/100 Dollars ($1,000,000.00) and umbrella liability insurance of not less than Five Million Dollars ($5,000,000.00) and workers' compensation insurance (if applicable); and (c) in the event any part of the Property is now or is hereafter determined by the Secretary of Housing and Urban Development ("**HUD**") or the Director of the Federal Emergency Management Agency ("**FEMA**") to be in a "Special Flood Hazard Area," ~~Mortgagor covenants~~Mortgagors covenant to provide flood insurance providing coverage at least equivalent to that provided under the National Flood Insurance Program ("**NFIP**"), in the Special Flood Hazard Area, the aggregate amount of flood insurance must equal, at a minimum, (i) the amount of flood insurance available under NFIP, (ii) the insurable value of all buildings, or (iii) such other amount as may reasonably be required by Mortgagee; or, if only part of the Property is in a Special Flood Hazard Area, the insurable buildings exposed to flood hazards must be covered by flood insurance in an aggregate amount equal at a minimum (x) the amount of flood insurance available under NFIP, (y) the insurable value of the exposed building, or (z) such other amount as may reasonably be required by Mortgagee.  All insurance policies shall be in the form and substance, for amounts and in companies reasonably acceptable to Mortgagee, with annual premiums prepaid by ~~Mortgagor~~Mortgagors, shall contain non-contributory standard mortgagee and Mortgagee's loss payable clauses (as Mortgagee may require) effective as of the closing date, providing for any loss payable thereunder to be paid to Mortgagee, shall provide that the policy may not be canceled without thirty (30) calendar days' prior written notice to Mortgagee and shall be deposited with Mortgagee at any time while any part of the Secured Indebtedness remains outstanding.

Section 8.02  **Notice to Mortgagee.**  ~~Mortgagor~~Mortgagors shall give Mortgagee prompt written notice (which shall in no event be greater than seven (7) calendar days after such occurrence) of the occurrence of any Casualty affecting, or the institution of any proceedings for eminent domain or  condemnation of, the Property or any portion thereof.  Mortgagee may participate in any suits or proceedings relating to any such occurrence of Casualty or institution of proceedings for eminent domain or condemnation, or any proceeds, causes of action, claims, compensation, awards, or recoveries related thereto, and Mortgagee is hereby authorized, in its

own name or in Mortgagor's or Tenant Mortgagor's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and ~~Mortgagor~~Mortgagors shall from time to time upon request deliver to Mortgagee any instruments required to permit such participation; *provided, however,* that, so long as no Event of Default shall be continuing, Mortgagee shall not have the right to participate in the adjustment of any loss.

<div align="center">

**ARTICLE IX**
**MISCELLANEOUS**

</div>

**Section 9.01    Amendments, Extensions, and Modifications.**  No amendment, supplement, waiver, or other modification of this Mortgage shall be effective unless it is in writing and executed by ~~Mortgagor~~Mortgagors and Mortgagee.

**Section 9.02    Entire Agreement.** The Credit Documents and the Plan of Reorganization contain or incorporate by reference the entire agreement of the parties with respect to matter contemplated herein and supersede all prior negotiations.  The Credit Documents and the Plan of Reorganization grant further rights to Mortgagee and contain further agreements and affirmative and negative covenants by ~~Mortgagor~~Mortgagors that apply to this Mortgage and to the Property and such further rights and agreements are incorporated herein by this reference.

**Section 9.03    Successors and Assigns.** This Mortgage may be assigned or transferred, in whole or in part, by Mortgagee subject, in all events, to the terms and conditions of Section 16 of the Note Issuance Agreement. ~~Mortgagor~~Mortgagors may not assign or transfer this Mortgage or any of its rights hereunder without the prior written consent of Mortgagee or as otherwise permitted by this Mortgage. This Mortgage shall inure to the benefit of and be binding upon the parties hereto and their permitted assigns. The terms "~~Mortgagor~~Mortgagors" and "Mortgagee" shall include the respective legal representatives, heirs, executors, administrators, successors, and assigns of the parties hereto, and all those holding under either of them. The term "Mortgagee" shall include any payee of the Secured Indebtedness and any transferee or assignee thereof, whether by operation of law or otherwise.

**Section 9.04    No Merger.** In the event that Mortgagee's interest under this Mortgage and title to the Property or any estate therein shall become vested in the same person or entity, this Mortgage shall not merge in such title but shall continue as a valid lien on the Property for the amount secured hereby, unless expressly provided otherwise in writing executed by the person in whom such interests, title, and estate are vested.

**Section 9.05    Headings.** The headings of the various articles, sections, and subsections in this Mortgage are for reference only and shall not define, expand, or limit any of the terms or provisions hereof.

**Section 9.06    Severability.** Whenever possible, each provision of this mortgage shall be interpreted in such manner as to be effective and valid under Applicable Law, but to the extent

any provision of this Agreement is held to be invalid, void, voidable, prohibited, illegal, or unenforceable in any respect under any Applicable Law of any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Mortgage in any jurisdiction. ~~Mortgagor~~Mortgagors shall use commercially reasonable efforts to replace such invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision of this Mortgage with an effective, valid, and enforceable provision that will achieve, to the fullest extent possible, the economic, business, and other purposes of the invalid, void, voidable, prohibited, illegal, unenforceable, or rejected provision; *provided, however*, that no provision of this Mortgage shall be replaced without the consent of Mortgagee.

    **Section 9.07   Governing Law.** This Mortgage and any claim, controversy, dispute, or cause of action (whether in contract, equity, tort, or otherwise) based upon, arising out of, or relating to this Mortgage and the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to principles of conflicts of law.

    **Section 9.08   Waiver of Jury Trial.**

        (a)    ~~MORTGAGOR~~MORTGAGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY ~~WAIVES~~WAIVE, TO THE EXTENT PERMITTED BY LAW, ANY RIGHT ~~IT~~MORTGAGORS MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS MORTGAGE, THE SECURED INDEBTEDNESS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, EQUITY, TORT, OR ANY OTHER THEORY. ~~MORTGAGOR AGREES~~MORTGAGORS AGREE AND ~~CONSENTS~~CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY BENCH TRIAL WITHOUT A JURY AND THAT ANY PARTY THERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH PARTY TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY.

        (b)    ~~MORTGAGOR   RESPRESENTS~~MORTGAGORS REPRESENT AND ~~WARRANTS~~WARRANT TO HAVING DISCUSSED, OR HAVING HAD AN OPPORTUNITY TO DISCUSS, THIS AGREEMENT AND SPECIFICALLY THE PROVISIONS OF THIS SECTION 9.08 WITH COUNSEL OF ITS OWN CHOOSING.

**Section 9.09   Service of Process and Jurisdiction.**

        (a)    Unless otherwise required by non-waivable provisions of Applicable Law, ~~Morgagor~~Mortgagors consents to service of process by overnight mail or overnight delivery by a nationally recognized overnight courier, at the ~~addtess~~address to which ~~notie~~notice is to be given under Section 7.01 hereof, it being agreed that service in such

manner shall constitute valid service upon ~~Mortgagor~~Mortgagors in connection with any action or proceeding arising out of, connected with, related to, or incidental to this Mortgage; provided, however, that nothing in this Section 9.08 shall affect the right of any Entity to serve legal process in any other manner permitted by Applicable Law of the jurisdiction in which such action or proceeding is brought.

(b)      Except as provided in subsection (c) below, ~~Mortgagor~~Mortgagors irrevocably ~~agrees~~agree that all disputes arising out of, connected with, related to, or incidental to this Mortgage, whether arising in contract, tort, or otherwise, must be resolved exclusively by state or federal courts located in Trenton, New Jersey, and ~~Mortgagor~~Mortgagors irrevocably ~~waives~~waive any objection to the location of the court considering the dispute or any claim that ~~Mortgagor~~Mortgagors is not personally subject to the jurisdiction of such court; however, any appeals from those courts may be heard by a court outside of Trenton, New Jersey.

(c)      Mortgagee shall have the right to proceed in a court in any location to enable Mortgagee (1) to obtain personal jurisdiction over any Entity or any property of any Entity, including any of the Property, (2) to institute a foreclosure action in accordance with Section 5.01(d), (3) to enforce any part of the Lien and security interest granted under this Mortgage, including, without limitation, the collection or recovery of Rents, or (4) to enforce a judgment or other court order in favor of Mortgagee. ~~Mortgagor waives~~Mortgagors waive any objection to the location of the court in which Mortgagee has commenced a proceeding described in this subsection.

**Section 9.10   Sole Discretion of Mortgagee.** Except as may otherwise be expressly provided to the contrary, wherever, pursuant to this Mortgage or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the Secured Indebtedness, Mortgagee exercises any right given to it to consent or not consent, or to approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to consent or not consent, or to approve or disapprove, or to decide that arrangements or terms are satisfactory or not satisfactory, shall be in the sole and absolute discretion of Mortgagee and shall be final and conclusive.

**Section 9.11   Reasonableness.** If at any time ~~Mortgagor believes~~Mortgagors believe that Mortgagee has not acted reasonably in granting or withholding any approval or consent under the Note, this Mortgage, or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the loan secured hereby, as to which approval or consent either (i) Mortgagee has expressly agreed to act reasonably, or (ii) absent such agreement, Applicable Law would nonetheless require Mortgagee to act reasonably, then ~~Mortgagor's~~Mortgagors' sole remedy shall be to seek injunctive relief or specific performance, and no action for monetary damages or punitive damages shall in any event or under any circumstance be maintained by ~~Mortgagor~~Mortgagors against Mortgagee.

**Section 9.12    Waiver of Statutory Rights.** ~~Mortgagor~~Mortgagors shall not and will not apply for or avail ~~itself~~themselves of any appraisement, valuation, stay, extension or exemption laws, or any so-called "Moratorium Laws," now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, but hereby waives the benefit of such laws to the full extent that ~~Mortgagor~~Mortgagors may do so under Applicable Law. ~~Mortgagor~~Mortgagors for ~~itself~~themselves and all who may claim through or under it waives any and all right to have the property and estates comprising the Property marshaled upon any foreclosure of the lien of this Mortgage and ~~agrees~~agree that any court having jurisdiction to foreclose such lien may order the Property sold as an entirety. ~~Mortgagor~~Mortgagors hereby ~~waives~~waive for ~~itself~~themselves and all who may claim through or under ~~it~~such Mortgagors, and to the full extent ~~Mortgagor~~Mortgagors may do so under applicable law, any and all rights of redemption from sale under any order of decree of foreclosure of this Mortgage or granted under any statute now existing or hereafter enacted.

**Section 9.13    Filing of the Mortgage.** ~~Mortgagor~~Mortgagors forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage, and any security instrument creating a Lien or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any Applicable Law in order to publish notice of and fully to protect, preserve, and perfect the Lien hereof upon, and the interest of Mortgagee in, the Property. To the extent not exempted therefrom under section 1146(a) of the Bankruptcy Code or the order confirming the Plan of Reorganization, ~~Mortgagor~~Mortgagors will pay all filing, registration, and recording fees, and all expenses incident to the preparation, execution, and acknowledgement of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Property, and any instrument of further assurance, and all other costs arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, and security instrument with respect to the Property or any instrument of further assurance; *provided, however,* that any Taxes imposed on the making and recording of this Mortgage shall be subject to the treatment set forth in Section 10.02(f) hereof.

**Section 9.14    Further Assurances.** ~~Mortgagor~~Mortgagors shall from time to time and at the sole cost and expense of ~~Mortgagor~~Mortgagors promptly execute and deliver all further instruments, documents, and notices and take all further action that may be necessary or desirable, or that Mortgagee may reasonably request, in order to create, grant, perfect, or protect any interest or rights granted or purported to be granted to Mortgagee by this Mortgage or to enable Mortgagee to exercise its rights and remedies hereunder. Without limiting the generality of the foregoing, ~~Mortgagor~~Mortgagors shall, upon Mortgagee's request, appear in and defend any action or proceeding that may affect ~~Mortgagor's~~Mortgagors' respective title to the Property or otherwise affect the interests and rights of Mortgagee under this Mortgage. Further, ~~Mortgagor~~Mortgagors shall furnish to Mortgagee, from time to time upon Mortgagee's request, statements and schedules further identifying, updating, and describing the Property and such other information, reports, and evidence concerning the Property as Mortgagee may reasonably request.

## ARTICLE X
## STATE-SPECIFIC PROVISIONS

**Section 10.01 State-Specific Provisions Control.** In the event of any conflict between the terms and provisions set forth in this Article X and the other terms and provisions of this Mortgage, the terms and provisions of this Article X shall control and be binding.

**Section 10.02 State-Specific Provisions.** With respect to the Property, which is located in the State of Ohio, notwithstanding anything contained herein to the contrary:

(a)    **Lien Law.** ~~Mortgagor covenants~~Mortgagors covenant and ~~agrees~~agree that Mortgagee, at Mortgagee's option, is authorized and empowered to do all things provided to be done by a mortgagee under Section 1311.14 of the Ohio Revised Code, and any present or future amendments or supplements thereto.

(b)    **Protective Advances.**   This Mortgage secures unpaid balances of advances made with respect to the Property for the payment of taxes, assessments, insurance premiums, or costs incurred for the protection of the Property under Section 5301.233 of the Ohio Revised Code.

(c)    **Event of Default.** An Event of Default constitutes a default under each of the Credit Documents, and as a consequence of such continuing default, Mortgagee may accelerate the Obligations secured hereby and foreclose the Bay Shore Mortgage or resort to any of Mortgagee's other remedies thereunder or under the other Credit Documents.

It is specifically covenanted and agreed that, upon the occurrence and continuation of an Event of Default, Mortgagee may proceed, at the same or at different times, to foreclose this Mortgage, the Bay Shore Mortgage, or any one or more of them, by any proceedings appropriate in a state where any of the underlying properties are located; that no enforcement action being taken in any state shall in any way stay, preclude, or bar enforcement of this Mortgage or any other Credit Documents in any other state; and that Mortgagee may pursue any or all of Mortgagee's remedies to the maximum extent permitted by state law until all the Obligations have been paid and discharged in full.

~~Mortgagor~~Mortgagors hereby ~~acknowledges~~acknowledge receipt, without charge, of a true copy of this Mortgage.

(d)    **Fixture Filing.** This Mortgage, to the extent that it conveys or otherwise deals with property or with items of property that are or that may become fixtures related to the Property, under Section 1309.502(C) of the Ohio Revised Code or otherwise under Ohio law, constitutes a financing statement filed and indexed as a fixture filing in the real estate records of the recorder of the county in which such property is located with respect to any and all fixtures and with respect to any personal property that may now be or hereafter become such fixtures.  For purposes of the foregoing, ~~Mortgagor~~each of the

Mortgagors is thea debtor (with its address as set forth in this Mortgage) and Mortgagee is the secured party (with its address as set forth in this Mortgage). Property Mortgagor is the record owner of the Land and Improvements other than the Tenant-Owned Improvements and Tenant Mortgagor is the record owner of the Tenant-Owned Improvements. If any items of property hereunder also constitute collateral granted to Mortgagee under any other mortgage, agreement, document, or instrument, in the event of any conflict between the provisions of such other mortgage, agreement, document, or instrument relating to such collateral, the provision or provisions selected by Mortgagee shall control with respect to such collateral.

(e)    **Attorneys' Fees.** With respect to any agreement by MortgagorMortgagors in this Mortgage or in any other Credit Documents to pay Mortgagee's attorneys' fees and disbursements incurred in connection with the Obligations, Mortgagor agreesMortgagors agree that each of the Credit Documents is a "contract of indebtedness" and that the attorneys' fees and disbursements referenced are those that are a reasonable amount, all as contemplated by Section 1319.02 (formerly Section 1301.21) of the Ohio Revised Code, as such Section may hereafter be amended. MortgagorMortgagors further agreesagree that the indebtedness incurred in connection with the Obligations is not incurred for purposes that are primarily personal, family, or household and confirms that the total amount owed on the contract of indebtedness exceeds ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00).

(f)    **Maturity Date.** The maturity date of the Trust Note is [_____ __, 20__].

(g)    **Prior Instrument Reference.**

(i)    Property Mortgagor claims title to the Property under that certain instrument recorded as Instrument No. [_____] in the Recorder's Office of Butler County, Ohio.

(ii)    [_____] claims title to the Tenant-Owned Improvements under that certain instrument recordedrecorded as Instrument No. [_____] in the Recorder's Office of Butler County, Ohio.

(h)    **Open-End Mortgage.** This Mortgage is intended to be an open-end mortgage as provided for in Section 5301.232 of the Ohio Revised Code. Accordingly, Secured Indebtedness shall be deemed to include all present and future obligations evidenced by the Trust Note, the Note Issuance Agreement and this Mortgage, including, but not limited to unpaid balances of loan advances made after this Mortgage is delivered to the recorder for record.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, ~~Mortgagor has~~Mortgagors have caused this Mortgage to be executed on the date set forth in the acknowledgment below and to be effective as of the date first set forth above.

WITNESS:

ISWR OHIO LLC, an Ohio limited liability company

_____

Name:

By_____

Name:

Title:

STATE OF _____      )

                                          )      SS.

COUNTY OF _____      )

On the _____ day of _____ in the year ~~2018~~2019 before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/ executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

My commission expires:

| ATTEST: | | DURO DYNE NATIONAL CORP., a New York corporation |
|---------|---|-----------------------------------------------|
| | | |
| ~~~~~~~~ | | By |
| Name: | | Name: |
| Title: | | Title: |

STATE OF _____      )
                          )    SS.
COUNTY OF _____     )

On the _____ day of _____ in the year 2019 before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/ executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

My commission expires:

This Instrument was Prepared By:

Jeffrey D. Prol, Esq.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

**SCHEDULE A**

**LEGAL DESCRIPTION**

EXHIBIT A

Tenant-Owned ~~Improvments~~Improvements

01.~~23598050.1~~23598050.3

Document comparison by Workshare Compare on Tuesday, January 15, 2019
4:37:51 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://WORKSITE02/YCST01/23598050/2 |
| Description | #23598050v2<YCST01> - Fitzpatrick as FCR for Duro Dyne - OH Mortgage |
| Document 2 ID | interwovenSite://WORKSITE02/YCST01/23598050/3 |
| Description | #23598050v3<YCST01> - Fitzpatrick as FCR for Duro Dyne - OH Mortgage |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 332 |
| Deletions | 269 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 603 |

**EXHIBIT C**

DURO DYNE ASBESTOS PERSONAL INJURY TRUST AGREEMENT

# DURO DYNE ASBESTOS PERSONAL INJURY TRUST AGREEMENT

## TABLE OF CONTENTS

SECTION I – Agreement of Trust ................................................................................................. 3

    1.1    Creation and Name ........................................................................................................ 3

    1.2    Purpose.......................................................................................................................... 3

    1.3    Transfer of Assets ......................................................................................................... 4

    1.4    Acceptance of Assets and Assumption of Liabilities ...................................................... 4

SECTION II – Powers and Trust Administration........................................................................ 5

    2.1    Powers.......................................................................................................................... 5

    2.2    General Administration.................................................................................................. 9

    2.3    Claims Administration ................................................................................................. 13

SECTION III – Accounts, Investments, and Payments............................................................. 13

    3.1    Accounts ...................................................................................................................... 13

    3.2    Investments .................................................................................................................. 13

    3.3    Source of Payments...................................................................................................... 16

SECTION IV – Trustee; Delaware Trustee ............................................................................... 16

    4.1    Number ........................................................................................................................ 16

    4.2    Term of Service............................................................................................................ 17

    4.3    Appointment of Successor Trustee ............................................................................... 17

    4.4    Liability of Trustee, Members of the TAC and the FCR ............................................... 18

    4.5    Compensation and Expenses of Trustee and Delaware Trustee ..................................... 18

    4.6    Indemnification ............................................................................................................ 19

    4.7    Lien ............................................................................................................................. 21

    4.8    Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel ....... 21

    4.9    Trustee's Independence ................................................................................................ 21

    4.10    Bond............................................................................................................................ 22

    4.11    Delaware Trustee ......................................................................................................... 22

i

4.12    Medicare Reporting Obligations ................................................................... 24

SECTION V – Trust Advisory Committee ................................................................ 25

5.1    Members ................................................................................................ 25

5.2    Duties ..................................................................................................... 25

5.3    Term of Office ........................................................................................ 25

5.4    Appointment of Successor ...................................................................... 26

5.5    TAC's Employment of Professionals ...................................................... 27

5.6    Compensation and Expenses of the TAC ................................................ 28

5.7    Procedures for Consultation With and Obtaining the Consent of the TAC ................. 29

SECTION VI – The FCR ............................................................................................ 31

6.1    Duties ..................................................................................................... 31

6.2    Term of Office ........................................................................................ 32

6.3    Appointment of Successor ...................................................................... 32

6.4    FCR's Employment of Professionals ...................................................... 33

6.5    Compensation and Expenses of the FCR ................................................ 34

6.6    Procedures for Consultation with and Obtaining the Consent of the FCR ................. 34

SECTION VII – General Provisions ......................................................................... 36

7.1    Irrevocability ......................................................................................... 36

7.2    Term; Termination ................................................................................. 37

7.3    Amendments ........................................................................................... 38

7.4    Meetings ................................................................................................. 39

7.5    Severability ............................................................................................ 39

7.6    Notices ................................................................................................... 39

7.7    Successors and Assigns .......................................................................... 42

7.8    Limitation on Claim Interests for Securities Laws Purposes .................. 42

7.9    Entire Agreement; No Waiver ................................................................ 42

7.10    Headings ................................................................................................. 43

7.11    Governing Law ....................................................................................... 43

7.12    Settlors' Representative and Cooperation ............................................... 44

7.13    Dispute Resolution ................................................................................. 44

7.14    Enforcement and Administration .................................................................................. 45

7.15    Effectiveness ............................................................................................................... 45

7.16    Counterpart Signatures ................................................................................................ 45

## DURO DYNE ASBESTOS PERSONAL INJURY TRUST AGREEMENT

This Duro Dyne Asbestos Personal Injury Trust Agreement (this **"Trust Agreement"**), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp, et al., under Chapter 11 of the Bankruptcy Code, dated as of November 16, 2018 (as it may be amended or supplemented, the **"Plan"**),[1] by Duro Dyne National Corp. and the other Debtors (collectively referred to as the **"Debtors," "Duro Dyne,"** or the **"Settlors"**), the debtors and debtors-in-possession whose chapter 11 case is administered under Case No. 18-27963 (MBK) in the United States Bankruptcy Court for the District of New Jersey; the Legal Representative (the **"FCR"**); the Asbestos Claimants Committee (the **"ACC"**); Wilmington Trust, National Association (the **"Delaware Trustee"**); the Asbestos Trustee identified on the signature pages hereof (the **"Trustee"**); and the members of the Trust Advisory Committee identified on the signature pages hereof (the **"TAC"**); and

**WHEREAS,** the Debtors have reorganized under the provisions of chapter 11 of the Bankruptcy Code in the case filed in the United States Bankruptcy Court for the District of New Jersey, administered and known as *In re Duro Dyne National Corp, et al.*, Case No. 18-27963 (MBK); and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court and affirmed by the District Court; and

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the Duro Dyne Asbestos Personal Injury Trust (the "**Asbestos Trust**"); and

**WHEREAS**, pursuant to the Plan, the Asbestos Trust is to use its assets and income to satisfy all Channeled Asbestos Claims ("**Asbestos Claims**"); and

**WHEREAS**, it is the intent of Duro Dyne, the Trustee, the ACC, the TAC, and the FCR that the Asbestos Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the Asbestos Trust will satisfy all Asbestos Claims pursuant to the Duro Dyne Asbestos Trust Distribution Procedures (the "**TDP**") attached to the Plan Supplement dated March __, 2019 as Exhibit ___ in substantially the same manner, and in strict compliance with the terms of this Trust Agreement; and

**WHEREAS**, all rights of the holders of Asbestos Claims arising under this Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS**, pursuant to the Plan, the Asbestos Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

**WHEREAS**, the Bankruptcy Court has determined that the Asbestos Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all Asbestos Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE**, it is hereby agreed as follows:

## SECTION I

### AGREEMENT OF TRUST

**1.1    Creation and Name.** The Debtors as Settlors hereby create a trust known as the "Duro Dyne Asbestos Personal Injury Trust," which is the Asbestos Trust provided for and referred to in the Plan. The Trustee of the Asbestos Trust may transact the business and affairs of the Asbestos Trust in the name of the Asbestos Trust, and references herein to the Asbestos Trust shall include the Trustee acting on behalf of the Asbestos Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document constitutes the governing instrument of the Asbestos Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto.

**1.2    Purpose.** The purpose of the Asbestos Trust is to assume all liabilities and responsibility for all Asbestos Claims, and, among other things to: (a) direct the processing, liquidation and payment of all Asbestos Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims; and (c) qualify at all times as a qualified settlement fund. The Asbestos Trust is to use the Asbestos Trust's assets and income to pay the holders of all Asbestos Claims in accordance with this Trust Agreement and the TDP in such a way that such holders of Asbestos Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

**1.3    Transfer of Assets.** Pursuant to, and in accordance with, Sections 4.08 and 4.10 of the Plan, the Asbestos Trust has received the Asbestos Trust Assets to fund the Asbestos Trust and settle or discharge all Asbestos Claims. In all events, the Asbestos Trust Assets or any other assets to be transferred to the Asbestos Trust under the Plan will be transferred to the Asbestos Trust free and clear of any liens or other claims by the Debtors, the Reorganized Debtor, the other Protected Parties, any creditor, or other entity except as otherwise provided in the Plan. Sections 5.02 and 13.12 of the Plan provide for the Debtors and the Reorganized Debtor, among others, to execute and deliver such documents to the Asbestos Trust as the Trustee may request to effectuate the transfer and assignment of any Asbestos Trust Assets to the Asbestos Trust.

**1.4    Acceptance of Assets and Assumption of Liabilities.**

(a)    In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust hereby expressly accepts the transfer to the Asbestos Trust of the Asbestos Trust Assets or any other transfers contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

(b)    In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust expressly assumes all liabilities and responsibility for all Asbestos Claims in substitution for the financial or other responsibility or liability of the Reorganized Debtor therefor. Except as otherwise provided in this Trust Agreement and the TDP, the Asbestos Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such claims that the Debtors or the Reorganized Debtor have or would have had under applicable law. Regardless of the foregoing, however, a claimant must meet otherwise applicable federal and state statutes of limitations and repose, except as otherwise provided in Section 5.1(a)(2) of the TDP.

- 4 -

(c)     Notwithstanding anything to the contrary herein, no provision herein or in
the TDP shall be construed or implemented in a manner that would cause the Asbestos Trust to
fail to qualify as a "qualified settlement fund" under the QSF Regulations.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit (i)
the scope, enforceability, or effectiveness of the Injunctions, or (ii) subject to the provisions of
Section 1.4(b) above, the Asbestos Trust's assumption of all liability for Asbestos Claims.

(e)     In this Trust Agreement and the TDP the words "must," "will," and
"shall" are intended to have the same mandatory force and effect, while the word "may" is
intended to be permissive rather than mandatory.

(f)     To the extent required by the Act, the beneficial owners (within the
meaning of the Act) of the Asbestos Trust (the "**Beneficial Owners**") shall be deemed to be the
holders of Asbestos Claims; provided that (i) the holders of Asbestos Claims, as such Beneficial
Owners, shall have only such rights with respect to the Asbestos Trust and its assets as are set
forth in the TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or
winding up of the Asbestos Trust, shall be deemed to apply to the holders of Asbestos Claims in
their capacity as Beneficial Owners.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

### 2.1    Powers.

(a)     The Trustee is and shall act as the fiduciary to the Asbestos Trust in
accordance with the provisions of this Trust Agreement and the Plan.  The Trustee shall, at all
times, administer the Asbestos Trust and the Asbestos Trust Assets in accordance with the
purposes set forth in Section 1.2 above.  Subject to the limitations set forth in this Trust

- 5 -

Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Asbestos Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustee shall have the power to:

(i)     receive and hold the Asbestos Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the Asbestos Trust Assets;

(ii)     invest the monies held from time to time by the Asbestos Trust;

(iii)     sell, transfer, or exchange any or all of the Asbestos Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Asbestos Trust to operate;

(v)     pay liabilities and expenses of the Asbestos Trust;

(vi)     establish such funds, reserves, and accounts within the Asbestos Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the Asbestos Trust;

- 6 -

(vii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)    establish, supervise, and administer the Asbestos Trust in accordance with this Trust Agreement and the TDP and the terms thereof;

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and agents as the business of the Asbestos Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Asbestos Trust;

(x)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the Asbestos Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)    compensate the Trustee, the Delaware Trustee, the TAC members, and the FCR as provided below, and their employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustee, the Delaware Trustee, the TAC members, and the FCR all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee considers proper in administering the Asbestos Trust;

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Asbestos Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

- 7 -

(xiv)    in accordance with Section 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, the Delaware Trustee, the members of the TAC, and the FCR, and (B) the officers and employees of the Asbestos Trust, and any agents, advisors and consultants of the Asbestos Trust, the TAC, or the FCR (the "**Additional Indemnitees**"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors, and representatives;

(xv)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvi)    consult with the TAC and the FCR at such times and with respect to such issues relating to the conduct of the Asbestos Trust as the Trustee considers desirable; and

(xvii)    make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos Trust, any claim, right, action, or cause of action included in the Asbestos Trust Assets, including, but not limited to, insurance recoveries, before any court of competent jurisdiction.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the Asbestos Trust required hereunder.

- 8 -

(f)    The Trustee shall give the TAC and the FCR prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

**2.2    General Administration.**

(a)    The Trustee shall act in accordance with this Trust Agreement.

(b)    The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Asbestos Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Asbestos Trust as a qualified settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the Asbestos Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(c)    The Trustee shall timely account to the Bankruptcy Court as follows:

(i)    The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the **"Annual Report"**) containing financial statements of the Asbestos Trust (including, without limitation, a balance sheet of the Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustee and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims. The Trustee shall provide a copy of such Annual Report to the TAC and the FCR when such reports are filed with the Bankruptcy Court.

- 9 -

(ii)    Simultaneously with the filing of the Annual Report, the Trustee
shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary
regarding the number and type of claims disposed of during the period covered by the financial
statements. The Trustee shall provide a copy of such report to the TAC and the FCR when such
report is filed.

(iii)    All materials required to be filed with the Bankruptcy Court by this
Section 2.2(c) shall be available for inspection by the public in accordance with procedures
established by the Bankruptcy Court and shall be filed with the Office of the United States
Trustee for the District of New Jersey (the "**U.S. Trustee**").

(d)    The Trustee shall cause to be prepared as soon as practicable prior to the
commencement of each fiscal year a budget and cash flow projections covering such fiscal year.
The budget and cash flow projections shall include a determination of the Maximum Annual
Payment pursuant to Section 2.4 of the TDP.  The Trustee shall provide a copy of the budget and
cash flow projections to the TAC and the FCR.

(e)    The Trustee shall consult with the TAC and the FCR (i) on the general
implementation and administration of the Asbestos Trust; (ii) on the general implementation and
administration of the TDP; and (iii) on such other matters as may be required under this Trust
Agreement and the TDP.

(f)    The Trustee shall be required to obtain the consent of the TAC and the
FCR pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to
any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change the Payment Percentage
described in Section 2.3 of the TDP as provided in Section 4.2 of the TDP;

- 10 -

(ii)    to change the Claims Payment Ratio described in Section 2.5 of the

TDP;

(iii)    to change the Disease Levels, Scheduled Values and/or

Medical/Exposure Criteria set forth in Section 5.3(a)(3) of the TDP;

(iv)    to establish and/or to change the Claims Materials to be provided

to holders of Asbestos Claims under Section 6.1 of the TDP;

(v)    to require that claimants provide additional kinds of medical

evidence pursuant to Section 6.1 of the TDP;

(vi)    to change the form of release to be provided pursuant to Section

7.8 of the TDP;

(vii)    to terminate the Asbestos Trust pursuant to Section 7.2 below;

(viii)    to settle the liability of any insurer under any insurance policy or

legal action related thereto;

(ix)    to change the compensation of the members of the TAC, the FCR,

the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or to reflect

changes approved by the Bankruptcy Court as otherwise provided herein;

(x)    to take actions to minimize any tax on the Asbestos Trust Assets;

provided that no such action prevents the Asbestos Trust from qualifying as a qualified

settlement fund within the meaning of the QSF Regulations or requires an election for the

Asbestos Trust to be treated as a grantor trust for tax purposes;

(xi)    to amend any provision of this Trust Agreement or the TDP in

accordance with the terms thereof;

- 11 -

(xii)    to acquire an interest in or to merge any claims resolution organization formed by the Asbestos Trust with another claims resolution organization that is not specifically created by this Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the Asbestos Trust pursuant to the Trust Agreement or the TDP; provided that such merger, acquisition, contract or joinder shall not (a) subject the Reorganized Debtor or any successors in interest thereto, to any risk of having any Asbestos Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Injunctions or any other injunction or release issued or granted in connection with the Plan; and provided further that the terms of such merger will require the surviving organization to make decisions about the allowability and value of claims in accordance with Section 2.1 of the TDP which requires that such decisions be based on the provisions of the TDP, or (c) cause the Asbestos Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations; or

(xiii)    if and to the extent required by Section 6.5 of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section 6.5 of the TDP.

(g)    The Trustee shall meet with the TAC and the FCR no less often than quarterly. The Trustee shall meet in the interim with the TAC and the FCR when so requested by either. Meetings may be held in person, by telephone conference call, or by a combination of the two.

- 12 -

(h)     The Trustee, upon notice from either the TAC or the FCR, if practicable in view of pending business, shall at his or her next meeting with the TAC or the FCR consider issues submitted by the TAC or the FCR.  The Trustee shall keep the TAC and the FCR reasonably informed regarding all aspects of the administration of the Asbestos Trust.

**2.3     Claims Administration.**  The Trustee shall promptly proceed to implement the TDP.

## SECTION III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1     Accounts.**

(a)     The Trustee may, from time to time, create such accounts and reserves within the Asbestos Trust estate as he or she may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of Asbestos Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(b)     The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the accounts to be filed with the Bankruptcy Court and provided to the TAC and the FCR pursuant to Section 2.2(c)(i) above.

**3.2     Investments.**  Investment of monies held in the Asbestos Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions:

- 13 -

(a)      The Asbestos Trust may invest only in diversified equity portfolios whose
benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell
1000 Index, S&P ADR Index or MSCI EAFE Index. The Asbestos Trust shall not acquire,
directly or indirectly, equity in any entity (other than the Reorganized Debtor or any successor to
the Reorganized Debtor) or business enterprise if, immediately following such acquisition, the
Asbestos Trust would hold more than 5% of the equity in such entity or business enterprise. The
Asbestos Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity
(other than the Reorganized Debtor, or any successor to the Reorganized Debtor) or business
enterprise.

(b)      The Asbestos Trust shall not acquire or hold any long-term debt securities
unless (i) such securities are Asbestos Trust Assets under the Plan, (ii) such securities are rated
"Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("S&P"), or have been
given an equivalent investment grade rating by another nationally recognized statistical rating
agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United
States of America or any agency or instrumentality thereof. This restriction does not apply to
any pooled investment vehicles where pooled assets receive an investment grade rating (i.e.,
"BBB" rating or above) by a nationally recognized rating agency.

(c)      The Asbestos Trust shall not acquire or hold for longer than ninety (90)
days any commercial paper unless such commercial paper is rated "Prime-1" or higher by
Moody's or "A-1" or higher by S&P, or has been given an equivalent rating by another
nationally recognized statistical rating agency.

(d)      The Asbestos Trust shall not acquire any debt securities or other debt
instruments issued by any entity if, following such acquisition, the aggregate market value of all

- 14 -

such debt securities and/or other debt instruments issued by such entity held by the Asbestos
Trust would exceed 5% of the then current aggregate value of the Asbestos Trust's assets. There
is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as
to principal and interest by the United States of America or any agency or instrumentality
thereof.

(e)     The Asbestos Trust shall not acquire or hold any certificates of deposit in
an amount exceeding any federal insurance on such certificates of deposit unless all publicly
held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit
and the holding company, if any, of which such financial institution is a subsidiary, meet the
standards set forth in Section 3.2(b) above.

(f)     The Asbestos Trust may acquire and hold any securities or instruments
issued by the Reorganized Debtor or any successor to the Reorganized Debtor or obtained as
proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth
in Subsections (a)-(e) above.

(g)     The Asbestos Trust shall not acquire or hold any repurchase obligations
unless, in the opinion of the Trustee, they are adequately collateralized.

(h)     The Asbestos Trust may allow its investment managers to acquire
prudently or hold derivative instruments, including, without limitation, options, futures and
swaps in the normal course of portfolio management. Specifically, the Asbestos Trust may
acquire or hold derivatives to help manage or mitigate portfolio risk, including, without
limitation, interest rate risk and equity market risk. Using derivative instruments to leverage a
portfolio to enhance returns (at a much greater risk to the portfolio) is prohibited.

(i)    The Asbestos Trust may lend securities on a short-term basis, subject to adequate, normal and customary collateral arrangements.

(j)    Notwithstanding (a) above, the Asbestos Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if prior to such acquisition, the Asbestos Trust complies with the provisions of Section 2.2(f)(xii) hereof with respect to the acquisition.

**3.3    Source of Payments.**

(a)    All Asbestos Trust expenses and payments and all liabilities with respect to Asbestos Claims shall be payable solely by the Trustee out of the Asbestos Trust Assets. Neither the Trustee, the Delaware Trustee, the TAC or FCR, or any of their officers, agents, advisors, or employees, nor the Debtors, the Reorganized Debtor, or any other Protected Party shall be liable for the payment of any Asbestos Trust expense or any other liability of the Asbestos Trust, except to the extent provided in the Plan or Plan Documents.

(b)    The Trustee shall include a reasonably detailed description of any payments made in accordance with this Section 3.3 in the Annual Report.

(c)    The Trustee, with the consent of the TAC and the FCR, shall establish and implement billing guidelines applicable to the TAC, the FCR, the Trustee and their respective professionals that seek compensation from the Asbestos Trust.

## SECTION IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1    Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall be one (1) Trustee who shall be that person named on the signature page hereof.

- 16 -

## 4.2    Term of Service.

(a)    The initial Trustee named pursuant to Section 4.1 above shall serve an initial term of service of five (5) years. Thereafter each term of service shall be five (5) years. The initial Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) below, (v) his or her removal pursuant to Section 4.2(c) below, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)    The Trustee may resign at any time by written notice to the TAC and the FCR. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed at the recommendation of the TAC and the FCR with the approval of the Bankruptcy Court, in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings. Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

## 4.3    Appointment of Successor Trustee.

- 17 -

(a)      In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the TAC and FCR. In the event that the TAC and the FCR cannot agree on the successor Trustee, the Bankruptcy Court shall make the appointment. Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as the Trustee for an additional term or terms.

(b)      Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)      Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

**4.4      Liability of Trustee, Members of the TAC and the FCR.** The Trustee, the Members of the TAC and the FCR shall not be liable to the Asbestos Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or for willful misappropriation.

**4.5      Compensation and Expenses of Trustee and Delaware Trustee.**

(a)      The Trustee shall receive a retainer from the Asbestos Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually. Hourly time, as

- 18 -

described below, shall first be billed and applied to the annual retainer. Hourly time in excess of

the annual retainer shall be paid by the Asbestos Trust. For all time expended as Trustee,

including attending meetings, preparing for such meetings, and working on authorized special

projects, the Trustee shall receive the sum of $500 per hour. For all non-working travel time in

connection with Asbestos Trust business, the Trustee shall receive the sum of $250 per hour. All

time shall be computed on a decimal hour basis. The Trustee shall record all hourly time to be

charged to the Asbestos Trust on a daily basis. The hourly compensation payable to the Trustee

hereunder shall be reviewed every year by the Trustee and, after consultation with the members

of the TAC and the FCR, appropriately adjusted by the Trustee for changes in the cost of living.

The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee

agreement.

        (b)    The Asbestos Trust will promptly reimburse the Trustee and the Delaware

Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee or the

Delaware Trustee in connection with the performance of their duties hereunder.

        (c)    The Asbestos Trust shall include a description of the amounts paid under

this Section 4.5 in the Annual Report.

    **4.6    Indemnification.**

        (a)    The Asbestos Trust shall indemnify and defend the Trustee, the members

of the TAC, the Delaware Trustee, and the FCR in the performance of their duties hereunder to

the fullest extent that a statutory trust organized under the laws of the State of Delaware (after

the application of Section 7.11) is from time to time entitled to indemnify and defend such

persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in

the performance of their duties hereunder or in connection with activities undertaken by them

- 19 -

prior to the Effective Date in connection with the formation, establishment, or funding of the
Asbestos Trust. The Asbestos Trust may indemnify any of the Additional Indemnitees in the
performance of their duties hereunder to the fullest extent that a statutory trust organized under
the laws of the State of Delaware (after the application of Section 7.11) is from time to time
entitled to indemnify and defend such persons against any and all liabilities, expenses, claims,
damages, or losses incurred by them in the performance of their duties hereunder or in
connection with activities undertaken by them prior to the Effective Date in connection with the
formation, establishment or funding of the Asbestos Trust. Notwithstanding the foregoing, no
individual shall be indemnified or defended in any way for any liability, expense, claim, damage,
or loss for which he or she is ultimately liable under Section 4.4 above.

    (b)    Reasonable expenses, costs and fees (including attorneys' fees and costs)
incurred by or on behalf of the Trustee, a member of the TAC, the Delaware Trustee, the FCR or
an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil,
administrative or arbitrative, from which they are indemnified by the Asbestos Trust pursuant to
Section 4.6(a) above, shall be paid by the Asbestos Trust in advance of the final disposition
thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC,
the Delaware Trustee, the FCR or the Additional Indemnitee, to repay such amount in the event
that it shall be determined ultimately by final order that the Trustee, the member of the TAC, the
FCR or the Additional Indemnitee is not entitled to be indemnified by the Asbestos Trust.

    (c)    The Trustee must purchase and maintain reasonable amounts and types of
insurance on behalf of an individual who is or was a Trustee, a member of the TAC, the FCR or
an Additional Indemnitee, including against liability asserted against or incurred by such
individual in that capacity or arising from his or her status as a Trustee, TAC member, FCR, an

- 20 -

officer or an employee of the Asbestos Trust, or an advisor, consultant or agent of the Asbestos
Trust, the TAC or the FCR.

    **4.7**    **Lien.** The Trustee, members of the TAC, the FCR and the Additional
Indemnitees shall have a first priority lien upon the Asbestos Trust Assets to secure the payment
of any amounts payable to them pursuant to Section 4.6 above.

    **4.8**    **Trustee's Employment of Experts; Delaware Trustee's Employment of
Counsel.**

    (a)    The Trustee may, but shall not be required to, retain and/or consult with
counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors
and such other parties deemed by the Trustee to be qualified as experts on the matters submitted
to them (the "**Trust Professionals**"), and in the absence of gross negligence, the written opinion
of or information provided by any such party deemed by the Trustee to be an expert on the
particular matter submitted to such party shall be full and complete authorization and protection
in respect of any action taken or not taken by the Trustee hereunder in good faith and in
accordance with the written opinion of or information provided by any such party.

    (b)    The Delaware Trustee shall be permitted to retain counsel only in such
circumstances as required in the exercise of its obligations hereunder and compliance with the
advice of such counsel shall be full and complete authorization and protection for actions taken
or not taken by the Delaware Trustee in good faith in compliance with such advice.

    **4.9**    **Trustee's Independence.** The Trustee shall not, during the term of his or her
service, hold a financial interest in, act as attorney or agent for, or serve as any other professional
for the Reorganized Debtor. Notwithstanding the foregoing, the Trustee may serve, without any
additional compensation other than the compensation to be paid by the Asbestos Trust pursuant
to Section 4.5(a) above, as a director of the Reorganized Debtor. The Trustee shall not act as an

- 21 -

attorney for any person who holds an asbestos claim. For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10   Bond.** The Trustee and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11   Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein. The Delaware Trustee shall be one of the trustees of the Asbestos Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Asbestos Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act (acting

- 22 -

solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c) The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.11(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) below. If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d) Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any fees and expenses due to the outgoing Delaware Trustee are paid. Following

- 23 -

compliance with the preceding sentence, the successor Delaware Trustee shall become fully

vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee

under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the

outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust

Agreement.

### 4.12   Medicare Reporting Obligations.

(a)      The Asbestos Trust shall register as a Responsible Reporting Entity

("**RRE**") under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP

Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**").

(b)      The Asbestos Trust shall, at its sole expense, timely submit all reports that

are required under MMSEA on account of any claims settled, resolved, paid, or otherwise

liquidated by the Asbestos Trust or with respect to contributions to the Asbestos Trust. The

Asbestos Trust, in its role as RRE, shall follow all applicable guidance published by the Centers

for Medicare & Medicaid Services of the United States Department of Health and Human

Services and/or any other agent or successor entity charged with responsibility for monitoring,

assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether

or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)      The Trustee shall obtain prior to remittance of funds to claimants' counsel

or to the claimant, if pro se, in respect of any Asbestos Claim a certification from the claimant to

be paid that said claimant has or will provide for the payment and/or resolution of any

obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules,

regulations, or guidance, in connection with, or relating to, such Asbestos Claim.

- 24 -

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1**    **Members.**  The TAC shall consist of five (5) members, who shall initially be the persons named on the signature page hereof.

**5.2**    **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present Asbestos Claims.  The TAC shall have no fiduciary obligations or duties to any party other than the holders of present Asbestos Claims.  The Trustee must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the TAC.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

**5.3**    **Term of Office.**

(a)    The initial members of the TAC appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof.  Thereafter, each term of office shall be five (5) years.  Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b)

- 25 -

below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)     A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustee and the FCR. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

**5.4    Appointment of Successor.**

(a)     If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor. If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor. If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the TAC or, if such members cannot agree on a successor, the Bankruptcy Court. Nothing in this Trust

- 26 -

Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term or terms, and there shall be no limit on the number of terms that a TAC member may serve.

(b)     Each successor TAC member shall serve until the earlier of (i) the end of the full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the TAC completed his or her term, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(c)     No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.5     **TAC's Employment of Professionals.**

(a)     The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "**TAC Professionals**"). The TAC and the TAC Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustee provided that any information provided

- 27 -

by the Trust Professionals shall not constitute a waiver of any applicable privilege. In the absence of gross negligence, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; *provided, however*, that (i) the TAC has first submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the Asbestos Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the Asbestos Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an Asbestos Trust expense. If the Asbestos Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the Asbestos Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 7.13 below.

5.6    **Compensation and Expenses of the TAC**. The members of the TAC shall not

- 28 -

receive compensation from the Asbestos Trust for their services as TAC members. However, the members of the TAC shall be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement shall be deemed an Asbestos Trust expense. The Asbestos Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the FCR and the TAC pursuant to Section 2.2(c)(i).

    **5.7**    **Procedures for Consultation With and Obtaining the Consent of the TAC.**

        (a)    Consultation Process.

            (i)    In the event the Trustee is required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

            (ii)    In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.7(a), the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing

- 29 -

the TAC with the initial written notice that such matter is under consideration by the Trustee,
unless such time period is waived by the TAC.

      (b)   Consent Process.

      (i)   In the event the Trustee is required to obtain the consent of the
TAC pursuant to Section 2.2(f) above, the Trustee shall provide the TAC with a written notice
stating that their consent is being sought pursuant to that provision, describing in detail the nature
and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the
Trustee desires to take such action. The Trustee shall provide the TAC as much relevant
additional information concerning the proposed action as is reasonably practicable under the
circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust
Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC
may reasonably request during the time that the Trustee is considering such action, and shall also
provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to
discuss and comment on such action with the Trustee.

      (ii)   The TAC must consider in good faith and in a timely fashion any
request for its consent by the Trustee, and must in any event advise the Trustee in writing of its
consent or its objection to the proposed action within thirty (30) days of receiving the original
request for consent from the Trustee, or within such additional time as the Trustee and the TAC
may agree. The TAC may not withhold its consent unreasonably. If the TAC decides to
withhold its consent, it must explain in detail its objections to the proposed action. If the TAC
does not advise the Trustee in writing of its consent or its objections to the action within thirty
(30) days of receiving notice regarding such request (or the additional time period agreed to by

- 30 -

the Trustee and the TAC), the TAC's consent to the proposed actions shall be deemed to have

been affirmatively granted.

                        (iii)    If, after following the procedures specified in this Section 5.7(b),

the TAC continues to object to the proposed action and to withhold its consent to the proposed

action, the Trustee and/or the TAC shall resolve their dispute pursuant to Section 7.13.

However, the burden of proof with respect to the validity of the TAC's objection and

withholding of its consent shall be on the TAC.

## SECTION VI

## THE FCR

**6.1**    **Duties.**  The initial FCR shall be the individual identified on the signature pages

hereto. He or she shall serve in a fiduciary capacity, representing the interests of the holders of

future Asbestos Claims for the purpose of protecting the rights of such persons. The FCR shall

have no fiduciary obligations or duties to any party other than holders of future Asbestos Claims.

The Trustee must consult with the FCR on matters identified in Section 2.2(e) above and on

certain other matters provided herein, and must obtain the consent of the FCR on matters

identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the

Trustee are also subject to the consent of the FCR. Except for the duties and obligations

expressed in this Trust Agreement and the documents referenced herein (including the TDP),

there shall be no other duties (including fiduciary duties) or obligations, express or implied, at

law or in equity, of the FCR.   To the extent that, at law or in equity, the FCR has duties

(including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties

hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other

parties hereto that such duties and liabilities are replaced by the duties and liabilities of the FCR

- 31 -

expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

**6.2    Term of Office.**

(a)    The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)    The FCR may resign at any time by written notice to the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The FCR may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

(d)    No successor FCR shall be liable personally for any act or omission of his or her predecessor. No successor FCR shall have any duty to investigate the acts or omissions of his or her predecessor. No FCR shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.3    Appointment of Successor.** A vacancy caused by resignation or death shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased FCR, and a vacancy caused by removal of the FCR shall be filled with an individual selected by the Trustee in consultation with the TAC. In the event a nominee has not been pre-selected, the successor shall be chosen by the Trustee in consultation with the TAC.

- 32 -

**6.4    FCR's Employment of Professionals.**

(a)    The FCR may, but is not required to, retain and/or consult counsel,

accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and

such other parties deemed by the FCR to be qualified as experts on matters submitted to the FCR

(the "**FCR Professionals**"). The FCR and the FCR Professionals shall at all times have complete

access to the Asbestos Trust's officers, employees and agents, as well as to the Trust

Professionals, and shall also have complete access to all information generated by them or

otherwise available to the Asbestos Trust or the Trustee provided that any information provided

by the Trust Professionals shall not constitute a waiver of any applicable privilege. In the absence

of gross negligence, the written opinion of or information provided by any FCR Professional or

Trust Professional deemed by the FCR to be qualified as an expert on the particular matter

submitted to the FCR shall be full and complete authorization and protection in support of any

action taken, or not taken, by the FCR in good faith and in accordance with the written opinion of

or information provided by the FCR Professional or Trust Professional.

(b)    The Asbestos Trust shall promptly reimburse, or pay directly if so

instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of

legal counsel pursuant to this provision in connection with the FCR's performance of his or her

duties hereunder. The Asbestos Trust shall also promptly reimburse, or pay directly if so

instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of

any other FCR Professionals pursuant to this provision in connection with the FCR's

performance of his or her duties hereunder; *provided, however*, that (i) the FCR has first

submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the

reasons why the FCR desires to employ the FCR Professional, and (B) the basis upon which the

- 33 -

FCR seeks advice independent of the Trust Professionals to meet the need of the FCR for such expertise or advice, and (ii) the Asbestos Trust has approved the FCR's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the Asbestos Trust agrees to pay for the FCR Professional, such reimbursement shall be treated as an Asbestos Trust expense. If the Asbestos Trust declines to pay for the FCR Professional, it must set forth its reasons in writing. If the FCR still desires to employ the FCR Professional at the Asbestos Trust's expense, the FCR and/or the Trustee shall resolve their dispute pursuant to Section 7.13 below.

     **6.5**    **Compensation and Expenses of the FCR.** The FCR shall receive compensation from the Asbestos Trust in the form of payment at the FCR's normal hourly rate for services performed. The Asbestos Trust will promptly reimburse the FCR for all reasonable out-of-pocket costs and expenses incurred by the FCR in connection with the performance of his or her duties hereunder. Such reimbursement or direct payment shall be deemed an Asbestos Trust expense. The Asbestos Trust shall include a description of the amounts paid under this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the FCR and the TAC pursuant to Section 2.2(c)(i).

     **6.6**    **Procedures for Consultation with and Obtaining the Consent of the FCR.**

         (a)    <u>Consultation Process</u>.

            (i)    In the event the Trustee is required to consult with the FCR pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustee shall provide the FCR with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the FCR with such reasonable access to the Trust Professionals

- 34 -

and other experts retained by the Asbestos Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such matter, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

         (ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.6(a), the Trustee shall take into consideration the time required for the FCR, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the FCR with the initial written notice that such matter is under consideration by the Trustee, unless such period is waived by the FCR.

        (b)     Consent Process.

         (i)     In the event the Trustee is required to obtain the consent of the FCR pursuant to Section 2.2(f) above, the Trustee shall provide the FCR with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the FCR as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the FCR with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such action, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

- 35 -

(ii)      The FCR must consider in good faith and in a timely fashion any request for his or her consent by the Trustee, and must in any event advise the Trustee in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and FCR may agree. The FCR may not withhold his or her consent unreasonably. If the FCR decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the FCR does not advise the Trustee in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustee regarding such consent (or the additional time period agreed to by the Trustee and the FCR), the FCR's consent shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 6.6(b), the FCR continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and/or the FCR shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the FCR's objection and withholding of his or her consent shall be on the FCR.

## SECTION VII

### GENERAL PROVISIONS

**7.1    Irrevocability.** To the fullest extent permitted by applicable law, the Asbestos Trust is irrevocable.

- 36 -

### 7.2    Term; Termination.

(a)    The term for which the Asbestos Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.2 (b) – (d) below.

(b)    The Asbestos Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the following events:

(i)    the date on which the Trustee decides to dissolve the Asbestos Trust because (A) he or she deems it unlikely that new Asbestos Claims will be filed against the Asbestos Trust, (B) all Asbestos Claims duly filed with the Asbestos Trust have been liquidated and paid to the extent provided in this Trust Agreement and the TDP or have been disallowed by a final non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos Claim has been filed with the Asbestos Trust; or

(ii)    if the Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)    to the extent that any rule against perpetuities shall be deemed applicable to the Asbestos Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

- 37 -

(c)     On the Dissolution Date or as soon as reasonably practicable, after the

wind-up of the Asbestos Trust's affairs by the Trustee and payment of all the Asbestos Trust's

liabilities have been provided for as required by applicable law including Section 3808 of the

Act, all monies remaining in the Asbestos Trust estate shall be given to such organization(s)

exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which

tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable

discretion; *provided, however*, that (i) if practicable, the activities of the selected tax-exempt

organization(s) shall be related to the treatment of, research on, or the relief of suffering of

individuals suffering from asbestos-related disorders, and (ii) the tax-exempt organization(s)

shall not bear any relationship to the Reorganized Debtor within the meaning of section

468B(d)(3) of the Internal Revenue Code.  Notwithstanding any contrary provision of the Plan

and related documents, this Section 7.2(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the assets of the Asbestos

Trust, the Asbestos Trust shall terminate and the Trustee and the Delaware Trustee (acting solely

at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the

Certificate of Trust of the Asbestos Trust to be filed in accordance with the Act.

Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the

Asbestos Trust as a separate legal entity shall continue until the filing of such Certificate of

Cancellation.

7.3     **Amendments.**  The Trustee, after consultation with the TAC and the FCR, and

subject to the unanimous consent of the TAC and the FCR, may modify or amend this Trust

Agreement.  The Trustee, after consultation with the TAC and the FCR, and subject to the

consent of the TAC and the FCR, may modify or amend the TDP; *provided, however*, that no

- 38 -

amendment to the TDP shall be inconsistent with the provisions limiting amendments to that

document provided therein, and in particular the provisions limiting amendment of the Payment

Percentage set forth in Section 4.2 of the TDP. Any modification or amendment made pursuant

to this Section must be done in writing. Notwithstanding anything contained in this Trust

Agreement or the TDP to the contrary, neither this Trust Agreement, the TDP, nor any document

annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair,

or modify (i) the applicability of section 524(g) of the Bankruptcy Code to the Plan and the

Confirmation Order, (ii) the efficacy or enforceability of the Injunctions or any other injunction

or release issued or granted in connection with the Plan, or (iii) the Asbestos Trust's qualified

settlement fund status under the QSF Regulations. Any amendment affecting the rights, duties,

immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written

consent.

7.4    **Meetings.** The Delaware Trustee shall not be required nor permitted to attend

meetings relating to the Asbestos Trust.

7.5    **Severability.** Should any provision in this Trust Agreement be determined to be

unenforceable, such determination shall in no way limit or affect the enforceability and operative

effect of any and all other provisions of this Trust Agreement.

7.6    **Notices.** Notices to persons asserting claims shall be given by first class mail,

postage prepaid, at the address of such person, or, where applicable, such person's legal

representative, in each case as provided on such person's claim form submitted to the Asbestos

Trust with respect to his or her Asbestos Claim.

(a)    Any notices or other communications required or permitted hereunder to

the following parties shall be in writing and delivered at the addresses designated below, or sent

- 39 -

by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or

certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other

address or addresses as may hereafter be furnished in writing to each of the other parties listed

below in compliance with the terms hereof.

To the Asbestos Trust through the Trustee:

> Duro Dyne Asbestos Personal Injury Trust
> c/o Law Office of Alan B. Rich
> Attn: Alan B. Rich, Esq.
> 7324 Gaston Avenue
> Suite 124, LB 430
> Dallas, Texas 75214
> Phone: (214) 744-5100
> Fax: (214) 744-5101
> durodyne@alanrichlaw.com

> With a copy to:

> [____]

To the Delaware Trustee:

> Wilmington Trust, National Association
> 1100 N. Market Street
> Wilmington, DE 19890-1625
> Attn: Corporate Trust Administration
> Email: dyoung@wilmingtontrust.com
> Phone: (302) 636-5216
> Fax: (302) 636-4149

To the TAC:

> Joseph W. Belluck, Esq.
> Belluck & Fox, LLP
> 546 5th Avenue, 4th Floor
> New York, NY 10036
> Email: jbelluck@belluckfox.com

Alan R. Brayton, Esq.
Brayton & Purcell LLP
222 Rush Landing Road
Novato, CA 94945
Email: abrayton@braytonlaw.com

Perry J. Browder, Esq.
Simmons Hanly Conroy
One Court Street
Alton, IL 62002
Email: pbrowder@simmonsfirm.com

Kathy Byrne, Esq.
Cooney & Conway
120 N. LaSalle Street, Suite 3000
Chicago, IL 60602
Email: kbyrne@cooneyconway.com

James L. Ferraro, Esq.
Kelley & Ferraro, LLP
Ernst & Young Tower – 950 Main Avenue
Cleveland, OH 44113
Email: jlf@ferrarolaw.com

To the FCR:

Lawrence Fitzpatrick
100 American Metro Blvd., Suite 108
Hamilton, NJ 08619
Email: lfitzpatrick@theccr.com
Phone: (609) 219-8862

With a copy to:

Edwin J. Harron, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Email: eharron@ycst.com
Phone: (302) 571-6703

To the Reorganized Debtor:

[____]

With a copy to:

- 41 -

[___]

(b)    All such notices and communications if mailed shall be effective when physically

delivered at the designated addresses or, if electronically transmitted, when the communication is

received at the designated addresses and confirmed by the recipient by return transmission.

**7.7    Successors and Assigns.**  The provisions of this Trust Agreement shall be

binding upon and inure to the benefit of the Debtors, the Asbestos Trust, the Trustee, and the

Reorganized Debtor, and their respective successors and assigns, except that neither the Debtors,

the Asbestos Trust, the Trustee, nor the Reorganized Debtor may assign or otherwise transfer any

of its, or their, rights or obligations, if any, under this Trust Agreement except, in the case of the

Asbestos Trust and the Trustee, as contemplated by Section 2.1 above.

**7.8    Limitation on Claim Interests for Securities Laws Purposes.**  Asbestos Claims,

and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise

transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of

descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall

not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest;

provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that

is subrogated to an Asbestos Claim as a result of its satisfaction of such Asbestos Claim.

**7.9    Entire Agreement; No Waiver.**  The entire agreement of the parties relating to

the subject matter of this Trust Agreement is contained herein and in the documents referred to

herein, and this Trust Agreement and such documents supersede any prior oral or written

agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising

any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or

- 42 -

partial exercise of any right, power or privilege hereunder preclude any further exercise thereof
or of any other right, power or privilege. The rights and remedies herein provided are
cumulative and are not exclusive of rights under law or in equity.

**7.10 Headings.** The headings used in this Trust Agreement are inserted for
convenience only and do not constitute a portion of this Trust Agreement, nor in any manner
affect the construction of the provisions of this Trust Agreement.

**7.11 Governing Law.** The validity and construction of this Trust Agreement and all
amendments hereto and thereto shall be governed by laws of the State of Delaware, and the
rights of all parties hereto and the effect of every provision hereof shall be subject to and
construed according to the laws of the State of Delaware without regard to the conflicts of law
provisions thereof that would purport to apply the law of any other jurisdiction; provided,
however, that the parties hereto intend that the provisions hereof shall control and there shall not
be applicable to the Asbestos Trust, the Trustee, the Delaware Trustee, the TAC, the FCR, or this
Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware
pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a)
the filing with any court or governmental body or agency of trustee accounts or schedules of
trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents,
or employees of a trust; (c) the necessity for obtaining court or other governmental approval
concerning the acquisition, holding or disposition of real or personal property; (d) fees or other
sums payable to trustees, officers, agents or employees of a trust; (e) the allocation of receipts
and expenditures to income or principal; (f) restrictions or limitations on the permissible nature,
amount or concentration of trust investments or requirements relating to the titling, storage or
other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or

otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or

dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or

limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the

limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC,

or the FCR set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not

apply to the Asbestos Trust.

　　　7.12　**Settlors' Representative and Cooperation.** The Debtors are hereby irrevocably

designated as the Settlors, and they are hereby authorized to take any action required of the

Settlors by the Trustee in connection with the Trust Agreement. The Reorganized Debtor agrees

to cooperate in implementing the goals and objectives of this Trust Agreement.

　　　7.13　**Dispute Resolution.** Any disputes that arise under this Trust Agreement or under

the TDP among the parties hereto shall be resolved by submission of the matter to an alternative

dispute resolution ("**ADR**") process mutually agreeable to the parties involved. Should any party

to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to

the Bankruptcy Court for a judicial determination of the matter. Any review conducted by the

Bankruptcy Court shall be *de novo*. In any case, if the dispute arose pursuant to the consent

provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the

FCR), the burden of proof shall be on the party or parties who withheld consent to show that the

objection was valid. Should the dispute not be resolved by the ADR process within thirty (30)

days after submission, the parties are relieved of the requirement to pursue ADR prior to

application to the Bankruptcy Court. If the Trustee determines that the matter in dispute is

exigent and cannot await the completion of the ADR process, the Trustee shall have the

discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

**7.14    Enforcement and Administration.** The provisions of this Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

**7.15    Effectiveness.** This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**7.16    Counterpart Signatures.** This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by facsimile or portable document format (pdf)), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement this

_____ day of _____, 2018.

**SETTLORS:**                                    **ASBESTOS CLAIMANTS COMMITTEE**

**DURO DYNE NATIONAL CORP.**
**DURO DYNE CORPORATION**
**DURO DYNE WEST CORP.**                         By:_____
**DURO DYNE MIDWEST CORP.**
**DURO DYNE MACHINERY CORP.**



By:_____


Title:  In the capacity listed on Schedule I
        hereto with respect to each entity listed above



**TRUSTEE**                                      **DELAWARE TRUSTEE**

                                                 WILMINGTON TRUST, NATIONAL
                                                 ASSOCIATION

_____
Name: Alan B. Rich                               By:_____
                                                   Name:

                                                   Title:

[Signature Pages to Trust Agreement]

**TRUST ADVISORY COMMITTEE**

_____

Name:  Joseph W. Belluck
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement


_____

Name:  Alan R. Brayton
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement


_____

Name:  Perry J. Browder
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement


_____

Name:  Kathy Byrne
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement


_____

Name:  James L. Ferraro
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement


**FCR**


_____

Name: Lawrence Fitzpatrick


[Signature Pages to Trust Agreement]

**EXHIBIT D**

**DURO DYNE ASBESTOS PERSONAL INJURY
TRUST DISTRIBUTION PROCEDURES**

## DURO DYNE ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

## TABLE OF CONTENTS

Section 1. Introduction ................................................................................................1

   1.1   Purpose ...............................................................................................................1

   1.2   Interpretation .......................................................................................................1

Section 2. Overview ....................................................................................................2

   2.1   Asbestos Trust Goals. ........................................................................................2

   2.2   Claims Liquidation Procedures. .........................................................................3

   2.3   Establishment and Application of the Payment Percentage. ...............................4

   2.4   Asbestos Trust's Determination of the Maximum Annual Payment. ...................5

   2.5   Claims Payment Ratio .......................................................................................7

   2.6   Indirect Trust Claims. ........................................................................................9

Section 3. TDP Administration ..................................................................................10

   3.1   Trust Advisory Committee and Future Claimants' Representative. ...................10

   3.2   Consent and Consultation Procedures. .............................................................10

Section 4. Payment Percentage; Periodic Estimates ..................................................10

   4.1   Uncertainty of Debtors' Personal Injury Asbestos Liabilities. .........................10

   4.2   Computation of Payment Percentage. ...............................................................11

   4.3   Applicability of the Payment Percentage. ........................................................12

Section 5. Resolution of Asbestos Claims. ................................................................15

   5.1   Ordering, Processing and Payment of Asbestos Claims. ..................................15

      5.1(a)   Ordering of Claims. ...........................................................................15

         5.1(a)(1)   Establishment of the FIFO Processing Queue. .........................15

5.1(a)(2)      Effect of Statutes of Limitation and Repose. ...............................................15

5.1(b)    Payment of Claims. ...............................................................................16

5.2    Resolution of Pre-Petition Liquidated Claims. ...............................................17

5.2(a)    Processing and Payment. .......................................................................17

5.2(b)    Marshalling of Security. ........................................................................19

5.3    Resolution of Unliquidated Asbestos Claims. ...............................................19

5.3(a)    Expedited Review Process. .....................................................................20

5.3(a)(1)      In General..............................................................................20

5.3(a)(2)      Claims Processing Under Expedited Review. .............................................20

5.3(a)(3)      Disease Levels, Scheduled Values and Medical/Exposure Criteria. .........21

5.4    Secondary Exposure Claims. ...................................................................24

5.5    Indirect Trust Claims. ...........................................................................24

5.6    Evidentiary Requirements........................................................................26

5.6(a)      Medical Evidence. ..............................................................................26

5.6(a)(1)      In General..............................................................................26

5.6(a)(1)(A) Disease Level I. ...............................................................27

5.6(a)(1)(B) Disease Levels II-V. .........................................................28

5.6(a)(2)      Credibility of Medical Evidence. ...............................................28

5.6(a)(3)      Reliance by Asbestos Trust on Finding of another Asbestos Trust...........29

5.6(b)    Exposure Evidence. ..............................................................................29

5.6(b)(1)      In General..............................................................................29

5.6(b)(2)      Significant Occupational Exposure.............................................29

5.6(b)(3)      Debtor Exposure. ...................................................................30

5.6(b)(3)(A) Presumptive Occupations.....................................................31

5.6(b)(3)(B) Standard of Exposure. .......................................................31

5.6(b)(3)(C) Non-Presumptive Occupations..............................................................31

5.7    Claims Audit Program. ...................................................................................32

5.8    Arbitration.......................................................................................................33

    5.8(a)    Establishment of ADR Procedures........................................................33

    5.8(b)    Limitations on and Payment of Arbitration Awards. ............................33

5.9    Litigation...........................................................................................................33

5.10   Claims Covered by Policies Issued by Non-Settling Asbestos Insurers..........35

5.11   Claims against Non-Settling Asbestos Insurers...............................................36

5.12   Second Disease Claims. ...................................................................................36

Section 6. Claims Materials ...............................................................................................36

6.1    Claims Materials. .............................................................................................36

6.2    Content of Claims Materials. ...........................................................................37

6.3    Withdrawal or Deferral of Claims. ..................................................................37

6.4    Filing Requirements and Fees...........................................................................38

6.5    Confidentiality of Claimants' Submissions. ....................................................38

Section 7. General Guidelines for Liquidating and Paying Claims ..................................40

7.1    Showing Required.............................................................................................40

7.2    Costs Considered. ............................................................................................40

7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited
       Liquidity...........................................................................................................40

7.4    Punitive Damages. ...........................................................................................41

7.5    Sequencing Adjustment. ..................................................................................42

    7.5(a)    In General.............................................................................................42

    7.5(b)    Unliquidated Asbestos Claims. ............................................................42

    7.5(c)    Liquidated Pre-Petition Claims. ...........................................................43

7.6    Suits in the Tort System....................................................................................43

7.7 Payment of Judgments for Money Damages. ...................................................................44

7.8 Releases..............................................................................................................................44

7.9 Third-Party Services. .......................................................................................................45

Section 8. Miscellaneous ...............................................................................................................45

8.1 Amendments. ....................................................................................................................45

8.2 Severability. .....................................................................................................................45

8.3 Governing Law. ...............................................................................................................46

## DURO DYNE ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

The Duro Dyne Asbestos Personal Injury Trust Distribution Procedures (the **"TDP"**) contained herein provide for resolving all Channeled Asbestos Claims (**"Asbestos Claims"**) as defined in the Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., under Chapter 11 of the Bankruptcy Code, dated as of [_____], 2018 (as it may be amended or modified, the **"Plan"**),[1] as provided in and required by the Plan and the Duro Dyne Asbestos Personal Injury Trust Agreement (the **"Trust Agreement"**). The Plan and the Trust Agreement establish the Duro Dyne Asbestos Personal Injury Trust (the **"Asbestos Trust"**). The Asbestos Trustee of the Asbestos Trust (the **"Trustee"**) shall implement and administer this TDP in accordance with the Trust Agreement.

## SECTION 1.

## INTRODUCTION

**1.1    Purpose.** This TDP has been adopted pursuant to the Trust Agreement. It is designed to provide fair, equitable and substantially similar treatment for all Asbestos Claims that may presently exist or may arise in the future.

**1.2    Interpretation.** Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant. The rights and benefits provided herein to holders of Asbestos Claims shall vest in such holders as of the Effective Date.

---

[1]    Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the Trust Agreement.

## SECTION 2.

## OVERVIEW

### 2.1    Asbestos Trust Goals.

The goal of the Asbestos Trust is to treat all claimants equitably. This TDP furthers that

goal by setting forth procedures for processing and paying the Debtors' several share of the unpaid

portion of the liquidated value of Asbestos Claims generally on an impartial, first-in-first-out

("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as

possible of the value of their claims based on historical values for substantially similar claims in

the tort system.[2] To this end, the TDP establishes a schedule of five asbestos-related diseases

("**Disease Levels**") which have presumptive medical and exposure requirements

("**Medical/Exposure Criteria**") and specific liquidated values ("**Scheduled Values**"). The

Disease Levels, Medical/Exposure Criteria, and Scheduled Values, which are set forth in Section

5.3(a)(3) below, have all been selected and derived with the intention of achieving a fair allocation

of the Asbestos Trust funds as among claimants suffering from these different disease processes

in light of the best available information considering the settlement history of the Debtors and the

rights claimants would have in the tort system absent the bankruptcy. Except as set forth in Section

5.12 hereof, a claimant may not assert more than one Asbestos Claim hereunder.

Historically, the Debtors resolved only a few dozen asbestos cases annually on a national

basis. The vast majority of those cases were based on claims by sheet metal workers who worked

directly with the Debtors' asbestos-containing specialty products and who were installing such

---

[2]    As used in this TDP, the phrase "in the tort system" shall **not** include claims asserted against
a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g)
and/or section 105 of the Bankruptcy Code or any other applicable law.

products personally. Because of the very limited resources of the Asbestos Trust, it is constrained

with respect to the claimants it can compensate. As a consequence, this TDP provides for the

payment to both present and future claimants by the Asbestos Trust of Asbestos Claims based only

on certain diseases and only with respect to those claims that provide certain evidence of exposure

patterns. To that end, the Asbestos Trust may make reasonable inquiries of claimants and/or co-

workers as to the nature and extent of their exposure to the Debtors' asbestos-containing products.

      **2.2**    **Claims Liquidation Procedures.** Asbestos Claims shall be processed based on

their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a)(1) below.

The Asbestos Trust shall take all reasonable steps to resolve Asbestos Claims as efficiently and

expeditiously as possible at each stage of claims processing and arbitration, which steps may

include, in the Asbestos Trust's sole discretion, conducting settlement discussions with claimants'

representatives with respect to more than one claim at a time, provided that the claimants'

respective positions in the FIFO Processing Queue are maintained and each claim is evaluated

pursuant to the valuation factors set forth herein. The Asbestos Trust shall also make every effort

to resolve each year at least that number of Asbestos Claims required to exhaust the Maximum

Annual Payment as that term is defined below.

      The Asbestos Trust shall liquidate all Asbestos Claims under the Expedited Review

Process described in Section 5.3(a) below. Based upon the Debtors' claims settlement history in

light of applicable tort law, and current projections of present and future unliquidated claims, the

Scheduled Values for all Disease Levels have been established as set forth in Section 5.3(a)(3).

      All unresolved disputes over a claimant's medical condition or exposure history shall be

subject to binding or non-binding arbitration as set forth in Section 5.8 below, at the election of

the claimant, under the ADR Procedures that are to be established by the Asbestos Trust. Asbestos

3

Claims that are the subject of a dispute with the Asbestos Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.9 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable as provided in Section 7.7 below (subject to the Payment Percentage, as defined in Section 4.1 below, and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions set forth herein).

      **2.3    Establishment and Application of the Payment Percentage.** The Payment Percentage for Asbestos Claims shall be established by the Trustee with the consent of the Trust Advisory Committee ("**TAC**") and the Legal Representative ("**FCR**"). After the liquidated value of an Asbestos Claim as defined in Section 5.3(a)(3) below is determined pursuant to the procedures set forth herein for Expedited Review, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro rata share of that value based on a Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below and to all sequencing adjustments paid pursuant to Section 7.5 below.

      The Payment Percentage may be adjusted upwards or downwards from time to time by the Asbestos Trust with the consent of the TAC and the FCR to reflect then-current estimates of the Asbestos Trust's assets and its liabilities, as well as the then-estimated value of then-pending and future claims. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.3 below. Because there is uncertainty in the prediction of both the number and severity of future Asbestos Claims, and the amount of the Asbestos Trust's assets, no guarantee can be made of any Payment Percentage of an Asbestos Claim's liquidated value.

4

   **2.4    Asbestos Trust's Determination of the Maximum Annual Payment.** After
calculating the Payment Percentage, the Asbestos Trust shall model the cash flow, principal and
income year-by-year to be paid over its entire life to ensure that all present and future holders of
Asbestos Claims are compensated at the Payment Percentage. In each year, based upon the model
of cash flow, the Asbestos Trust shall be empowered to pay out the portion of its funds payable for
that year according to the model (the "**Maximum Annual Payment**"). The Asbestos Trust's
distributions to all claimants for that year shall not exceed the Maximum Annual Payment. The
Payment Percentage and the Maximum Annual Payment figures are based on projections over the
lifetime of the Asbestos Trust. If such long-term projections are revised, the Payment Percentage
may be adjusted accordingly, which would result in a new model of the Asbestos Trust's
anticipated cash flow and a new calculation of the Maximum Annual Payment figures.

   However, year-to-year variations in the Asbestos Trust's flow of claims or the value of its
assets, including earnings thereon, will not mean necessarily that the long-term projections are
inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve
created by the Asbestos Trust's long-term projections. If, in a given year, however, asset values,
including earnings thereon, are below projections, the Asbestos Trust may need to distribute less
in that year than would otherwise be permitted based on the original Maximum Annual Payment
derived from long-term projections. Accordingly, the original Maximum Annual Payment for a
given year may be temporarily decreased if the present value of the assets of the Asbestos Trust as
measured on a specified date during the year is less than the present value of the assets of the
Asbestos Trust projected for that date by the cash flow model described in the foregoing paragraph.
The Asbestos Trust shall make such a comparison whenever the Trustee becomes aware of any
information that suggests that such a comparison should be made. If the Asbestos Trust determines

                                            5

that as of the date in question, the present value of the Asbestos Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Asbestos Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the Temporary Maximum Annual Payment (additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Asbestos Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the Asbestos Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the Asbestos Trust shall first allocate the amount in question to outstanding Pre-Petition Liquidated Claims (as defined in Section 5.2(a) below). The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**") shall then be allocated and used to satisfy all other previously liquidated Asbestos Claims subject to the Claims Payment Ratio set forth in Section 2.5 below; provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly.

6

2.5     **Claims Payment Ratio.** Based upon the Debtors' claims settlement history and
analysis of present and future claims, a Claims Payment Ratio has been determined which, as of
the Effective Date, has been set at 90% for Category A claims, which consist of Asbestos Claims
involving mesothelioma (Disease Level V) and at 10% for Category B claims, which are Asbestos
Claims involving all other diseases (Disease Levels I-IV). In each year, after the determination of
the Maximum Available Payment described in Section 2.4 above, 90% of that amount shall be
available to pay Category A claims and 10% shall be available to pay Category B claims that have
been liquidated since the Petition Date; provided, however, that if the Maximum Annual Payment
is reduced during the year pursuant to Section 2.4 above, the amounts available to pay Category A
and Category B claims shall be recalculated based on the adjusted Maximum Available Payment.
In the event there are insufficient funds in any year to pay the liquidated claims within either or
both of the Categories, the available funds allocated to the particular Category shall be paid to the
maximum extent to claimants in that Category based on their place in the FIFO Payment Queue
described in Section 5.1(b) below.  Claims for which there are insufficient funds allocated to the
relevant Category shall be carried over to the next year where they shall be placed at the head of
the FIFO Payment Queue.  If there is a decrease in the Payment Percentage prior to the payment
of such claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that
they would have been entitled to receive but for the application of the Claims Payment Ratio. If,
at the end of any calendar year during the first three years the Asbestos Trust is accepting claims,
there are excess funds in either or both Categories, because there is an insufficient amount of
liquidated claims to exhaust the respective Maximum Available Payment amount for that Category,

7

then the excess funds for either or both Categories shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

Notwithstanding any other provision herein, if, at the end of any calendar year following the third anniversary of the date the Asbestos Trust began accepting claims, there are excess funds available in either Category A or Category B and insufficient funds in the other Category to pay such Category's claims, then the Trustee may transfer up to a specified amount of excess funds (the "Permitted Transfer Amount" as defined below) to the Category with the shortfall; provided, however that the Trustee shall never transfer more than the amount of the receiving Category's shortfall. The **"Permitted Transfer Amount"** shall be determined as follows: (a) the Trustee shall first determine the cumulative amount allocated to the Category with excess funds based on the Claims Payment Ratio since the date the Asbestos Trust last calculated its Payment Percentage; (b) the Trustee shall then determine the cumulative amount that the Asbestos Trust estimated would be paid to the Category with excess funds since the date the Asbestos Trust last calculated its Payment Percentage; (c) the Trustee shall then subtract the amount determined in (b) from the amount determined in (a), and the difference between the two shall be referred to as the **"Permitted Transfer Amount."** The Trustee shall provide the TAC and the FCR with the Permitted Transfer Amount calculation thirty (30) days prior to making a transfer. If, at the end of any calendar year following the third anniversary of the date the Asbestos Trust began accepting claims, there are excess funds in either or both Categories because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, or, in a year where there was a transfer from one Category to the other, if the amount transferred was less than the amount of excess funds, then the excess funds for the Category or Categories with excess

8

funds shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

During the first nine months of a given year, the Asbestos Trust's payments to claimants in a Category shall not exceed the amount of any excess funds that were rolled over for such Category from the prior year plus 85% of the amount that would otherwise be available for payment to claimants in such Category.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustee shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustee should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

No amendment to the Claims Payment Ratio may be made without the consent of the TAC members and the consent of the FCR. The consent process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement shall apply in the event of any amendments to the Claims Payment Ratio. The Trustee, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "**Reduced Payment Option**").

2.6     **Indirect Trust Claims.** As set forth in Section 5.5 below, any Indirect Trust Claim shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other Asbestos Claims.

9

## SECTION 3.

## TDP ADMINISTRATION

**3.1    Trust Advisory Committee and Future Claimants' Representative.**  Pursuant to the Plan and the Trust Agreement, the Asbestos Trust and this TDP shall be administered by the Trustee in consultation with the TAC, which represents the interests of holders of present Asbestos Claims, and the FCR, who represents the interests of holders of Asbestos Claims that shall be asserted in the future.  The Trustee shall obtain the consent of the TAC and the FCR on any amendments to this TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the Trust Agreement.  The Trustee shall also consult with the TAC and the FCR on such matters as are provided below and in Section 2.2(e) of the Trust Agreement.  The initial Trustee, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

**3.2    Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustee shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the Trust Agreement, respectively.

## SECTION 4.

## PAYMENT PERCENTAGE; PERIODIC ESTIMATES

**4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding the Debtors' total asbestos-related tort liabilities, as

10

well as the total value of the assets available to the Asbestos Trust to pay Asbestos Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of Asbestos Claims shall receive.  To seek to ensure substantially equivalent treatment of all present and future Asbestos Claims, the Trustee must determine from time to time the percentage of full liquidated value that holders of present and future Asbestos Claims shall be likely to receive, *i.e.*, the "**Payment Percentage**" described in Section 2.3 above and Section 4.2 below.

    **4.2**    **Computation of Payment Percentage.**  As provided in Section 2.3 above, the Payment Percentage shall be established by the Trustee with the consent of the TAC and the FCR, and shall apply to all Trust Claims.

    The Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Trust Agreement if the Trustee with the consent of the TAC and FCR determines that an adjustment is required.  No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustee shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the FCR.  The Trustee shall also reconsider the then-applicable Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the TAC or the FCR.  In any event, no less frequently than once every twelve (12) months commencing on the date that the Asbestos Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos Trust (the six-month anniversary of the date the Asbestos Trust first makes available the proof of claim form and other claims materials required to file a claim being referred to herein as the "**Initial Claims Filing Date**"), the Trustee shall compare the liability forecast on which the then applicable Payment Percentage is

11

based with the actual claims filing and payment experience of the Asbestos Trust to date. If the results of the comparison call into question the ability of the Asbestos Trust to continue to rely upon the current liability forecast, the Trustee shall undertake a reconsideration of the Payment Percentage.

The Trustee must base his or her determination of the Payment Percentage on current estimates of the number, types, and values of present and future Asbestos Claims, the value of the assets then available to the Asbestos Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of Asbestos Claims. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.

      **4.3**    **Applicability of the Payment Percentage.** Except as otherwise provided (a) in Section 5.1(b) below for Asbestos Claims involving deceased or incompetent claimants for which approval of the Asbestos Trust's offer by a court or through a probate process is required, (b) in the paragraph below with respect to Released Claims, and (c) in Section 2.5 above with respect to Asbestos Claims whose payment is delayed as a result of the Claims Payment Ratio, no holder of any other Asbestos Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustee, in his or her sole discretion, may cause the Asbestos Trust to pay an Asbestos Claim based on the Payment Percentage that was in effect prior to the reduction if such Asbestos Claim was filed and actionable with the Asbestos Trust ninety (90) days or more prior to the date the Trustee proposed the new Payment Percentage in writing to the TAC and the FCR (the **"Proposal Date"**) and the processing of such claim was unreasonably

delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the FCR but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Asbestos Claim was liquidated prior to the Proposal Date and who either (a) transmitted[3] an executed release to the Asbestos Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the Asbestos Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Asbestos Trust transmits a release electronically, the release shall be deemed to have been received on the date the Asbestos Trust transmits the

---

[3]  For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

offer notification, and (c) if the Asbestos Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Section 2.4 or Section 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the FCR a change in the Payment Percentage, the Trustee shall issue a written notice to claimants or claimants' counsel indicating that the Trustee is reconsidering such Payment Percentage.

If the Trustee, with the consent of the TAC and the FCR, makes a determination to increase the Payment Percentage, the Trustee shall make supplemental payments to all claimants who previously liquidated their claims against the Asbestos Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustee's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $250. However, the Trustee's obligation shall resume and the Trustee shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $250.

14

## SECTION 5.

## RESOLUTION OF ASBESTOS CLAIMS.

**5.1**    **Ordering, Processing and Payment of Asbestos Claims.**

**5.1(a)  Ordering of Claims.**

**5.1(a)(1)**      **Establishment of the FIFO Processing Queue.**    The
Asbestos Trust shall order claims that are sufficiently complete to be reviewed for processing
purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").
The claimant's position in the FIFO Processing Queue shall be determined by the date the claim
is filed with the Asbestos Trust. If any claims are filed on the same date, the claimant's position in
the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related
disease for which the claim was filed. If any claims are filed and diagnosed on the same date, the
claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of
birth, with older claimants given priority over younger claimants.

**5.1(a)(2)**      **Effect of Statutes of Limitation and Repose.**    All
unliquidated Asbestos Claims must meet either (i) for claims first filed in the tort system against a
Debtor prior to the Petition Date, the applicable federal or state statute of limitation and repose
that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed
against a Debtor in the tort system prior to the Petition Date, the applicable federal or state statute
of limitation that was in effect at the time of the filing with the Asbestos Trust.  However, the
running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing
of the claim against a Debtor prior to the Petition Date, whether in the tort system or by submission
of the claim to a Debtor pursuant to an administrative settlement agreement; (B) the tolling of the

15

claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

If an Asbestos Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal or state statute of limitation at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos Trust within three (3) years after the Initial Claims Filing Date, or within three (3) years after the date of the diagnosis of the disease for which the claim is filed, whichever occurs later. In addition, any Asbestos Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal or state statute of limitation or repose, may be filed with the Asbestos Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later. However, the processing of any Asbestos Claim by the Asbestos Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

               **5.1(b) Payment of Claims.** Asbestos Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by arbitration as provided in Section 5.8 below, or by litigation in the tort system provided in Section 5.9 below, shall be paid in FIFO order based on the date their liquidation became final (the **"FIFO Payment Queue"**), all such payments being subject to the applicable Payment Percentage, the Maximum Annual Payment, the Claims Payment Ratio and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein. Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos Trust

on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease for which the claim was filed. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Asbestos Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

     **5.2**    **Resolution of Pre-Petition Liquidated Claims.**

       **5.2(a)**  **Processing and Payment.** As soon as practicable after the Effective Date, the Asbestos Trust shall pay, upon submission by the claimant of the appropriate documentation, all Asbestos Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii) a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date, or (iii) a judgment that became final and non-appealable prior to the Petition Date (collectively "**Pre-Petition Liquidated Claims**"). In order to receive payment from the Asbestos Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the Asbestos Trust that the claim was liquidated in the manner described in the preceding sentence, which documentation shall include (A) a copy of the settlement agreement (if applicable), a court-

17

authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable) or a final judgment (if applicable) and (B) the name, social security number, and date of birth of the claimant, and the name and address of the claimant's lawyer; provided, however, that if a Pre-Petition Liquidated Claim is listed on the schedule of such claims that the Debtors provide to the Asbestos Trust and the claimant confirms the information provided by the Debtors, the claimant shall not be required to provide any additional documentation.

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment or the unpaid portion of the amount of the final judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages. In addition, the amounts payable with respect to such claims shall be subject to the Maximum Annual Payment and Payment Percentage provisions. In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the Asbestos Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of an Asbestos Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.8 and 5.9 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order in a separate FIFO queue, to be established by the Asbestos Trust based on the date the Asbestos Trust received all required documentation for the particular claim. If any Pre-Petition Liquidated

18

Claims were filed on the same date, the claimant's position in the FIFO queue for such claims shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

      **5.2(b) Marshalling of Security.** Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the Asbestos Trust. Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

      **5.3**     **Resolution of Unliquidated Asbestos Claims.** As soon as possible after the establishment of the Asbestos Trust, the Trustee, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below. It is anticipated that the Asbestos Trust shall provide an initial response to the claimant within three (3) months of receiving the proof of claim form.

      The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a)(1) above.

**5.3(a)  Expedited Review Process.**

**5.3(a)(1)    In General.**  The Asbestos Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos Claims eligible for payment under this TDP.  Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/ Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below.  All claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio limitations set forth above.

Subject to the provisions of Section 5.7, the claimant's eligibility to receive the Scheduled Value for his or her Asbestos Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below.

**5.3(a)(2)    Claims Processing Under Expedited Review.**  All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the Asbestos Trust's proof of claim form. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the Disease Levels, and shall advise the claimant of its determination. If a Disease Level is determined, the Asbestos Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable

20

Payment Percentage, together with a form of release approved by the Asbestos Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos Trust shall disburse payment subject to the limitations of the Maximum Annual Payment and the Claims Payment Ratio.

> 5.3(a)(3)    **Disease Levels, Scheduled Values and Medical/Exposure Criteria.**  The five Disease Levels covered by this TDP, together with the Medical/Exposure Criteria and the Scheduled Values for each are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Asbestos Claims filed with the Asbestos Trust (except Pre-Petition Liquidated Claims) on or before the Initial Claims Filing Date provided in Section 4.2.  Thereafter, for purposes of administering the Expedited Review Process and with the consent of the TAC and the FCR, the Trustee may add to, change, or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then-current Disease Levels.  In addition, commencing on January 1, 2020, the Asbestos Trust shall increase these valuation amounts by one percent (1%) per annum.  Any such increases shall be applicable to offers made following the dates of such increases.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level V) | $140,000 | (1) Diagnosis[4] of mesothelioma, and (2) Debtor Exposure as defined in Section 5.6(b)(3). |
| Lung Cancer 1 (Level IV) | $50,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos- |

---

[4]    The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.6 below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | Related Nonmalignant Disease,[5] (2) six months Debtor Exposure, (3) Significant Occupational Exposure[6] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level III) | $25,000 | (1) Diagnosis of a primary lung cancer, (2) six months Debtor Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Other Cancer (Level II) | $20,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach |

---

[5]   Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels II and IV, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (*e.g.*, an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels II and IV. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.6, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of Asbestos Claims. In addition, for all purposes of this TDP, if the diagnostic images being interpreted in such regard are digital images, then a written report by a Qualified Physician confirming that the images reviewed are with reasonable medical certainty equivalent to those that would qualify for the required ILO grade shall be acceptable as well.

[6]   The term "Significant Occupational Exposure" is defined in Section 5.6(b)(2) below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level I) | $34,000 | (1) Either (a) a diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (x) TLC less than 65%, or (y) FVC less than 65% and FEV1/FVC ratio greater than 65%,[7] (b) an "Asbestosis Death," which is defined to mean a death where (x) asbestosis is listed as the cause or a significant contributing cause of death on the death certificate or (y) a report from a Qualified Physician who is a pathologist, a pulmonologist or an occupational medicine physician states that asbestosis was a significant contributing cause of death, or (c) a diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (x) a Qualified Physician who is a pulmonologist or an occupational medicine physician prescribes oxygen to the injured party, (y) the treating Qualified Physician states that the predominant cause of the need for oxygen is asbestosis, and (z) the oxygen is needed by the injured party to perform activities of daily life (e.g., not oxygen that is prescribed only for comfort care, at night, for surgery, or on occasion), (2) six months Debtor Exposure, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |

---

[7]   This must be the actual measured value as opposed to the percentage of predicted.

**5.4    Secondary Exposure Claims.** If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the Asbestos Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the five Disease Levels described in Section 5.3(a)(3) above, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility, and that such secondary exposure was a cause of the claimed disease. All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

**5.5    Indirect Trust Claims.** Indirect Trust Claims asserted against the Asbestos Trust shall be treated as presumptively valid and paid by the Asbestos Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and, and (b) the holder of such claim (the **"Indirect Claimant"**) establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos Trust to the individual claimant to whom the Asbestos Trust would otherwise have had a liability or obligation under this TDP (the **"Direct Claimant"**), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the Asbestos Trust superior to the rights of the related

24

Direct Claimant against the Asbestos Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Asbestos Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Asbestos Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Asbestos Trust a release in form and substance satisfactory to the Trustee.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Asbestos Trust review the Indirect Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the Asbestos Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect Trust Claim paid by the Asbestos Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Claim that might be subsequently asserted by the Direct Claimant against the Asbestos Trust.

Any dispute between the Asbestos Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.8 below. If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.9 and 7.6 below.

Notwithstanding any provision in this TDP or any other Plan Document, because the Non-Settling Asbestos Insurers have received the benefit of certain credits and judgment reduction, as set forth in and subject to the terms and conditions of Sections 4.14 and 4.15 of the Plan, any claim of a Non-Settling Asbestos Insurer shall not be eligible for payment or compensation from the Asbestos Trust under this Section 5.5.

The Trustee may develop and approve a separate proof of claim form for Indirect Trust Claims. Indirect Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustee consistent with the provisions of this Section 5.5, which procedures (a) shall determine the validity, acceptability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos Trust would have afforded the holders of the underlying valid Asbestos Claims.

**5.6    Evidentiary Requirements.**

**5.6(a)   Medical Evidence.**

**5.6(a)(1)       In General.** All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products

26

and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.

        **5.6(a)(1)(A) Disease Level I.** All diagnoses of Severe Asbestosis (Disease Level I) shall be based, in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide (i) an ILO reading of 2/1 or greater or pathological evidence of asbestosis and (ii) pulmonary function testing (unless the claimant is able to meet the requirements in (1)(c) of the Medical/Exposure Criteria for Severe Asbestosis in Section 5.3(a)(3) above).[8]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of Severe Asbestosis (Disease Level I) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis along with an ILO reading of 2/1 or greater, (ii) pathological evidence of asbestosis, or (iii) the medical documentation required for an "Asbestosis Death" in Section 5.3(a)(3) above. In the case of a diagnosis based on (i) or (ii), the claimant must also provide pulmonary function testing (unless the claimant is able to meet the requirements in (1)(c) of the Medical/Exposure Criteria for Severe Asbestosis in Section 5.3(a)(3) above).

---

[8]  "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by The Joint Commission ("**JC**"), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in a JC-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the Asbestos Trust, certifying that the PFT was conducted in material compliance with ATS standards.

**5.6(a)(1)(B) Disease Levels II-V.** All diagnoses of an asbestos-related malignancy (Disease Levels II-V) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by The Joint Commission.

**5.6(a)(2)      Credibility of Medical Evidence.** Before making any payment to a claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Asbestos Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to a Debtor to settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption. In addition, claimants who otherwise meet the requirements of this TDP for payment of an Asbestos Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be

28

introduced by either the claimant or the Asbestos Trust in any Arbitration proceeding conducted pursuant to 5.8.

                  **5.6(a)(3)**         **Reliance by Asbestos Trust on Finding of another Asbestos Trust.** The Trustee may review the governing documents of another asbestos trust or claims facility and, with the consent of the TAC and the FCR, determine to accept the disease level classifications as found by such other asbestos trust or claims facility in lieu of the medical evidence claimants are required to submit under this TDP.

            **5.6(b) Exposure Evidence.**

                  **5.6(b)(1)**         **In General.** As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility. Claims based on conspiracy theories that involve no exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Debtor Exposure as defined in Section 5.6(b)(3) below; and (ii) for Severe Asbestosis (Disease Level I), Other Cancer (Disease Level II), or Lung Cancer 1 or 2 (Disease Levels III and IV), the claimant must show six (6) months Debtor Exposure plus Significant Occupational Exposure to asbestos.

                  **5.6(b)(2)**         **Significant Occupational Exposure.** **"Significant Occupational Exposure"** means employment for a cumulative period of at least five (5) years in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked

29

with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

                    **5.6(b)(3)**       **Debtor Exposure.**    The claimant must demonstrate meaningful and credible exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility as described in this Section 5.6(b)(3) ("**Debtor Exposure**"). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the Asbestos Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos Trust to process a claim shall be set forth on the proof of claim form to be used by the Asbestos Trust. The Asbestos Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the Asbestos Trust, not third parties or defendants in the tort system. The Asbestos Trust has no need for, and therefore claimants are not required to furnish the Asbestos Trust with, evidence of exposure to specific asbestos products other than those for which a Debtor has legal responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify a Debtor's products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

**5.6(b)(3)(A) Presumptive Occupations.** Because of the nature of the Debtors' business, the Asbestos Trust shall consider that there is a limited universe of occupations in which claimants are likely to have been directly exposed to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility. Those occupations are sheet metal mechanic, sheet metal worker, sheet metal apprentice, HVAC repairman, HVAC installer, HVAC technician, duct installer, and furnace installer (the **"Presumptive Occupations"**). The Asbestos Trust may add occupations to the Presumptive Occupations. The Asbestos Trust may also remove occupations from the Presumptive Occupations if it determines that such occupations should not have been included.

**5.6(b)(3)(B) Standard of Exposure.** In order for a claim to be approved by the Asbestos Trust, the injured party must have worked in a Presumptive Occupation and must demonstrate to the Asbestos Trust's satisfaction that he or she worked directly with Duro Dyne asbestos-containing flexible duct connectors.[9] When evaluating whether an injured party has demonstrated that he or she worked directly with Duro Dyne asbestos-containing flexible duct connectors, the Asbestos Trust shall base its determination upon whether the circumstances of the injured party's exposure to the product are the same as those of claimants with respect to which the Debtors historically paid claims.

**5.6(b)(3)(C) Non-Presumptive Occupations.** If an injured party did not work in one of the Presumptive Occupations but believes that he or she can demonstrate

---

[9] Based on the Debtors' history, the Asbestos Trust believes that flexible duct connectors are the only asbestos-containing product for which the Asbestos Trust has legal responsibility. A claimant may seek to prove that other such products exist, in which case the Asbestos Trust shall review the evidence and make a determination. If the Asbestos Trust determines that the Asbestos Trust is responsible for other asbestos-containing products, the Trustee, the TAC and the FCR shall amend this TDP to add references to such products to the relevant provisions of this TDP.

the requisite direct exposure to Duro Dyne asbestos-containing flexible duct connectors, he or she may present evidence of such exposure to the Asbestos Trust for the Asbestos Trust's consideration, and, if the Asbestos Trust approves the claim, the claimant shall receive the Scheduled Value for the applicable Disease Level, subject to the Payment Percentage and the Maximum Annual Payment and Claims Payment Ratio provisions above.

5.7    **Claims Audit Program.** The Asbestos Trust, with the consent of the TAC and the FCR, shall develop a Claims Audit Program. Such Claims Audit Program may include methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products for which the Asbestos Trust has legal responsibility. In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the Asbestos Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any claimant or claimant's attorney by rejecting the Asbestos Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

32

**5.8    Arbitration.**

**5.8(a)  Establishment of ADR Procedures.**  The Asbestos Trust, with the consent
of the TAC and the FCR, shall institute binding and non-binding arbitration procedures in
accordance with Alternative Dispute Resolution ("**ADR**") Procedures to be established by the
Trustee, with the consent of the TAC and the FCR, for resolving disputes concerning whether a
pre-petition settlement agreement with a Debtor is binding and judicially enforceable in the
absence of a Final Order of the Bankruptcy Court determining the issue, whether the Asbestos
Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical
condition or exposure history meets the requirements of this TDP for purposes of categorizing a
claim involving Disease Levels I-V.  Binding and non-binding arbitration shall also be available
for resolving disputes over a Debtor's share of the unpaid portion of a Pre-Petition Liquidated
Claim described in Section 5.2 above and disputes over the validity of an Indirect Trust Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary
requirements that are set forth in Section 5.6 above.  With respect to all claims eligible for
arbitration, the claimant, but not the Asbestos Trust, may elect either non-binding or binding
arbitration.  The ADR Procedures may be modified by the Asbestos Trust with the consent of the
TAC and the FCR.

**5.8(b)  Limitations on and Payment of Arbitration Awards.**  The arbitrator shall
not return an award in excess of the Scheduled Value for any claim.  A claimant who submits to
arbitration and who accepts the arbitral award shall receive payments in the same manner as one
who accepts the Asbestos Trust's original valuation of the claim.

**5.9    Litigation.**  Claimants who elect non-binding arbitration and then reject their
arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos Trust

33

pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment

for monetary damages obtained in the tort system from the Asbestos Trust's available cash only as

provided in Section 7.7 below.

**5.10    Claims Covered by Policies Issued by Non-Settling Asbestos Insurers.** In the event that a claimant ("**Tort Claimant**") pursues the rights afforded by Section 4.13 of the Plan to bring litigation against the Reorganized Debtor for the purpose of seeking recovery from a Non-Settling Asbestos Insurer to obtain the benefit of Asbestos Insurance Coverage, then the Tort Claimant shall so advise the Asbestos Trust. Such notification to the Asbestos Trust of intention to pursue the rights granted under Section 4.13 of the Plan shall not affect the processing by the Asbestos Trust of any Asbestos Claim filed by the Tort Claimant or the payment to the Tort Claimant of any amount that would otherwise be due to the Tort Claimant as an unliquidated claim pursuant to this TDP (a "**Current Trust Payment**"). In response to a request (a) from the Reorganized Debtor or (b) from any Non-Settling Asbestos Insurer that is providing a defense to an action brought under Section 4.13 of the Plan by a Tort Claimant, or against which an action is brought by such Tort Claimant under Section 4.14 of the Plan, the Asbestos Trust shall promptly provide information as to the amount and timing of any Current Trust Payments. Upon notification and proof to the Asbestos Trust's reasonable satisfaction that a Non-Settling Asbestos Insurer has satisfied in full a judgment obtained in an action brought under Section 4.13 or 4.14 of the Plan, then, as provided in Section 4.15(b) of the Plan, the Asbestos Trust shall treat the claim held by the Tort Claimant as being assigned to the Non-Settling Asbestos Insurer(s) that satisfied the judgment for the purpose of paying any further amounts due on the claim to the assignee(s). The Tort Claimant shall hold the Asbestos Trust harmless from and against any and all Indirect Trust Claims that may be asserted against the Asbestos Trust in connection with the litigation, including attorneys' fees and costs associated therewith.

**5.11    Claims against Non-Settling Asbestos Insurers.** The Asbestos Trust, with the consent of the TAC and the FCR, shall institute procedures to be utilized in the event that a Tort Claimant desires to pursue the rights afforded by Section 4.14 of the Plan.

**5.12    Second Disease Claims.** The holder of a Severe Asbestosis (Disease Level I) claim may assert a new Asbestos Claim against the Asbestos Trust for a Lung Cancer 1 (Disease Level IV) or Mesothelioma (Disease Level V) claim that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to the Lung Cancer 1 (Disease Level IV) or Mesothelioma (Disease Level V) claim shall be reduced by the amount paid to the claimant for the Severe Asbestosis (Disease Level I) claim.

## SECTION 6.

## CLAIMS MATERIALS

**6.1    Claims Materials.** The Asbestos Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Asbestos Claims, and shall provide such Claims Materials upon a written request for such materials to the Asbestos Trust. The proof of claim form to be submitted to the Asbestos Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing. The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing procedures, the Asbestos Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the Internet. The proof of claim form to be used by the Asbestos Trust shall be developed by the

Asbestos Trust and submitted to the TAC and the FCR for approval; it may be changed by the Asbestos Trust with the consent of the TAC and the FCR.

**6.2    Content of Claims Materials.** The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed proof of claim form. This TDP has been prepared with the goal of simplifying the filing of claims, reducing paperwork by claimants, and reducing the cost of reviewing claims in an effort to maximize distribution to claimants. Accordingly, instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the Asbestos Trust may, with the consent of the claimant or the claimant's attorney, obtain such information from electronic databases maintained by any other asbestos claims resolution organization. If requested by the claimant, the Asbestos Trust shall accept information provided electronically. The claimant may, but shall not be required to, provide the Asbestos Trust with evidence of recovery from other defendants and claims resolution organizations.

**6.3    Withdrawal or Deferral of Claims.** A claimant can withdraw an Asbestos Claim at any time upon written notice to the Asbestos Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her Asbestos Claim by the Asbestos Trust be deferred for a period not to exceed two (2) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Asbestos Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Asbestos Claims

37

held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos Trust's offer is required, or an Asbestos Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within one (1) year of the Asbestos Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the Asbestos Trust may extend the withdrawal or deferral period for an additional six (6) months.

6.4    **Filing Requirements and Fees.**  Each claimant must submit a filing fee of $50 to have an Asbestos Claim processed by the Asbestos Trust. The fee shall be refunded in full to claimants who receive and accept payment of a settlement offer from the Asbestos Trust.

6.5    **Confidentiality of Claimants' Submissions.**  All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including a proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement discussions. The Asbestos Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware. Furthermore, the Asbestos Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served; provided, however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Asbestos Trust may instead first provide a copy of the subpoena to counsel

38

for the TAC and the FCR and delay providing a copy of the subpoena to counsel for individual holders of Asbestos Claims until, in the Trustee's judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Asbestos Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Asbestos Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto. Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Asbestos Trust may, in specific limited circumstances, disclose information, documents or other materials reasonably necessary in the Asbestos Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement within the Asbestos Insurance Assets; provided, however, that the Asbestos Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as set forth in the written agreement of confidentiality. Nothing in this TDP, the Plan or the Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of

39

factual information to the Asbestos Trust for the purpose of obtaining compensation for asbestos-related injuries from the Asbestos Trust.

## SECTION 7.

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1    Showing Required.** To establish a valid Asbestos Claim, a claimant must meet the requirements set forth in this TDP.

**7.2    Costs Considered.** Notwithstanding any provisions of this TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos Claims so that the payment of valid Asbestos Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos Claim. The Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Asbestos Trust so that valid Asbestos Claims are not unduly further impaired by the costs of additional investigation. Nothing herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the Asbestos Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable pursuant to the Claims Audit Program described in Section 5.7 above or otherwise.

**7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.** Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio requirements set forth above, the Trustee shall proceed as quickly as possible to liquidate valid Asbestos Claims, and shall make payments to holders of such claims in accordance with this

40

TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustee, the purposes of the Asbestos Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Asbestos Trust faces temporary periods of limited liquidity, the Trustee may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, (c) offer a Reduced Payment Option as described in Section 2.5 above and/or (d) commence making payments on an installment basis.

**7.4    Punitive Damages.**  Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or paid, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos Trust in the tort system pursuant to Sections 5.9 above and 7.6 below. The only damages that may be awarded pursuant to this TDP to Alabama claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall

41

be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to the choice of law principles.

7.5    **Sequencing Adjustment.**

**7.5(a) In General.**  Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Asbestos Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, or for a period when the claim was deferred or withdrawn at the claimant's request. The sequencing adjustment factor shall be the one-year U.S. Treasury bill interest rate in effect on January 1 of the year in which the accrual of the sequencing adjustment commences. The rate of the sequencing adjustment shall be adjusted each January 1 to correspond to the one-year Treasury bill interest rate then in effect. The applicable sequencing adjustment shall be calculated based only on the value of the claim specified in Section 7.5(b) or (c) below, subject to the Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in such calculation.

**7.5(b) Unliquidated Asbestos Claims.**  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Asbestos Claim, whether the claim is liquidated under Expedited Review or by arbitration.  No sequencing adjustment shall be paid on any claim liquidated in the tort system pursuant to Section 5.9 above and Section 7.6 below.  Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against a Debtor prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; (c) the claim was filed with the

Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed with the Asbestos Trust after the Effective Date.

7.5(c) **Liquidated Pre-Petition Claims.** A sequencing adjustment shall also be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above. In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, the sequencing adjustment shall be measured from the date of payment back to the date that is one (1) year after the date that the verdict or judgment was entered; provided, however, that in no event shall the sequencing adjustment be measured from a date prior to the Petition Date if the liquidated value of the Pre-Petition Liquidated Claim includes pre-petition interest. In the case of Pre-Petition Liquidated Claims liquidated by a binding, judicially enforceable settlement, the sequencing adjustment shall be measured from the date of payment back to the date that is one (1) year after the Petition Date.

7.6    **Suits in the Tort System.** If the holder of a disputed claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim or the claimant's exposure history, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder may file a lawsuit against the Asbestos Trust in the Claimant's Jurisdiction as defined in Section 8.3 below. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos Trust, the case shall be treated as a personal injury

43

case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

      7.7    **Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Asbestos Trust an initial payment (subject to the applicable Payment Percentage and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Asbestos Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

      The total amounts paid with respect to such claims shall not exceed the relevant Scheduled Values for such Disease Levels as set forth in Section 5.3(a)(3) above.  Under no circumstances shall (a) a sequencing adjustment be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

      7.8    **Releases.**  As a condition to making a payment to a claimant, the Asbestos Trust shall obtain from such claimant a Release in the form attached hereto as Exhibit 1.  The Trustee may modify the provisions of the Release so long as he or she obtains the consent of the TAC and

the FCR. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of
a claimant may, in the discretion of the Asbestos Trust, constitute such a release.

**7.9    Third-Party Services.** Nothing in this TDP shall preclude the Asbestos Trust from
contracting with another asbestos claims resolution organization to provide services to the
Asbestos Trust so long as decisions about the categorization and liquidated value of Asbestos
Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled
Values, and Medical/Exposure Criteria set forth above.

<div align="center">

**SECTION 8.**

**MISCELLANEOUS**

</div>

**8.1    Amendments.** Except as otherwise provided herein, the Trustee may amend,
modify, delete, or add to any provisions of this TDP (including, without limitation, amendments
to conform this TDP to advances in scientific or medical knowledge or other changes in
circumstances), provided he or she first obtains the consent of the TAC and the FCR pursuant to
the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement, except that the
right to amend the Claims Payment Ratio is governed by the provisions of Section 2.5 above, and
the right to adjust the Payment Percentage is governed by Section 4.2 above. Nothing herein is
intended to preclude the TAC or the FCR from proposing to the Trustee, in writing, amendments
to this TDP. Any amendment proposed by the TAC or the FCR shall remain subject to Section 7.3
of the Trust Agreement.

**8.2    Severability.** Should any provision contained in this TDP be determined to be
unenforceable, such determination shall in no way limit or affect the enforceability and operative
effect of any and all other provisions of this TDP. Should any provision contained in this TDP be
determined to be inconsistent with or contrary to the Debtors' obligations to any insurance

<div align="center">

45

</div>

company providing insurance coverage to a Debtor in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, the Asbestos Trust with the consent of the TAC and the FCR may amend this TDP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

    **8.3**    **Governing Law.** Except for purposes of determining the liquidated value of any Asbestos Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of Asbestos Claims in the case of arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described below.

    For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against a Debtor in the tort system prior to the Petition Date. If the claim was not filed against a Debtor in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Asbestos Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility.

46

**Exhibit 1**

Duro Dyne Asbestos Personal Injury Trust Release and Indemnity Agreement

**[TO COME]**

**EXHIBIT E**

## DURO DYNE ASBESTOS PERSONAL INJURY TRUST

### RELEASE AND INDEMNITY AGREEMENT

NOTICE: THIS IS A BINDING DOCUMENT THAT AFFECTS YOUR LEGAL RIGHTS. PLEASE CONSULT YOUR ATTORNEY IN CONNECTION WITH EXECUTING THIS DOCUMENT. IF YOU DO NOT PRESENTLY HAVE AN ATTORNEY, YOU MAY WISH TO CONSIDER CONSULTING ONE.

All capitalized terms not defined herein shall have the respective meanings ascribed to them in either the Second Amended Prenegotiated Plan of Reorganization for Duro Dyne National Corp., et al., under Chapter 11 of the Bankruptcy Code, dated November 15, 2018, as confirmed by order of the United States Bankruptcy Court for the District of New Jersey in *In re Duro Dyne National Corp., et al.*, Case No. 18-27963, which confirmation was affirmed by an order of the United States District Court for the District of New Jersey (the "Plan"), or the Duro Dyne Asbestos Personal Injury Trust Distribution Procedures (the "TDP", which may be amended from time to time) adopted pursuant to the Plan.

WHEREAS, the undersigned, who is either the "Injured Party" or the/an "Official Representative"* (either being referred to herein as the "Claimant"), has filed a claim (the "Claim") with the Duro Dyne Asbestos Personal Injury Trust (the "Trust") pursuant to the TDP and such Claim asserts an Asbestos Claim for which one or more of Duro Dyne National Corp., Duro Dyne Corporation, Duro Dyne West Corp., Duro Dyne Midwest Corp., and Duro Dyne Machinery Corp. (the "Debtors") is alleged to have legal responsibility; and

WHEREAS, the Claimant has agreed to settle and compromise the Claim, for and in consideration of the allowance of the Claim by the Trust and its payment pursuant to the TDP in accordance with the terms set forth therein and herein.

NOW, THEREFORE, the Claimant hereby agrees as follows:

1.      On behalf of the Injured Party, the Injured Party's estate, the Injured Party's legal and personal representatives, heirs and/or anyone else claiming rights through the Injured Party, now and in the future, the Claimant hereby fully and finally RELEASES, ACQUITS, and FOREVER DISCHARGES (a) the Trust, the Trust Advisory Committee, the Legal Representative, and their respective trustees, members, directors, officers, agents, consultants, financial advisors, servants, employees, attorneys, heirs, legal and personal representatives, and executors and (b) the Debtors, the Reorganized Debtor, each of the Hinden Family Members, each of the Hinden Family Entities, each Settling Asbestos Insurer, and any other Protected Party (collectively "Releasees") from any and all Asbestos Claims (and any claims related thereto), except as expressly provided herein.

2.      Notwithstanding the paragraph immediately above or anything to the contrary contained herein, if the Claim involves a non-malignant asbestos-related disease (Disease Level I under the TDP), the Injured Party may, pursuant to Section 5.12 of the TDP, file a new Asbestos Claim against the Trust for a Lung Cancer 1 (Disease Level IV under the TDP) or Mesothelioma (Disease Level V under the TDP) that is diagnosed after the date of the Claimant's original submission of a proof of claim form to the Trust with respect to the Claim.

3.      The Claimant expressly covenants and agrees forever to refrain from bringing any suit or proceeding at law or in equity, against the Releasees with respect to any Asbestos Claim released herein.

4.      The Claimant intends this Release and Indemnity Agreement to be as broad and comprehensive as possible so that the Releasees shall never be liable, directly or indirectly, to the Injured Party or the Injured Party's heirs, legal or personal representatives, successors or assigns, or any other person or entity claiming by, through, under, or on behalf of the Injured Party, for or on account of any Asbestos Claim, except as expressly provided herein, whether the same is now known or unknown or may now be latent or may in the future appear to develop, including all spousal claims for the Injured Party's claims. If the Claimant is an Official Representative, the Claimant represents and warrants that the Claimant has all requisite legal authority to act for, bind and accept payment on behalf of the Injured Party and all legal or personal representatives and heirs of the Injured Party on account of any Asbestos Claim against the Trust and hereby agrees to indemnify and hold harmless, to the extent of payment hereunder, excluding attorney's fees and costs, the Releasees from any loss, cost, damage or expense arising out of or in connection with the rightful claim of any other Entity to payments with respect to the Injured Party's Asbestos Claim against the Trust.

5.      This Release and Indemnity Agreement is not intended to bar any cause of action, right, lien or claim that the Claimant may have against any alleged tortfeasor, or any other person or entity, not included in the definition of Releasees. The Claimant hereby expressly reserves all his or her rights against such persons or entities. This Release and Indemnity Agreement is not intended to release or discharge any Asbestos Claim or potential Asbestos Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any) or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to asbestos or asbestos-containing products.

6.      The Claimant represents and warrants that all valid liens or subrogation and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Asbestos Claim have been resolved or will be resolved from the net proceeds of the settlement payment to the Claimant under this Release and Indemnity Agreement or otherwise. It is further agreed and understood that no Releasee shall have any liability to the Claimant or any other person or entity in connection with such liens or subrogation and reimbursement claims and that the Claimant will indemnify and hold the Releasees harmless from any and all such alleged liability as provided in the following sentence. The Claimant will indemnify and hold the Releasees harmless, to the extent of the amount of payment hereunder, excluding attorney's fees and costs, from any and all liability arising from subrogation, indemnity, or contribution claims related to the Asbestos Claim released herein,

---

* The "Official Representative" is the/a person who under applicable state law or legal documentation has the authority to represent the Injured Party, the Injured Party's estate, or the Injured Party's heirs.

1

including those arising from any compensation or medical payments due, or claimed to be due, under any applicable law, regulation, or contract related to the Asbestos Claim released herein.

7.      It is further agreed and understood that if the Claimant has filed a civil action against the Trust, the Claimant shall dismiss such civil action and obtain the entry of an Order of Dismissal with Prejudice with respect to any Asbestos Claim released herein no later than 30 days after the date hereof.

8.      The Claimant understands that the Asbestos Claim released herein is being resolved by the Trust, and a liquidated value ($_____) has been established for such Claim. The Claimant acknowledges that, pursuant to the TDP, the Trust will only be able to pay the Claimant a percentage (the "Payment Percentage") of the liquidated value of such Claim. The Payment Percentage applicable to the Claim will be determined in the manner set forth in the TDP. The Claimant further acknowledges that the Payment Percentage is based on estimates that change over time, and that other claimants may have in the past received, or may in the future receive, a smaller or larger percentage of the value of their claims than the Claimant. The Claimant further acknowledges that, other than as specifically set forth in the TDP, the fact that earlier or later claimants may have been paid or may in the future be paid a smaller or larger percentage of the value of their claims shall not entitle the Claimant to any additional compensation from the Trust.

9.      In the event of a verdict against others, any judgment entered on the verdict that takes into account the status of the Trust as a joint tortfeasor legally responsible for the Injured Party's injuries shall be reduced by no more than the total and actual amount paid as consideration for this Release and Indemnity Agreement or such lesser amount as allowed by law.

10.     In the event that the Claimant pursues his or her rights under 4.13 of the Plan to bring litigation against the Reorganized Debtor for the purpose of seeking recovery from a Non-Settling Asbestos Insurer to obtain the benefit of Asbestos Insurance Coverage, and a Non-Settling Asbestos Insurer satisfies in full a judgment obtained in an action brought under Section 4.13 or 4.14 of the Plan, then the Trust will treat the Claim held by the Claimant as being assigned to the Non-Settling Asbestos Insurer(s) that satisfied the judgment for the purpose of paying any further amounts due on the claim to the assignee(s).

11.     The Claimant shall hold the Trust harmless from and against any and all Indirect Asbestos Claims that may be asserted against the Trust in connection with litigation under Section 4.13 or 4.14 of the Plan, including attorneys' fees and costs associated therewith.

12.     The Claimant understands, represents, and warrants that this Release and Indemnity Agreement is a compromise of a disputed claim and not an admission of liability by, or on the part of, the Releasees. Neither this Release and Indemnity Agreement, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be admissible as evidence against the Trust in any suit, claim, or proceeding of any nature except to enforce this Release and Indemnity Agreement. However, this Release and Indemnity Agreement is and may be asserted by the Releasees as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to the Asbestos Claim released herein, except as expressly provided herein.

13.     The Claimant (a) represents that no judgment debtor has satisfied in full or in part, the Trust's liability with respect to the Injured Party's Asbestos Claim as the result of a judgment entered in the tort system, and (b) upon information and belief, represents that the Claimant has not entered into a release (other than this Release and Indemnity Agreement) that discharges or releases the Trust's liability to the Claimant with respect to the Injured Party's Asbestos Claim.

14.     The Claimant represents that he or she understands that this Release and Indemnity Agreement constitutes a final and complete release of the Releasees with respect to the Injured Party's Asbestos Claim, except as expressly provided herein. The Claimant has relied solely upon his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Trust and the legal consequences of this Release and Indemnity Agreement, and not on any statement or representation made by or on behalf of the Trust.

15.     This Release and Indemnity Agreement contains the entire agreement between the parties and supersede all prior or contemporaneous, oral or written agreements or understandings relating to the subject matter hereof between or among any of the parties hereto, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Claim.

16.     This Release and Indemnity Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof and shall be binding on the Injured Party and his or her heirs, legal representatives, successors and assigns.

17.     TO THE EXTENT APPLICABLE, THE CLAIMANT HEREBY WAIVES ALL RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, AND ANY SIMILAR LAWS OF ANY OTHER STATE. CALIFORNIA CIVIL CODE SECTION 1542 STATES:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

THE CLAIMANT UNDERSTANDS AND ACKNOWLEDGES THAT BECAUSE OF THE CLAIMANT'S WAIVER OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, EVEN IF THE INJURED PARTY SHOULD EVENTUALLY SUFFER ADDITIONAL DAMAGES, THE INJURED PARTY WILL NOT BE ABLE TO MAKE ANY CLAIM AGAINST THE RELEASEES FOR THOSE DAMAGES, EXCEPT AS EXPRESSLY PROVIDED HEREIN. THE CLAIMANT ACKNOWLEDGES THAT HE OR SHE INTENDS THESE CONSEQUENCES.

{S1152260 2}                                          2

18.      If the Claimant's counsel directed the [CLAIMS PROCESSING FACILITY] ("___") to transmit to the Trust any information from ___ for purposes of settling the Claim, the Claimant acknowledges that the Claimant consented to the disclosure, transfer and/or exchange of information related to the Claim (including medical information) between the Trust and ___ in connection with ___'s processing of the Claim.

19.      The Claimant authorizes payment pursuant to Paragraph 8 to the Claimant or the Claimant's counsel, as trustee for the Claimant.

20.      The Claimant acknowledges that the Trust's obligation to pay the Claimant is not triggered until the Trust receives the executed Release and Indemnity Agreement from Claimant.

<div align="center">CERTIFICATION</div>

I state that I have carefully read the foregoing Release and Indemnity Agreement and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Claim is true according to my knowledge, information, and belief, and further that I have the authority as the Claimant to sign this Release and Indemnity Agreement.

I further represent and certify to the Trust that, in respect of the Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, the Claim.

I am: _____ the Injured Party
_____ the Official Representative of the Injured Party, the Injured Party's Estate, or the Injured Party's Heirs

EXECUTED this ___ day of _____, 20___

_____
Signature of the Claimant

Name of the Claimant: _____    SSN: _____

Name of the Injured Party if different from the Claimant: _____    SSN: _____

SWORN to and subscribed before me this ___ day of _____, 20___

_____
Notary Public
My Commission Expires: _____

**-OR-**

Signatures of two persons unrelated to the Claimant by blood or marriage who witnessed the signing of this Release and Indemnity Agreement

_____    _____
Witness Signature            Witness Signature

**EXHIBIT A**

**EXHIBIT B**

**EXHIBIT C**

**EXHIBIT D**

**EXHIBIT E**